1  **POMERANTZ LLP**
2  Jennifer Pafiti (SBN 282790)
   1100 Glendon Avenue, 15th Floor
3  Los Angeles, California 90024
   Telephone: (310) 405-7190
4  jpafiti@pomlaw.com

5  *Co-Lead Counsel for Plaintiffs*

6  *[Additional Counsel on Signature Page]*

7

8
                     UNITED STATES DISTRICT COURT
9                  NORTHERN DISTRICT OF CALIFORNIA
                          OAKLAND DIVISION
10

11 | IN RE FASTLY, INC. SECURITIES       | Case No. 4:24-cv-03170-JST
   | LITIGATION                          |
12 |                                     | CLASS ACTION
   |                                     |
13 |                                     | AMENDED COMPLAINT FOR
   |                                     | VIOLATION OF THE FEDERAL
14 | THIS DOCUMENT RELATES TO:           | SECURITIES LAWS
   | All Actions                         |
15 |                                     | DEMAND FOR JURY TRIAL
   |                                     |
16

17

18

19

20

21

22

23

24

25

26

27

28 {00637015;12 }
                AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................ 1

JURISDICTION AND VENUE ................................................................................ 8

PARTIES ................................................................................................................... 9

FORMER EMPLOYEES WHO SUBSTANTIATE THE ALLEGATIONS ............................. 10

SUBSTANTIVE ALLEGATIONS ............................................................................ 12

    Background ........................................................................................................ 12

    Fastly Experiences a Significant Customer Pullback Beginning in 2023........................ 15

    The Company Struggles to Acquire New Customers ........................................ 20

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................................. 22

    Defendants Mislead Investors During Q4 2023 About Macroeconomic Impacts on the
    Company's Business ......................................................................................... 23

    The Previously Downplayed Risks Begin to Materialize but Defendants Continue to
    Mislead Investors .............................................................................................. 24

    Defendants Fail to Disclose Information Required to be Disclosed Under Regulation S-K
    ........................................................................................................................... 29

    The Truth Begins to Emerge ............................................................................ 30

    Defendants Continue to Mislead Investors About its Existing Customers' Growth ........ 33

    The Full Truth Emerges .................................................................................... 36

SCIENTER ALLEGATIONS ................................................................................... 39

LOSS CAUSATION ................................................................................................. 44

NO SAFE HARBOR ................................................................................................ 45

APPLICABILITY OF PRESUMPTION OF RELIANCE .................................................. 45

(FRAUD-ON-THE-MARKET DOCTRINE) ................................................................. 45

PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................................................ 47

COUNT I ................................................................................................................. 49

COUNT II ................................................................................................................ 51

PRAYER FOR RELIEF ............................................................................................ 52

DEMAND FOR TRIAL BY JURY ........................................................................... 52

i

Lead Plaintiff Olger Guri ("Lead Plaintiff") and named plaintiff Ken Kula (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by Plaintiffs' attorneys, which included, among other things, a review of Fastly, Inc.'s ("Fastly" or the "Company") public documents, conference calls, statements, and announcements made by Fastly, Fastly's Chief Executive Officer, Todd Nightingale, and Fastly's Chief Financial Officer, Ronald Kisling (collectively, "Defendants"); United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fastly; analyst reports and advisories about the Company; interviews with former employees; and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Fastly securities between November 15, 2023 and August 7, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its executives.

2.      Fastly operates an edge cloud platform for processing, serving, and securing customer's applications. The edge cloud is a category of Infrastructure-as-a-Service ("IaaS") that enables developers to build, secure, and deliver digital experiences. Fastly's platform includes a Content Delivery Network ("CDN"), or a geographically distributed network of proxy servers and their data centers. Content owners, such as media companies and e-commerce vendors, pay CDN operators to deliver their content to their end users. In other words, Fastly's customers are delivering web experiences, whether in the form of applications, websites, or streaming services. Certain companies have adopted a "Multi-CDN" framework which combines multiple CDNs from various providers into one large global network.

3.      The bulk of the Company's revenue is derived from its existing customers' use of Fastly's platform, although the Company generates some revenue from additional products and other services, such as account management and customer support.

4.      Fastly charges customers based on their use of the Company's platform and typically enters into contracts that include a monthly minimum billing commitment in exchange for more favorable pricing terms.

5.      For the fiscal year ended December 31, 2023, roughly 95% of the Company's revenue was derived from customers' use of its platform and new customers contributed less than 10% of that revenue.

6.      The majority of the Company's revenue is generated by its enterprise customers, which, as explained more fully below, were previously defined as those customers with revenue in excess of $100,000 over the trailing 12-month period, but are currently defined as those customers with annualized current quarter revenue in excess of $100,000, which is calculated by taking the revenue recognized in the current quarter and multiplying it by four.

7.      The Company's ten largest customers, which one confidential witness referred to as "big whales," include large streaming accounts and other accounts in the media space such as TikTok, Amazon Video, Apple, Twitter (X), Netflix, Paramount, and Disney. These customers account for a significant portion of the Company's revenue, generating 37% of the Company's revenue in FY 2023.

8.      Thus, a decline in revenue from the Company's existing enterprise customers, especially its largest customers, or a decline in retention of such customers, could create volatility in the Company's revenue and materially impact Fastly's business.

9.      Against that backdrop, beginning in November 2023, Defendants began to mislead investors about how macroeconomic trends and uncertainties (*i.e.*, the impact of rising interest rates, banking instability, and recession fears) were affecting the Company's business.

10.     During a November 15, 2023 conference, in response to a question about whether "macro trends" were getting better, Nightingale replied: "The biggest pressure that people saw in

this area was like in small to medium SMB customers, maybe some of the mid market. We don't have a lot of exposure there. . . . [s]o I didn't see too many headwinds. The only thing we saw was a little bit of elongated deal flow." When pressed, Nightingale responded, "***My competitors are seeing these effects, some slowing in growth, and [] we're not seeing that***" (emphasis added).

11.     However, according to one confidential witness, such statements were "BS," and Nightingale was "probably just trying to keep the share price afloat."  That same confidential witness explained that 30 to 40% of the Company's sales team was dedicated to the small and medium-sized business ("SMB") segment of the market. Another confidential witness, who worked with mid market enterprise customers, described how beginning in March and April of 2023, customers began requesting more aggressive discounts. There was a direct correlation between when customers began asking for these discounts and when interest rates began rising significantly.

12.     In addition, one confidential witness explained that, contrary to Nightingale's November 2023 public statements, macro forces, such as rising interest rates, were "definitely in the business cycle" and in fact, negatively affecting the Company's revenues overall throughout 2023, including revenues from Fastly's largest customers, who were increasingly more price-conscious.

13.     Adding to the pressures on Fastly was the fact that Fastly's competitors (*i.e.*, Cloudflare, Akamai, and Imperva) in the CDN market had caught up to the Company in technological prowess. Thus, Fastly had far less leverage in negotiating prices with its customers.

14.     The previously downplayed risks of macro effects on the Company's business began to materialize when the Company announced its Q4 and FY 2023 financial results on February 14, 2024. The Company reported revenues of $506 million for FY 2023 and $137.8 million for Q4 2023. The reported Q4 2023 revenue was on the lower side of their previous guidance and, according to Zacks Investment Research, missed analysts' consensus estimates by 1.1%. In response to this news, Fastly's stock price fell significantly, from $23.54 to close at $16.34 on February 15, 2024, a decline of 30.59 %.

15.    However, Defendants continued to mislead investors by making misleading statements about the Company's customer retention rates and its existing customers' continued expansion of their use of Fastly's services. During the February 14, 2024 earnings call with investors and analysts, Nightingale stated that the Company's "customer retention efforts were stable in the fourth quarter." When pressed by analysts on whether there were fundamental changes to the business in light of macroeconomic trends and uncertainties  affecting the Company, Nightingale stated unequivocally in the conference call, "No, I think it was pretty much as we saw last quarter. A handful of deals may be taking a little longer than we thought, a little bit of deals elongation."

16.    However, according to various confidential witnesses, in 2023, the appetite for Fastly's services was declining. These confidential witnesses describe how numerous enterprise customers were canceling their contracts in 2023 and it was very difficult to land new clients. For example, Indeed and USAA did not renew their contracts with Fastly in 2023. In or around March and April of 2023, some enterprise customers began requesting steeper discounts when negotiating contract renewals with Fastly. The revenue decline became apparent to one confidential witness in November 2023, when they began to struggle to meet sales quotas. By the end of 2023, only 30 percent of salespeople met their revenue targets. Customers continued to experience a stagnation in growth in 2024.

17.    Both the macro impacts on the Company's business and the declining appetite for Fastly's services was well known throughout the Company and the Company's C-Suite because the Company regularly held quarterly "all hands" meetings at the Company's San Francisco office, which discussed the overall state of the business, including, but not limited to, the effect of macro forces on the Company's business in 2023. All hands meetings typically were held a week after the Company's earnings calls and would provide a recap of what was discussed during the earnings call. They would include slide deck presentations and were attended by the Company's C-Suite and all employees, who either attended in-person or could tune into the meetings live via Vimeo. Recordings of the meetings were distributed to all employees by email after the meeting.

18.    By November 2023, during these all hands meetings, Nightingale was discussing how the Company's largest accounts were not bringing in as much traffic to Fastly. Specifically, during the November 2023 all hands meeting, which occurred shortly after Fastly's November 1, 2023 Q3 2023 earnings call, Nightingale spoke about "decreasing revenue from [the Company's] big customers" and discussed how Fastly's large media accounts had "throttled down" their usage, warning that a specific streaming company was "***throttling things back, which is why revenue is down***" (emphasis added). One confidential witness corroborated seeing this trend with their customers, stating that "New business really started falling off a cliff in Q4 [2023]."

19.    The decline in traffic was also known to Defendants because the Company's top executives – including, occasionally, Nightingale – attended weekly meetings throughout the relevant period, during which the Company's customers were rated based on how much traffic they were transmitting through Fastly's platform. If a major enterprise customer continued to be rated poorly, a "tiger team" was assembled to focus on improving that customer's performance.

20.    Notwithstanding the discussion behind the scenes about the Company's largest customers "throttling things back" in November 2023, during the February 14, 2024 earnings call, Nightingale also misleadingly attributed the Company coming in at the lower end of its guidance range to "weaker than anticipated international traffic, offset by seasonally strong live streaming and gaming activity" while omitting the critical information that a substantial contributor to the revenue decline was several of the Company's largest customers simultaneously experiencing a decline in traffic.

21.    Defendants continued to make similarly misleading statements in its annual report filed on February 22, 2024, touting that the Company's existing enterprise customers were increasing their spend on Fastly's platform and continuing to drive the Company's revenue growth. Further, Defendants claimed that any chance of its existing customers decreasing their use of Fastly's platform was a ***hypothetical risk***, despite the fact that the risk had already materialized.

22.    Additional negative information corrective of Defendants' prior misrepresentations emerged on May 1, 2024, when Fastly hosted an earnings call to discuss the Company's Q1 2024

financial results. During that call, Defendants decreased the company's FY 2024 revenue projections from a range of $580 million to $590 million to a range of $555 million to $565 million, blaming the decline in revenue on some of the Company's largest customers.

23. Specifically, Defendants disclosed that the "biggest factor" contributing to a revenue decline was "a reduction of revenue from a small number of [the Company's] largest customers," explaining that there was "a slight uptick from the typical level of rerates with [the Company's] largest customers," which was not accompanied by "the commensurate traffic expansion usually associated with this motion."

24. When pressed for further detail on the timing of that pricing pressure from some of the Company's largest accounts, Kisling clarified "[A] lot of that arose really at the end of March and in early April" with "negotiations result[ing] in bigger discounts than we thought that did not come with the typical increase in traffic that we've seen historically."

25. Analysts reacted negatively to the volatility with some of the Company's largest customers. For example, on May 2, 2024, BofA downgraded Fastly stock from "Buy" to "Underperform," citing the "[d]ecelerating growth in Fastly's largest customers" as a basis to question "a rebound in 2024." Similarly, D.A. Davidson downgraded Fastly's stock from "Buy" to "NEUTRAL," expressing concern about the Company's apparent expectation to "recover[] traffic with large customers," and stating "[w]e cannot get comfortable with that premise given what's transpired over the last two quarters."

26. Following these developments, Fastly's stock price fell $4.14 per share, or 32.02%, to close at $8.79 per share on May 2, 2024.

27. Nevertheless, Defendants continued to withhold the full truth from investors about the Company's revenue prospects from its existing enterprise customers, including its largest customers.

28. During the May 2, 2024 earnings call, Nightingale portrayed the revenue decline from the Company's top customers as stabilizing, stating: "Right now, we have already launched

a new engagement model. We're driving a far higher touch across all those major accounts. We've been running it for a couple of weeks now, and we're – I'm pretty happy with the progress so far."

29.    In reality, Defendants had not made any progress with its largest customers. To the contrary, according to one confidential witness who was tasked with developing a product for two of the Company's largest customers, Apple and Amazon, Apple and Amazon had been requesting the product since 2023 and the Company promised to deliver it by the end of 2023, but the Company had not even begun working on it until May 2024. Nightingale told that confidential witness to do whatever was needed to get the project done.

30.    Defendants also continued to mislead investors about the Company continuing to drive growth through existing customers. In the Company's Q1 2024 Quarterly Report filed on Form 10-Q on May 1, 2024, Defendants repeated that the Company is "focused on . . . expanding [its] relationship with existing customers" and "emphasize[s] retaining [its] customers and expanding their usage of [Fastly's] platform and adoption of [the Company's] other products."

31.    However, by that time, Defendants had shifted the Company's focus away from driving revenue growth through existing customers, implementing a new sales strategy using a new compensation model in 2024 that prioritized revenue generated from new customer acquisitions over existing customers, thereby incentivizing the sales team to focus their efforts on new customer growth. Historically, new customers only accounted for less than 10% of the Company's revenue derived from the use of its platform.

32.    The Company's Q1 2024 Quarterly Report also discussed the risk of existing customers, especially the Company's largest customers, decreasing their use of the Company's platform as hypothetical risks when, in reality, the risk had already materialized, as existing customers' use of Fastly's platform had been stagnating for at least a quarter.

33.    The full truth came to light on August 7, 2024, when the Company hosted an earnings call to discuss its Q2 2024 financial results and disclosed that revenue from the Company's largest customers was continuing to decline and the Company had shifted its focus towards new customer acquisitions in order to diversify and mitigate the Company's dependence

on its largest customers. Fastly's top 10 customers' revenue share had fallen from 40% to 34% in two quarters.

34.     Analysts reacted negatively. For instance, on August 7, 2024, Piper Sandler noted there was now "likely *lack of management credibility* for at least the next few quarters" (emphasis added). In an August 8, 2024 report, Craig-Hallum Capital noted that "[t]he team did make it clear that the decline was not in the whole top 10, but a 'small handful' of the top 10 in the media vertical. This would seem to imply declines of major magnitude at those customers, something on the order of *halving* revenue at those three or four customers." (emphasis added). It added, "*[t]here will be questions around management's visibility after this surprise*" and "FSLY is *bleeding badly when it comes to large customers and is providing very little visibility. . . . [I[nvestors are going to need more information*" (emphasis added).

35.     Following these developments, Fastly's stock price fell $0.98 per share, or 14.33%, to close at $5.86 per share on August 8, 2024.

36.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

37.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

38.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

39.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Fastly is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

40.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

41.     Lead Plaintiff acquired Fastly securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

42.     Named Plaintiff Ken Kula acquired Fastly securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

43.     Defendant Fastly is a Delaware corporation with principal executive offices located at 475 Brannan Street, Suite 300, San Francisco, California 94107. The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "FSLY."

44.     Defendant Nightingale has served as Fastly's Chief Executive Officer at all relevant times.

45.     Defendant Kisling has served as Fastly's Chief Financial Officer at all relevant times.

46.     Defendants Nightingale and Kisling are collectively referred to herein as the "Individual Defendants."

47.     The Individual Defendants possessed the power and authority to control the contents of Fastly's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Fastly's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Fastly, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and

misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

48.    Fastly and the Individual Defendants are collectively referred to herein as "Defendants."

## FORMER EMPLOYEES WHO SUBSTANTIATE THE ALLEGATIONS

49.    CW1 worked for Fastly remotely out of Dallas as an Enterprise Sales Director from December 2021 through September 2024. CW1 reported to a Director of Sales, who reported to a Senior Vice President of Sales, who reported to the Chief Revenue Officer. CW1 worked with both new and existing customers and had a portfolio of about twenty companies, which included several Fortune 500 companies. CW1 was responsible for selling Fastly's security services and managing existing customers. By the end of CW1's employment at Fastly, CW1's job was heavily focused on acquiring new customers.

50.    CW2 worked for Fastly both remotely and out of the Culver City office as a Senior Account Executive for the West Coast from September 2022 until August 2024. CW2 reported to Robbie Leukam, a current Senior Sales Leader for the West Coast, who reported to TJ Michie, a Senior Vice President of Sales. CW2 managed around fifty mid-market enterprise customers and was involved in contract renewals, as well as "cross-selling," *i.e.*, working with existing customers to see if they could benefit from additional services offered by Fastly. CW2 worked with both new and existing mid-market enterprise customers.

51.    CW3 worked for Fastly remotely from New Hampshire as an Enterprise Account Manager from September 2021 until April 2024 and reported to the Director of Account Management. CW3 was part of the Northeast enterprise account team, which focused on managing clients that brought in more than $100 million/year in revenue. These clients included some of the biggest clients at Fastly. CW3's job responsibilities included engaging in contract negotiations with customers and trying to upsell those customers by getting them to agree to use more of Fastly' services. CW3 was given quotas to meet on a "half-year" basis.

52.    CW4 worked remotely for Fastly as a Senior Enterprise Account Executive for the West Coast sales team from July 2023 through April 2024 and reported to the West Coast Enterprise Sales Director. CW4 focused on customer growth and acquisition and managed a portfolio of about ten enterprise customers. CW4's duties included reaching out to potential new business, going to sales events, and meeting with current customers looking for expansion opportunities. CW4 was tasked with attempting to bring on about one hundred and fifty businesses as customers.

53.    CW5 worked for Fastly as a Technical Program Manager from March 2021 until August 2024, and reported to the VP of Product Operations, Chris Domergue, who reported to the Chief Product Officer, currently Kip Compton. CW5 worked remotely but went into the San Francisco office about once a month. CW5 formed teams to develop new products at Fastly and CW5's responsibilities included assigning engineers to new roles, maintaining deadlines, and overseeing progress. CW5 interacted with many different departments, including the engineering, marketing, and sales teams. Following the release of the Q1 2024 results in May 2024, CW5 was tasked with developing a product for two of Fastly's biggest accounts, Apple and Amazon. The product consisted of a "staging environment" that would allow those companies to test out new web features before they go live on their platformsand functions much like a dress rehearsal where web engineers can evaluate how well a new product or tool works on their website before it is implemented.

54.    CW6 worked for Fastly remotely out of California as a Website Producer from January 2021 through August 2024 and reported to a Web Production Manager, Chris LeCompte, who is no longer employed by Fastly. CW6's job responsibilities included managing Fastly's marketing website, overseeing content updates, and making the website more accessible for the public. CW6 was in charge of search engine optimization to improve page rankings and resolving any bugs on the website's backend.

55.    CW7 worked for Fastly, both remotely and based out of Fastly's headquarters in San Francisco, as a Senior Program Manager from February 2016 through September 2023. CW7's

immediate boss was a Senior Manager, Jordana Pilmanis, who is no longer employed by Fastly. CW7 was part of the Client Services team, also known as the Customer Ops team, and CW7's daily responsibilities included setting up meetings for new customers switching over to Fastly's CDN. CW7 worked with large enterprise clients to ensure everything ran smoothly as they integrated Fastly's services to their operations and stepped in to resolve any issues the enterprise customer had. CW7 also sent executive management weekly, and sometimes daily, end-of-day reports to an email address for the C-Suite. During CW7's final year with Fastly, CW7 managed large live events for streaming companies, which included high-traffic events like the premiere of a hit TV show or popular live sports broadcasts. For example, CW7 oversaw Fastly's contract with CBS for hosting the Super Bowl, ensuring the CDN could handle the massive influx of viewers for such a major event.

## SUBSTANTIVE ALLEGATIONS

### Background

56.    Fastly operates an edge cloud platform for processing, serving, and securing its customer's applications in the U.S., the Asia Pacific, Europe, and other international locations. The edge cloud is a category of IaaS that enables developers to build, secure, and deliver digital experiences. Organizations seeking to improve their user experience (*i.e.*, by faster loading websites) can benefit from processing at the edge.

57.    Fastly's customers include organizations across many different industries. According to CW1, the majority of the Company's top ten customers are in the media space (*i.e.*, TikTok, Apple, Twitter (X), Paramount, and Amazon Video), known at Fastly as the "media accounts."

58.    The Company generates substantially all of its revenue from charging customers based on their usage of Fastly's platform, measured in gigabytes.

59.    Typically, the Company enters into one-year contracts with customers, which include a minimum monthly billing commitment in exchange for more favorable pricing terms,

although terms may vary by contract. Most of the Company's contracts are non-cancelable over the contractual term.

60.    However, the Company also generates some revenue from additional products and professional and other services, such as implementation, account management, and customer support. The Company charges a flat one-time fee or recurring monthly fee for the additional products and services.

61.    According to CW2, negotiations for existing customer contracts typically begin three months before the contract is set to expire, particularly with larger enterprise customers.

62.    The bulk of the Company's revenue is derived from existing customers' usage of Fastly's platform.

63.    For the years ended December 31, 2023 and 2022, approximately 95% and 94% of the Company's revenue, respectively, was driven by usage of its platform. New customers contributed less than 10% of that revenue.

64.    Historically, the Company's revenue has been driven primarily by its enterprise customers who leverage the platform substantially from a usage standpoint.

65.    The Company previously defined enterprise customers as those customers with revenue in excess of $100,000 over the trailing 12-month period. However, in 2023, the Company updated its methodology and redefined enterprise customers as those customers with annualized current quarter revenue in excess of $100,000, which is calculated by taking the revenue recognized in the current quarter and multiplying it by four.

66.    Under the prior methodology, the comparative revenue generated from enterprise customers versus non-enterprise customers for FY 2021, 2022, and 2023 was as follows:

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Enterprise customers | $458,472,000 | $386,853,000 | $313,360,000 |
| Non-enterprise customers | $47,516,000 | $45,872,000 | $40,970,000 |
| Total Revenue | $505,988,000 | $432,725,000 | $354,330,000 |

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

67.     Under the new methodology, the comparative revenue generated from enterprise customers versus non-enterprise customers for FY 2021, 2022, and 2023 was as follows:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Enterprise customers | $464,452,000 | $393,152,000 | $315,918,000 |
| Non-enterprise customers | $41,536,000 | $39,573,000 | $38,412,000 |
| Total Revenue | $505,988,000 | $432,725,000 | $354,330,000 |

68.     The Company's ten largest customers account for a significant portion of its revenue. In FY 2022, the ten largest customers generated an aggregate of 35% of the Company's revenue and in FY 2023, they generated an aggregate of 37% of the Company's revenue.

69.     Thus, changes in usage by these customers can create volatility in the Company's revenue.

70.     The Company measures revenue growth from existing customers – either through increased usage of Fastly's platform or purchase of additional products or services – using three key metrics: Dollar-Based Net Expansion Rate ("DBNER"), Net Retention Rate ("NRR") and Last-Twelve Months Net Retention Rate ("LTM NRR").

71.     DBNER measures the Company's expansion of business with existing customers and provides insight into how effectively the Company is retaining and expanding its customer base over a specific period. DBNER increases when customers increase their usage of Fastly's platform or purchase additional products. It declines when customers reduce their usage of Fastly's platform, obtain lower pricing on their existing usage, or curtail their purchases of additional products. DBNER measures expansion only among continuing customers and does not indicate any decrease in revenue attributable to former customers.

72.      DBNER is calculated by dividing revenue for a given period from customers who remained customers as of the last day of the given period (the current period) by revenue from the same customers for the same period measured one year prior (the base period). The revenue included in the current period excludes customers that churned (*i.e.,* terminated services) after the

end of the base period and new customers that entered into customer agreements after the end of the base period.

73.     NRR captures the ability of the Company to retain revenue from existing customers over a specific period by measuring the change in revenue generated by existing customers from one period to another. Fastly calculates NRR by dividing revenue derived from existing customers in the last month of the period by revenue from those same customers during the last month of the same period one year prior.

74.     NRR is a metric that tracks growth from existing customers without factoring in new customer acquisition. A low NRR could indicate customer churn or dissatisfaction. A NRR greater than 100% is a growth indicator.

75.     Beginning in Q1 2024, the Company discontinued disclosing quarterly NRR and DBNER. The Company had reported DBNER as a key metric since its first quarterly report, its Q2 2019 quarterly report filed with the SEC on Form 10-Q on August 9, 2019. The Company had reported quarterly NRR as a key metric since its Q2 2020 quarterly report filed with the SEC on Form 10-Q on August 7, 2020. The Company still discloses LTM NRR, which it described as "intended to be supplemental to our NRR" when it first began disclosing LTM NRR in the Company's Q3 2020 Quarterly Report filed on November 6, 2020.

**Fastly Experiences a Significant Customer Pullback Beginning in 2023**

76.     During the Class Period, Nightingale denied that macro forces were having an impact on the Company's business, claiming that factors that had negatively impacted its competitors did not apply to Fastly because Fastly was not exposed to the type of customer where the market weakness was being felt (the SMB customer market).

77.     However, in reality, the Company did face exposure from SMB customers who, according to CW2, specifically cited economic reasons and noted a correlation with rising interest rates as a reason for customers' requests for better pricing. Starting in March and April 2023, CW2's mid-market enterprise customers began requesting more aggressive discounts when renewing their contracts with Fastly and threatened to terminate services with Fastly. According

to CW2, customers were requesting these deals due to economic concerns and there was a direct correlation between when customers began asking for discounts and when interest rates began significantly rising. On average, customers were asking for a ten percent cut to their rates. Rather than agreeing to a discounted rate, Fastly often compromised by not increasing rates in the renewal contracts for these usage-based customers.

78.    According to CW2, when considering whether to agree to discounted rates, a major component Fastly considers is how much traffic the customer is driving towards Fastly. CW2 had to get approval from a VP of Sales for discounts that went past a certain threshold. The Company had a system in place that once a contract would go above a certain percentage of a discount, it required executive approval.

79.    CW1 similarly described how macro forces, such as rising interest rates, were "definitely in the business cycle" and in fact, negatively affecting the Company's revenues overall throughout 2023, including revenues from Fastly's largest customers, who were increasingly more price-conscious. CW1 referred to Nightingale's macro statements as "BS," and stated Nightingale was "probably just trying to keep the share price afloat."

80.    Moreover, according to CW1, macro forces were negatively impacting the Company's business as a whole, as even the largest customers were becoming increasingly price conscious and demanding better pricing. Adding to the pressures on Fastly was the fact that Fastly's competitors (*i.e.,* Cloudflare, Akamai, and Imperva) in the CDN market had caught up to the Company in technological prowess. Thus, Fastly had far less leverage in negotiating prices with its customers. CW1 confirmed that these macro concerns were discussed at the Company's all hands meetings throughout 2023.

81.    Defendants also touted that the Company's revenue growth was being driven by existing enterprise customers even as Defendants knew that revenue from existing enterprise customers, including the Company's largest enterprise customers, was on the decline.

82.    Beginning in 2023 and throughout 2024, existing enterprise customers were losing their appetite for Fastly's services.

16

83. During 2023, several of CW1's enterprise customers cancelled their contracts. For example, Indeed cancelled its $500,000/year security contract with Fastly in April 2023 because Fastly did not have the capability to fulfill their requirements for a bot solution. USAA's two-year $400,000 deal ended in November 2023 because the Company never implemented Fastly's software and CW1 could not convince the Company to deploy it.

84. In both instances, CW1 knew more than six months before the contracts were set to renew that it would be difficult to keep those customers.

85. CW1 also shared concerns about losing the $500,000/year contract if Fastly could not meet the customer's requirements all the way up to the founder of the Company, Artur Bergman.

86. CW4 worked on contract renewals for roughly ten existing customers between July 2023 through April 2024, and during that time period, only two of those customers were expanding their business with Fastly, while the majority of CW4's customers were stagnant in how they used Fastly year over year.

87. CW3, whose team handled clients responsible for at least $100 million of revenues, began to notice that revenues were declining for CW3's largest customers in November 2023 because CW3 began struggling to meet the quotas that the Company set for CW3. By the end of 2023, CW3 was about 40% short of meeting the quota set for CW3. CW3's colleagues were facing similar struggles with both large and small accounts. CW3 explained customers were no longer expanding their contracts with Fastly due to "tightening budgets" on their end, a general downturn in the tech sector as a whole, and sometimes being offered a better deal from competitors.

88. According to CW1, the Company's C-Suite "absolutely" knew by November 2023 that revenue for its larger customers was expected to decline because this issue was specifically being discussed in all hands meetings being held during Q4 2023 at these meetings. Nightingale discussed how large accounts were not bringing in as much traffic to Fastly, and the revenue derived from the large accounts was decreasing. He explained measures the Company was taking

to address the decrease in traffic, such as assigning more "customer success" employees to the big accounts and using analytics to identify which accounts were slowing down the most.

89.    CW6 corroborated CW1's account, describing that during all hands meetings during the last two quarters of 2023, including the November 2023 all hands meeting that occurred shortly after Fastly's November 1, 2023 Q3 2023 earnings call, Nightingale discussed how several of the Company's large media accounts were not bringing in as much traffic to Fastly. During that all hands meeting, Nightingale spoke about "decreasing revenue from [the Company's] big customers" and how Fastly's large media accounts had had "throttled down" their usage simultaneously, resulting in a decrease in revenue. Nightingale warned that a specific streaming company was "***throttling things back, which is why revenue is down***" (emphasis added).

90.    CW6 explained, during all hands meetings, Nightingale also discussed how the Company was trying to lessen its reliance on these big accounts by acquiring several other large enterprise accounts because he was concerned about Fastly's revenue model relying on just a handful of big streaming accounts (*i.e.*, Netflix and Disney), which CW6 described as "big whales" and which were known to fluctuate in how much they used Fastly's services.

91.    According to CW6, the Company's C-Suite and all employees attended the all hands meetings either in-person in the San Francisco office or remotely via Vimeo. The meetings included slide deck presentations and recordings of the meetings were distributed to all employees by email. The meetings were held regularly every quarter and typically occurred a week after the Company's earnings call. The meetings would include slide deck presentations and there would be a recap of what was discussed during the earnings call.

92.    In addition, the Company also regularly tracked its customers' usage of Fastly's platform and their traffic flow.

93.    According to CW1, employees at Fastly can track how much traffic a customer is using through an internal tool known as the "Fastly App" and anyone managing those accounts would be able to see traffic flow. The app is mostly used by the customer success and engineering teams to analyze performance.

94.   CW7 explained the Company also held weekly Customer Ops meetings, since at least as far back as 2022, to address customer issues and track bandwidth usage (*i.e.*, how much traffic was being transmitted through Fastly's platform) brought in by top clients, which took place every Thursday, typically at either 10 or 11 a.m. PT.

95.   These meetings were attended by around fifty to seventy-five people via Zoom and were recorded and uploaded to the Company's intranet for individuals unable to attend the meeting live.

96.   These meetings were cross-functional and included Account Managers, Technical Account Managers, Engineers, Customer Operations, and Sales team members. . During the meetings, account managers would present the amount of bandwidth (also referred to as the "throughput") that each customer was using and Fastly used a red/yellow/green system to indicate how much bandwidth its top customers were using, with red representing a customer who was not using as much bandwidth as expected or desired.

97.   A slide deck, compiled by Fastly's Vice President of Customer Support, Kami Richey, was always used at the meetings, showing each client's name and their color status. Every week, the Vice President of Customer Support gathered throughput data from the Account Managers, who monitored those numbers daily, and put that information in the slide deck.

98.   During the meetings, Account Managers or Technical Account Managers typically provided the overview, with Account Managers talking about their top customers. If a major customer had opened a support ticket, that would also be a key topic of discussion and an engineering employee would provide a summary of the issue and the steps being taken to resolve it. A support person also would present on the top support tickets and big customer tickets. The meetings would also include discussion about any type of security incident that would affect everyone.

99.   Fastly's Chief Customer Officer, Kim Ogletree, and the Vice President of Global Customer Success, Windy Mesquita, regularly attended these meetings. Nightingale would also occasionally join the meetings.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

100.    If a major enterprise customer remained in "red" status week after week, the Chief Customer Officer, Vice President of Global Customer Success, and Vice President of Customer Support would assemble a "tiger team" to focus on improving the customer's performance.

101.    CW7 recalled that by March 2023, Ticketmaster was one larger enterprise customer that consistently had issues with Fastly's services, was labeled "red" status in terms of throughput usage, and frequently threatened to cancel its contract with Fastly. These issues dated as far back as November 2022, with CW7 describing an incident involving Taylor Swift "Eras Tour" tickets, and Ticketmaster's system crashing due to several backend technical failures. CW7 explained Ticketmaster blamed Fastly for the issue.

102.    In addition, according to CW1, it was well known throughout the Company, beginning in some point during 2023, that the Company was at high risk of eventually losing TikTok as a customer because TikTok had begun "building out their own network," which would result in TikTok transitioning off of Fastly at some point.

103.    According to CW1, after the Q1 2024 results were released, the Company's leaders set up a "war room" and "tiger team," headed by the Chief Customer Officer, Kim Ogletree, to address the substantial drop in traffic from the Company's bigger customers. The tiger team was made up of employees involved with "customer success."

104.    In subsequent all hands meetings, CW6 recalled Nightingale discussing how several of the Company's top ten accounts were simultaneously reducing usage.

**The Company Struggles to Acquire New Customers**

105.    As revenue from existing customers, including the Company's largest customers, declined, the Company shifted its sales teams' focus towards acquiring new business, despite the fact that the vast majority of the Company's revenue was historically derived from existing customers and Defendants continued to publicly emphasize that the Company was driving revenue growth from existing customers.

106.    Behind the scenes, according to CW6, Nightingale and the new Chief Revenue Officer put together teams to try to obtain business from several bigger companies in 2024.

107.    Further, according to CW1, CW2, CW3, and CW4, Fastly reconfigured its sales compensation plan in 2024 in a manner that prioritized revenue secured from new accounts (also referred to as new "logos") over revenue generated from existing customers, thereby discouraging sales team members from continuing to attempt to drive growth from existing clients.

108.    According to CW4, prior to 2024, the sales compensation model weighed all additional revenue a sales employee secured equally, regardless of whether it was generated from a new or existing customer. Under the new model implemented in 2024, sales employees received fifty percent more pay on revenue acquired from new customers, while the pay-out for revenue gained from cross-sells, upsells, and renewals was substantially lowered. CW2 explained revenue secured from renewals, cross-sells, and upsells was no longer a significant factor because the Company was only counting new logos. CW1 corroborated that "the entire focus of the organization shifted to new business" and "[i]t was almost punitive to continue to work with your existing clients."

109.    CW4's boss explained to CW4 and CW4's colleagues that the basis for the new compensation plan was that Fastly needed to acquire new customers in order to succeed.

110.    However, according to CW1, new business "dried up" and started "falling off a cliff" during Q4 2023. No new contracts were being signed. CW1 explained potential customers were not interested in CW1's proposals because Fastly was offering only a slightly better deal than their current provider, but it would require a lot of resources and energy to implement Fastly's software.

111.    CW1 stated that the Company fell far short of the unrealistic sales goals it had set for new customer acquisitions for 2023. The Company's 2023 target was set at around a lofty one hundred and seventy new logos. However, CW1 only managed to bring on two new enterprise customers throughout all of 2023 and CW1 ranked as number two across the entire enterprise team. The number one person on the enterprise team was only able to bring on three new customers. Several colleagues were unable to bring on even one new customer that year.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

112.     In 2023, only 30% of the Company's salespeople were able to meet their targets, a fact that was conveyed to CW1 and others by TJ Michie, the Senior VP of Sales for Fastly.

113.     CW4 and the entire West Coast sales team, which was made up of six other sales executives and account managers, were unable to acquire any new business during CW4's tenure with the Company (July 2023-April 2024). Each week CW4 and CW4's boss had one-on-one meetings, and the West Coast sales team had weekly meetings during which the primary topic discussed was the lack of new customers that the team was bringing in. While CW4's boss was concerned about the lack of new business in the latter half of 2023, that concern escalated during 2024. Acquiring new customers was the main topic of conversation starting in 2024 until CW4 left Fastly in April 2024.

114.     CW3 stated the Company began setting unrealistic quotas for the enterprise account managers in the first two months of 2024 and the new sales compensation plan made it even more challenging to meet the targets set by the Company.

115.     According to CW2, sales teams struggled to meet the 2024 quota numbers and Fastly starting using performance improvement plans around April 2024. After CW3 left Fastly in April 2024, CW3 similarly heard that Fastly had begun instituting performance improvement plans in an effort to boost revenues and "increase quota attainment" and if employees failed to show signs of improvement, they were "on the chopping block."

116.     Notwithstanding the lack of monetary incentive to drive revenue through existing customers, CW2 continued to have renewal meetings with existing customers in 2024, describing it as follows: "we want[ed] to do the right thing and take care of them, but would not get compensated for it." However, CW2's customers did not have the appetite for more of Fastly's software and experienced a stagnation in growth that continued until CW2 left Fastly in August 2024.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

**Defendants Mislead Investors During Q4 2023 About Macroeconomic Impacts on the Company's Business**

117.    During a November 15, 2023 conference call involving Nightingale, Kisling, and Rishi Jaluria from RBC Capital Markets, Defendants made misleading statements regarding macro impacts on the Company's business.

118.    Specifically, when asked whether macro trends were getting better, Nightingale replied: "The biggest pressure that people saw in this area was like in small to medium SMB customers, maybe some of the mid market. We don't have a lot of exposure there. I wish [we] did have more exposure, and I am working to make our products simpler so we can. But I didn't have a lot of exposure. Financial services customers and telco customers, again, if I would had more exposure there, I probably would have seen more."

119.    In a follow-up question, Jaluria referenced how "[O]n the last earnings call, you did talk about some budget tightening that you had started to see."

120.    Nightingale responded that "[F]or the last three or four quarters, I've gotten this question in each earnings call about what are we seeing from the macro. ***My competitors are seeing these effects, some slowing in growth, and [] we're not seeing that***" (emphasis added).

121.    These statements were materially false or misleading because (i) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts; (ii) according to CW1 and CW2, customers were requesting more aggressive discounts in March and April 2023 due to economic concerns (*i.e.*, rising interest rates); (iii) the negative effect of macro forces such as rising interest rates had been generally discussed among Company executives at all hands meetings throughout 2023; and (iv) Fastly was exposed to these macro pressures because Fastly's competitors in the CDN market had improved their services such that they were at least on par with Fastly, if not superior, and, as a result, Fastly had far less leverage in negotiating prices with its customers and was experiencing increased pricing pressure. Thus, contrary to Nightingale's statement, macro forces were, in fact, negatively affecting the Company and slowing its growth.

**The Previously Downplayed Risks Begin to Materialize but Defendants Continue to Mislead Investors**

122.    During after-market hours on February 14, 2024, the Company issued a press release announcing the Company's Q4 and FY 2023 financial results and an investor supplement discussing the Company's Q4 and FY 2023 financial results. The Company reported revenues of $506 million for FY 2023 and $137.8 million for Q4 2024. The reported Q4 2023 revenue was on the lower side of their previous guidance and, according to Zacks Investment Research, missed analysts' consensus estimates by 1.1%. In response to this news, the Company's stock price fell from $23.54 to close at $16.34 on February 15, 2024, a decline of 30.59 %.

123.    The press release also provided FY 2024 guidance in a range of $580 million to $590 million.

124.    On that same day, the Company hosted an earnings call with investors and analysts to discuss the Company's Q4 and FY 2023 financial results (the "Q4 2023 Earnings Call"), during which Nightingale and Kisling made materially false and misleading statements.

125.    First, Nightingale stated that the Company's "customer retention efforts were stable in the fourth quarter."

126.    Second, Kisling indicated that the projected revenue range of $580 to $590 million was based on, *inter alia*, the Company's "expectation for . . . revenue growth through the year driven by . . . continued expansion of existing customers."

127.    The statements quoted in ¶¶ 125-126 were materially false or misleading because Nightingale and Kisling suggested that the Company's revenue from existing customers was, at least, stable, and would likely grow in 2024, despite the fact that (i) the Company's revenue from its larger enterprise customers had been declining because they were not bringing in as much traffic to Fastly, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline, and (ii) the Company's revenue from some of its largest customers was likely going to continue to decline because some of their contracts were up for renewal and by that time, those customers were already

demanding more favorable pricing; (iii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts; and (iv) the Company had shifted its sales strategy using a new compensation plan, beginning in 2024, to prioritize new customer acquisitions over generating revenue from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

128.    The fact that the Company's existing customers were decreasing their use of Fastly's platform was material because the Company derived the vast majority of its revenue from such customers. For example, in FY 2023, 95% of the Company's revenue was derived from the usage of its platform and new customers only contributed less than 10% of that revenue.

129.    Further, the fact that the Company's largest customers, in particular, were decreasing their use of Fastly's platform also was material because the ten largest customers accounted for a substantial portion of the Company's revenue. In FY 2023, they generated an aggregate of 37% of the Company's revenue.

130.    During the Q4 2023 Earnings Call, Nightingale also attributed the Company's revenue coming in at the lower end of the Q4 2023 guidance range to "weaker than anticipated international traffic, offset by seasonally strong live streaming and gaming activity."

131.    This statement was materially false or misleading insofar as it omitted the critical information that the decline in traffic involved several of the Company's largest customers, which accounted for a significant portion of the Company's revenue, and Defendants knew about the traffic decline by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline.

132.    In addition, when pressed by analysts during the Q4 2023 Earnings Call on whether there were fundamental changes to the business in light of macro impacts on the Company, Nightingale stated: "No. I think it was pretty much as we saw last quarter. A handful of deals may be taking a little longer than we thought, a little bit of deal elongation."

133.    This statement was materially false or misleading because (i) the Company's revenue from its larger enterprise customers had been declining because they were not bringing in as much traffic to Fastly, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; (ii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts; (iii) according to CW1 and CW2, customers were requesting more aggressive discounts in March and April 2023 due to economic concerns (*i.e.*, rising interest rates); (iv) the negative effect of macro forces such as rising interest rates had been generally discussed among Company executives at all hands meetings throughout 2023; and (v) Fastly was exposed to these macro pressures because Fastly's competitors in the CDN market had improved their services such that they were at least on par with Fastly, if not superior, and, as a result, Fastly had far less leverage in negotiating prices with its customers and was experiencing increased pricing pressure.

134.    In a February 15, 2024 report titled "Mixed Quarter And Outlook Driven By International Weakness. Lowering to HOLD," Jeff Van Rhee of Craig-Hallum Capital Group LLC noted the Company's lack of transparency: "Explanations on the call around the weak Q4 and weak Q1 revenue guide were particularly vague, other than generally calling out international" and "we are unclear on the drivers of Q4 and Q1 weakness."

135.    Defendants made similar misleading statements and risk disclosures about the growth of the Company's existing customers in the Company's annual report reporting the Company's financial and operating results for the quarter and year ended December 31, 2023, which the Company filed with the SEC on Form 10-K on February 22, 2024 (the "2023 10-K").

136.    Nightingale and Kisling signed the 2023 10-K and it included as exhibits signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Nightingale and Kisling certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this

report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

137.    First, the 2023 10-K stated: "Our enterprise customers continue to leverage our platform, increasing their spend on our platform and driving our revenue growth year over year."

138.    This statement was materially false or misleading because (i) the Company's revenue from its larger enterprise customers had been declining because they were not bringing in as much traffic to Fastly, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; (ii) the Company's revenue from its some of its largest customers was likely going to continue to decline because some of their contracts were up for renewal and by that time, those customers were already demanding more favorable pricing terms; (iii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts; and (iv) the Company had shifted its sales strategy using a new compensation plan, beginning in 2024, to prioritize new customer acquisitions over generating revenue from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

139.    Second, under the heading, "If we are unable . . . to have existing enterprise customers continue and increase their use of our platform, our business will likely be harmed," the 2023 10-K warned investors, in relevant part (emphasis added):

> [O]ur ability to grow and generate incremental revenue depends on our ability to maintain and grow our relationships with our existing enterprise customers so that they continue and increase their usage of our platform. If these customers do not maintain and increase their usage of our platform, our revenue may decline and our results of operations will likely be harmed.

> For some of our products, we charge our customers based on the usage of our platform. Most of our customers, including some of our largest enterprise customers, do not have long-term contractual financial commitments to us. In addition, most of our current customer contracts are only one year in duration and these customers may not use our platform in a subsequent year. In order for us to maintain or improve our results of operations, it is important that our customers, in

particular, our enterprise customers, use our platform in excess of their commitment levels, if any, and continue to use our platform on the same or more favorable terms.

…

**Our future success also depends in part on our ability to expand our existing customer relationships, in particular, with enterprise customers, by increasing their usage of our platform, selling them additional products and upgrading their existing products. . . . If our efforts to increase usage of our platform by, or sell new and additional products to, our enterprise customers are not successful, our business would be harmed.** In addition, even if our largest customers increase their usage of our platform, we cannot guarantee that they will maintain those usage levels for any meaningful period of time.

140.    This statement was materially false or misleading because the largest customers' use of Fastly's platform had been declining since 2023, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline. Defendants' disclosures were, therefore, inadequate.

141.    Third, under the heading, "We receive a substantial portion of our revenues from a limited number of customers …, and the loss of, or a significant reduction in usage by, one or more of our major customers would result in lower revenues and could harm our business," the 2023 10-K also warned investors, in relevant part:

It is likely that we will continue to be dependent upon a limited number of customers for a significant portion of our revenues for the foreseeable future. . . . The loss of one or more key customers or a reduction in usage by any major customers would reduce our revenues. If we fail to maintain existing customers . . . , our business would be harmed.

142.    This statement was materially false or misleading because Defendants described the risk of loss of its key customers, or a reduction in their usage of Fastly's platform, in hypothetical terms when that risk had already materialized, as (i) the Company's revenue from its larger enterprise customers had already been declining since 2023, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; and (ii) the Company's revenue from some of its largest customers was likely going to continue to decline because some of their contracts were up for renewal and by that time, those customers were already demanding more favorable pricing terms.

143.    Fourth, under the Management's Discussion and Analysis of Financial Condition and Results of Operations Section of the 2023 10-K, it states: "[w]e emphasize retaining our customers and expanding their usage of our platform and adoption of our other products."

144.    This statement was materially false or misleading because, the Company had shifted its sales strategy using a new compensation plan, beginning in 2024, to prioritize new customer acquisitions over generating revenue from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

145.    Fifth, under the Management's Discussion and Analysis of Financial Condition and Results of Operations Section of the 2023 10-K, it states: "[o]ur enterprise customers continue to leverage our platform, increasing their spend on our platform and driving our revenue growth year over year."

146.    This statement was materially false and misleading because (i) the Company's revenue from its larger enterprise customers had been declining since 2023, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; (ii) the Company's revenue from some of its largest customers was likely going to continue to decline because some of their contracts were up for renewal and by that time, those customers were already demanding more favorable pricing terms; and (iii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts.

**Defendants Fail to Disclose Information Required to be Disclosed Under Regulation S-K**

147.    Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

148.    Under the Management's Discussion and Analysis of Financial Condition and Results of Operations Section of the 2023 10-K, Defendants stated: "[o]ur enterprise customers

continue to leverage our platform, increasing their spend on our platform and driving our revenue growth year over year."

149.    As set forth above, this statement was materially false or misleading and, in violation of Item 303, Defendants failed to accurately describe the trends or uncertainties related to the Company's revenue derived from existing customers.

150.    Whereas Defendants claimed that the Company's existing enterprise customers were continuing to increase their usage of Fastly's platform and drive revenue growth, in reality, as described above, there was a trending material decline in such customers' use of Fastly's platform and the Company's revenue derived from them.

**The Truth Begins to Emerge**

151.    On May 1, 2024, Fastly issued a press release announcing the Company's Q1 2024 financial results.

152.    On that same day, Fastly hosted an earnings call with investors and analysts (the "Q1 2024 Earnings Call"), during which Defendants disclosed that revenue from some of its largest customers had declined due to pricing pressure and a decrease in traffic from those customers and, as a result, the Company's "revenue projection has pulled back," decreasing from the $580 million to $590 million originally forecasted for FY 2024 to $555 million to $565 million.

153.    During the scripted portion of the Q1 2024 Earnings Call, Nightingale stated, in relevant part (emphasis added):

> There are a few factors that contributed to a challenging short-term environment. **The biggest factor is a reduction of revenue from a small number of our largest customers. The first-quarter revenue from our top 10 customers dropped from 40% to 38%.**
>
> Many of the top 10 accounts run a multi-vendor strategy. And we did see significant volatility here. And there are a few reasons for that. Firstly, historically, Fastly has gradually won greater traffic share in our largest accounts. But with the timing of rate and volume changes, we saw increased volatility this quarter. To be clear, we have not been removed from any of our largest customers and we remain in a strong strategic position, each of them long term.
>
> Secondly, in some accounts, we did see an addition of CDN vendors or reversal of the vendor consolidation we saw last year. And thirdly, **we are seeing a slight uptick from the typical level of rerates with our largest customers, but we have**

**not yet seen the commensurate traffic expansion usually associated with this motion.**

154.    Similarly, Defendant Kisling stated: "**we are facing a challenging environment of revenue declines in our largest customers**" (emphasis added).

155.    During the Q&A portion of the call, Nightingale told investors (emphasis added):

[W]hat we saw in our top-10, 15 largest accounts, **we saw some or slightly more kind of pricing pressure than we're used to**. And that's got an outsized impact for us, and we are trying to make sure that we're doing the right adjustments to our projection based on that.

Usually, with these kinds of pricing changes, we see a commensurate volume increase as well, and we still hope to see that, especially in some of these key accounts.

156.    Kisling added, "we saw more modest rerates historically. I think that continues across kind of the broad market, but we have seen a change in the largest accounts."

157.    Nightingale also stated: "**The weakness and the shift in the projection from last quarter [to] this quarter is really in those large accounts**," and "**[W]e see a little more pricing pressure up there[] [a]nd that has – for the large accounts for us and have a large impact**" (emphasis added).

158.    In addition, Nightingale stated: "I think it's fair to say that we've seen some more rerates in our largest 10 or 15 accounts in this past quarter."

159.    Rudy Kessinger, an analyst from D.A. Davidson, pushed for further detail, asking:

When exactly in the quarter did these customers start repricing contracts and adding other CDNs and moving share, et cetera? And with these repricings, I guess, you guys just have no control over it whatsoever. And they just asked for repricing, you guys do it within a couple of days. I mean, I just don't understand how, you know, three months ago, you told us you didn't have any barge repricing expected. And now it turns out you did within a six-week time frame.

160.    Kisling responded (emphasis added):

**[A] lot of that arose really at the end of March and in early April**, when we saw, one, the motion of some of our customers, kind of reversing their trend to consolidating on CDNs, which affected our traffic projections for the year. **And then as we engage in some of the rerates that we knew were coming, those negotiations resulted in bigger discounts than we thought that did not come with the typical increase in traffic that we've seen historically. And so those**

**were the big drivers. I would say timeframe really was late March, early April, when we saw these different dynamics.**

161.    Nightingale responded to a follow-up question:

[A] small number of accounts where we had – where our projection, our revenue projection has pulled back. And those are large accounts that have very significant swing and they need to be handled and managed and optimized very specifically. It's why we're changing our motion there and look I believe we have an opportunity to move back to growth in those accounts. But our projection reflects where we currently are.

162.    In response to a question about the volatility with some of the Company's larger customers, Nightingale stated:

[W]e had a couple of accounts in that very large set that negotiated rerates in the past quarter. Usually, a rerate like that would come up – would come with like a commensurate volume increase. And we tried to model that very carefully. But our projections there was a little bit aggressive, I believe.

163.    Then, on May 2, 2024, during pre-market hours, BofA downgraded Fastly stock from a "Buy" rating to an "Underperform" rating and cut its price target on the stock from $18 per share to a mere $8 per share, noting that "[d]ecelerating growth in Fastly's largest customers, share loss in delivery, and limited visibility in 2H cause us to question a rebound in 2024," and that "[w]hile we continue to like Fastly's positioning in the edge compute market, we see it as a 2025 opportunity instead of a near-term growth driver."

164.    Other analysts followed suit. On May 2, 2024, in a report titled "Expectations Were Low But Wow; D/G to NEUTRAL - $8.50 PT," Rudy Kessinger, CFA, of D.A. Davidson, downgraded Fastly's stock from "Buy" to "NEUTRAL," stating:

The revised guide implies acceleration . . . seemingly expected to come from recovering traffic with large customers. We cannot get comfortable with that premise given what's transpired over the last two quarters. We are thus stepping to the sidelines until we can get more comfort around the concentration risk and see more durable growth from non-top 10 customers.

165.    On that same day, in a report titled "Fastly Earnings: Atrocious Outlook on Weakness with Major Customers Creates Grave Concerns," Matthew Dolgin, of Morningstar,

announced that Morningstar was cutting its fair value estimate in half, from $20 to $10. Discussing the drop in revenue guidance, Dolgin stated:

> More troublesome is that this drop does not seem to be due to short-term vacillations. Management advised that the change in its outlook was due to a decline in revenue from Fastly's biggest customers. Fastly's top 10 customers make up nearly 40% of revenue, and more than 90% comes from enterprise customers spending more than $25,000 quarterly. Major enterprises use multiple providers for their content delivery network needs. The biggest enterprises are now paying Fastly lower prices without giving Fastly more traffic, and it appears the reduced traffic is not the result of less demand but rather a shift to other providers.

166.    Following these developments, Fastly's stock price fell $4.14 per share, or 32.02%, to close at $8.79 per share on May 2, 2024.

**Defendants Continue to Mislead Investors About its Existing Customers' Growth**

167.    Even while Defendants pulled back the Company's FY 2024 revenue projections for being "a little bit aggressive," Defendants continued to mislead investors about the Company's revenue prospects from its existing enterprise customers, including its largest customers.

168.    During the Q1 2024 Earnings Call, Nightingale stated (emphasis added):

> The top 15 or 20 accounts at Fastly, they carry a lot of our revenue and the way that we engage with them, the way that we drive platforms like product line penetration, the way we drive price control and discount control, the way that we optimize their performance and driving more significant and complete technology solution, I believe we have an opportunity in all of those categories to improve the way that we engage and dedicate more resources and more focus to it. And that's exactly what we're doing.
>
> **Right now, we have already launched a new engagement model. We're driving a far higher touch across all those major accounts. We've been running it for a couple of weeks now, and we're – I'm pretty happy with the progress so far.** But just looking at the – where our projection is for those accounts and how much it's changed in just one quarter, like you said, some plus February, I think decisive change in our engagement model was warranted. And that's exactly the transition that we're undergoing right now.

169.    This statement was materially false or misleading because it suggested that the Company had begun making progress with driving additional revenue from these major accounts when no such progress had been made. Fastly's customers were bringing their business to competitors, reversing the consolidation trend (*i.e.*, working with more vendors).

170.    Further, according to CW5, two of Fastly's largest accounts, Apple and Amazon, had been requesting a "staging environment" to test out new web features before they go live on their platforms since 2023, and while Fastly originally told these customers it would have the product completed by the end of 2023, Fastly did not begin working on it until May 2024. According to CW5, two other program managers had previously tried to get the staging environment launched in 2023 but were unable to secure the necessary resources to do so. However, when CW5 was tasked with this project following the release of the Company's Q1 2024 results, it was backed by the Chief Product Officer and Nightingale. CW5 was instructed to have the product ready by the end of June 2024, and Nightingale told CW5 to do whatever was needed to get it done. CW5 was under the impression that Apple and Amazon would leave Fastly if Fastly was unable to deliver this feature, but described the June 2024 deadline as unrealistic and was ultimately unable to meet it.

171.    Defendants also made materially false or misleading statements in the Company's Q1 2024 Quarterly Report on Form 10-Q, filed with the SEC on May 1, 2024 (the "Q1 2024 10-Q").

172.    Nightingale and Kisling signed the Q1 2024 10-Q and it included as exhibits signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that the Q1 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

173.    Under the Management's Discussion and Analysis of Financial Condition and Results of Operations section, the Company stated "[w]e focus our direct selling efforts on expanding our customer's use of our platform," "[w]e are focused on . . . expanding our relationship with existing customers," "[w]e emphasize retaining our customers and expanding

their usage of our platform and adoption of our other products," and "[u]tilizing our direct sales force, we have multiple selling points within organizations to . . . increase usage from our existing customers."

174.    These statements were materially false and misleading because they suggested the Company was focused on driving revenue from existing customers when at that time, the Company had already shifted its sales strategy using a new sales compensation plan that prioritized new customer acquisitions over generating revenue from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

175.    The Q1 2024 10-Q also contained the same misleading risk disclosures as the 2023 10-K.

176.    Under the heading, "If we are unable . . . to have existing enterprise customers continue and increase their use of our platform, our business will likely be harmed," the Q1 2024 10-Q warned investors, in relevant part (emphasis added):

> [O]ur ability to grow and generate incremental revenue depends on our ability to maintain and grow our relationships with our existing enterprise customers so that they continue and increase their usage of our platform. If these customers do not maintain and increase their usage of our platform, our revenue may decline and our results of operations will likely be harmed.
>
> For some of our products, we charge our customers based on the usage of our platform. Most of our customers, including some of our largest enterprise customers, do not have long-term contractual financial commitments to us. In addition, most of our current customer contracts are only one year in duration and these customers may not use our platform in a subsequent year. In order for us to maintain or improve our results of operations, it is important that our customers, in particular, our enterprise customers, use our platform in excess of their commitment levels, if any, and continue to use our platform on the same or more favorable terms.
>
> …
>
> **Our future success also depends in part on our ability to expand our existing customer relationships, in particular, with enterprise customers, by increasing their usage of our platform, selling them additional products and upgrading their existing products. . . . If our efforts to increase usage of our platform by, or sell new and additional products to, our enterprise customers are not successful, our business would be harmed.** In addition, even if our largest customers increase their usage of our platform, we cannot guarantee that they will maintain those usage levels for any meaningful period of time.

177.    This statement was materially false or misleading because Defendants described the risk of existing customer growth stagnating or declining due to decreased usage as hypothetical or possible when the risk had already materialized, as existing customers' growth had already been stagnating for at least a quarter, and the Company had already shifted its sales strategy using a new sales compensation model in 2024 that deterred the sales team from focusing on driving existing customer growth, given that their compensation plan weighed revenue from new customer acquisition more heavily than revenue from existing customers.

178.    Under the heading, disclosure "We receive a substantial portion of our revenues from a limited number of customers …, and the loss of, or a significant reduction in usage by, one or more of our major customers would result in lower revenues and could harm our business," the Q1 2024 10-Q also warned investors, in relevant part:

> It is likely that we will continue to be dependent upon a limited number of customers for a significant portion of our revenues for the foreseeable future. . . . The loss of one or more key customers or a reduction in usage by any major customers would reduce our revenues. If we fail to maintain existing customers . . . , our business would be harmed.

179.    This statement was materially false or misleading because Defendants described the risk of loss of its key customers, or a reduction in their usage of Fastly's platform, in hypothetical terms when that risk had already materialized, as (i) the Company's revenue from its larger enterprise customers was continuing to decline, (ii) the Company's new engagement model for driving growth among these customers was not making progress in driving growth, and (iii) at least some of the Company's largest customers were not likely to contribute to any revenue growth because the Company failed to deliver products to them within the time period requested and the Company had only just begun working on the product in May 2024, despite telling the customers that the product would be ready by the end of 2023.

## The Full Truth Emerges

180.    On August 7, 2024, Fastly issued a press release announcing the Company's Q2 2024 results, disclosing "we are experiencing demand challenges with some of our largest customers."

181.    On that same day, Fastly hosted an earnings call with investors and analysts to discuss the Company's Q2 2024 financial results (the "Q2 2024 Earnings Call").

182.    During the Q2 2024 Earnings Call, Defendants disclosed that the Company was continuing to see a drop in revenue from its largest customers and was shifting its focus towards acquiring new business.

183.    Specifically, during the scripted portion of the Q2 2024 Earnings Call, Nightingale discussed the Company's challenges "with a small set of [its] largest customers" and how "projected growth in those accounts ha[d] declined," disclosing that revenue from the Company's largest ten customers had declined to 34% of the Company's revenue, a 4% drop from the previous quarter.

184.    Similarly, during the scripted portion of the Q2 2024 Earnings Call, Kisling stated:

> In the second quarter, we continued to see sequential declines in revenue from some of our largest customers that partially offset growth in revenue from other areas, particularly social media, development platforms and gaming. The sequential declines in revenue from our largest customers were driven by further impacts from the reversal in the consolidation of network services vendors last year that we discussed in Q1 and also a continuation of lower follow-on traffic than we have historically seen following typical customer rerate.

> As a result, network services revenue per gigabit declined more year-over-year than the historical trend line we typically experience. We anticipate this dynamic will continue throughout Q3 and then begin to moderate in the fourth quarter.

> Our Top 10 customers comprised 34% of our total revenues in the second quarter of 2024 compared to 38% in Q1 2024, reflecting the impact of the revenue declines from some of our largest customers. Also, no customer accounted for more than 10% of revenue in the second quarter.

185.    In response to a question about the declines from the largest customers, Nightingale clarified:

> [T]here is definitely softness in the traffic of those large accounts, primarily media, large media accounts. And there's certainly a push to profitability from within those teams and we're seeing that and trying to react to their needs and their business priorities of those customers. We've really transformed our customer success motion for these large multi-vendor customers.

> We're focusing on delivering the kind of differentiation and the kind of service that they're looking for in a very bespoke way. So we have consumed obviously some headwinds here in terms of the revenue projection for the back half which you see in our outlook. But yes, we believe we've stabilized those accounts at this point.

186.    However, Kisling discussed how the Company's "increased engagement model" with those accounts, which entailed "senior level engagement regularly with these customers," would provide "much better visibility into their own internal dynamics around their traffic expectations and traffic allocations," which would "translate[] into a much more reliable view of how their business will play out over the remainder of the year."

187.    Nightingale also described the Company's shifting focus towards acquiring new business, stating "we haven't lost focus on driving customer acquisition and growth in the other 2/3 of our business to effectively outgrow this concentration risk over time" and "[t]he success in this transformation will continue to drive top line revenue growth and become the foundation of our business."

188.    Nightingale stated that "[t]his is truly a moment of transition for Fastly," focused on "mitigat[ing] [the Company's] dependence on large multi-vendor customers," including by "expanding [the Company's] portfolio," in order to "drive more stability and higher growth for Fastly in the years to come."

189.    Similarly, Kisling stated: "As we continue to transform our business towards a bifurcated customer strategy, we will continue to focus our customer acquisition strategy and direct more development and go-to-market investment towards the broader market opportunity outside our Top 10 customers."

190.    Nightingale concluded by discussing the Company's "outlook" and "path forward," stating:

> The large customer headwinds we've seen have continued to impact our business. . . . [A]s I discussed previously, this is a moment of transition and we take this very seriously.

> We must continue to acquire new customers and grow accounts outside our large media cohort. This will diversify and strengthen our business and this is exactly the path that we're on.

191.    The Company, again, decreased its revenue projection for FY 2024 from the $555 million to $565 million forecasted during the Q1 2024 Earnings Call to a range between $530 million and $540 million, which, Kisling stated, "reflects continued weakness with some of [the

Company's] largest customers, offset by growth outside [its] largest existing customers and newer enterprise customers."

192.    Following these developments, Fastly's stock price fell $0.98 per share, or 14.33%, to close at $5.86 per share on August 8, 2024.

193.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

194.    During the Class Period, Defendants emphasized the importance of the Company's existing enterprise customers, including its largest customers, for driving the Company's revenue growth, even while Defendants knew or recklessly disregarded the fact that the revenue derived from such customers was on the decline and would likely continue to decline given that: (i) many enterprise customers were canceling contracts or demanding more favorable pricing, (ii) the Company's largest customers were already decreasing their use of the platform and some of them were in the process of renegotiating their contracts and seeking more favorable terms, (iii) the Company was shifting its focus towards acquiring new business versus generating revenue from existing customers, and iv) the Company's new engagement model with its largest customers was not driving progress as Defendants suggested.

195.    At the time when Defendants touted revenue growth from its existing enterprise customers, Defendants knew, or should have known, that the revenue from such customers was on the decline.

196.    Nightingale conceded during a November 15, 2023 RBC Capital Markets 2023 Technology, Internet, Media and Telecommunications Conference, "I track – just to give you it a hundred percent verbatim, I'm always tracking top 10, top 20 deals for any given quarter."

197.    Based on the information provided by CW1, CW2, CW3, and CW4, at best, customers were stagnant in their use of Fastly's platform at that time, whereas many other

enterprise customers were canceling contracts and requesting more aggressive discounts during contract renewals, threatening to leave Fastly altogether.

198.    This trend pervaded Company sales teams across the country and was known by Defendants. CW1 described sharing concerns about a contract that was cancelled in April 2023 all the way up to the founder of the Company.

199.    Further, the Company held all hands meetings attended by the Individual Defendants during 2023, during which, according to CW1 and CW6, Nightingale discussed how the Company's largest accounts had "throttled down" their usage and were not bringing in as much traffic, which resulted in a decrease in revenue from these customers. These all hands meetings also included discussion on the overall state of the Company's business, including, but not limited to, the effect of macro forces on the Company's business.

200.    In addition, according to CW1, the Company tracked its customers' traffic using the "Fastly App."

201.    According to CW7, the Company also held weekly Customer Ops meetings every Thursday during the relevant period to discuss any customer issues and their bandwidth usage (*i.e.*, how much traffic they were transmitting through Fastly's platform). Top Company executives, including the Chief Customer Officer, Vice President of Global Customer Success, and Vice President of Customer support regularly attended and participated in these meetings, and Nightingale occasionally attended as well. During the Customer Ops meetings, each customer was rated using a red/yellow/green system to indicate how much the customer was using Fastly's platform, with red indicating a customer who was not using as much bandwidth as expected or desired. If a major enterprise customer continued to be rated "red," the Chief Customer Officer, Vice President of Global Customer Success, and Vice President of Customer Support would assemble a "tiger team" to focus on improving the customer's performance.

202.    Defendants, thus, knew by, at latest, November 2023, that the Company's revenue from its largest customers was declining and would continue to decline.

203.    Further, following the release of the Company's Q1 2024 results, the Company also set up a "war room" and "tiger team" to address the substantial drop in traffic from the Company's biggest customers.

204.    While Defendants touted the growth from these customers, behind the scenes, they knew that the revenue derived from its largest customers, which contributed a significant portion of the Company's revenue, would continue to decline.

205.    Some of the Company's largest customers' contracts were up for renewal in March and April 2024. According to CW2, contract negotiations typically begin roughly three months before the contract is set to expire. Thus, given Defendants' disclosures that some of its largest customers had their contracts repriced in late March, early April 2024, these large customers were already negotiating their renewals and demanding more favorable pricing terms when Defendants made their false and misleading rosy statements about their revenue prospects in February 2024. Defendants knew, or should have known, by early January 2024 at the latest (three months before early April 2024) that there was a significant risk that the Company's revenue generated from these large customers, whose use of the platform Defendants knew was already declining, would continue to decline insofar as they were demanding more favorable pricing terms.

206.    Defendants also falsely or misleadingly implied that their new engagement model with the Company's largest customers was making progress, when in reality, that was not the case. Specifically, according to CW5, two of Fastly's largest accounts, Apple and Amazon, had been requesting a staging environment to test out new web features before they go live on their platforms since 2023, and while Fastly originally told these customers it would have the product ready by the end of 2023, no one at Fastly actually began working on it until May 2024. CW5 was instructed to have the product ready by the end of June 2024, but CW5 described that deadline as unrealistic and was unable to meet it.

207.    Nightingale knew about the product that CW5 was tasked with developing because, according to CW5, the only reason CW5 managed to get traction on the project was because she

had the backing of the Chief Product Officer and the CEO, Nightingale. Nightingale told CW5 to do whatever was needed to get it done.

208.    In addition, Defendants knew, or should have known, that the revenue derived from its other existing enterprise customers would continue to decline because, despite touting its continued focus on expanding its existing customers' use, the Company began shifting its focus towards acquiring new business.

209.    Unbeknownst to investors, Defendants reconfigured the sales strategy under a new sales compensation model in 2024 to prioritize revenue derived from new accounts over revenue derived from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

210.    As CW2 explained, sales team members lacked a financial incentive to continue to push for growth from existing customers, and only worked with them because "we want[ed] to do the right thing and take care of them."

211.    Meanwhile, Defendants took steps to ensure that the declining revenue from its existing customers would remain undetected. Beginning in Q1, 2024, the Company discontinued disclosing metrics that measure revenue growth from existing customers, DBNER and quarterly NRR.

212.    The Company had reported DBNER as a key metric since its first quarterly report, its Q2 2019 quarterly report. The Company had reported quarterly NRR as a key metric since its Q2 2020 quarterly report. The only remaining key metric which the Company discloses that measures growth from existing customers, LTM NRR, was "intended to be supplemental to [the Company's] NRR," according to the Company's Q3 2020 quarterly report, when the Company first reported LTM NRR.

213.    Defendants claimed the Company ceased reporting these metrics because, according to the Company's Q1 2024 10-Q, they "were used infrequently by investors." However, both Defendants and analysts regularly discussed these metrics.

214.    For example, during the August 12, 2019 KeyBanc Capital Markets Technology Leadership Forum, Adriel Lares, then-CFO of Fastly, discussed the growth of the Company's enterprise customers, stating:

> And the idea is, how much can we continue with them to grow, which is why we report the DBNER. The DBNER also takes into account any rerates they may negotiate on a yearly basis. So hopefully, it's a fairly truthful metric, because if there's a rerate an the DBNER is 132%, for example, that must mean their traffic to us is growing quite quickly.

215.    During the Company's Q2 2021 Earnings Call, Rishi N. Jaluria of D.A. Davidson asked:

> If I look at NRR in the quarter itself, it's the first time I've ever seen this number drop below 100%. And that's kind of a little bit of a scary number to see. Can you maybe walk me through why was NRR so low this quarter, at 93%? What is that – when you have customers that are shrinking their footprint, is it bringing more to competitors? Is it bringing more in-house? Maybe walk us through that number and how we should be thinking about that metric going forward.

216.    Further, the decision to discontinue reporting DBNER and quarterly NRR was suspiciously timed when those metrics would have revealed the trend that existing customer growth was declining, in contradiction to Defendants' statements about existing customers continued to drive revenue growth.

217.    While the Company's 2023 10-K, the Company's last disclosure of DBNER, showed a deceased in DBNER from 122.7% in FY 2022 to 119% in FY 2023 and showed a drop in NRR from 110.7% in FY 2022 to 110.1% in FY 2023, the quarterly data that the Company disclosed for 2022-2023 showed fluctuations in DBNER and NRR and did not yet reveal a trend.

218.    With the market price of Fastly stock artificially inflated based on Defendants' false and misleading statements and omissions, Defendants Nightingale and Kisling sold a substantial amount of Fastly stock during the Class Period. Specifically, Defendant Nightingale sold 410,228 of his shares of Fastly stock for proceeds of roughly $5,968,797, while Defendant Kisling sold 149,568 of his shares of Fastly stock for proceeds of roughly $1,969,417.

**LOSS CAUSATION**

219.    As a result of Defendants' materially false or misleading statements and omissions of material fact, Fastly securities traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Fastly securities and public information related to Fastly, Plaintiffs and other Class members purchased or otherwise acquired Fastly securities at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein.

220.    Defendants' materially false and misleading statements and omissions of material fact had their intended effect, directly and proximately causing Fastly securities to trade at a price higher than it would have had the facts, risks, and conditions concealed by Defendants' fraud become known sooner than they did.

221.    Absent Defendants' misrepresentations and omissions of material fact, Plaintiffs and other Class members would not have purchased or otherwise acquired their Fastly securities at the artificially inflated prices at which they traded.

222.    Plaintiffs and other Class members were damaged when the material facts and foreseeable risks mispresented or concealed by Defendants were revealed through the disclosure of new information concerning Fastly on the dates listed below, each of which directly and proximately caused declines in the price of Fastly securities by removing the artificial inflation in the price of Fastly's securities that resulted from Defendants' fraud.

223.    The previously downplayed risks of macro effects on the Company's business began to materialize when the Company announced its Q4 and FY 2023 financial results on February 14, 2024, reporting revenues on the lower side of their previous guidance and that missed analysts' consensus estimates by 1.1%. In response to this news, Fastly's stock price fell significantly, from $23.54 to close at $16.34 on February 15, 2024, a decline of 30.59 %.

224.    The truth was further revealed  on May 1, 2024, when Fastly issued a press release announcing the Company's Q1 2024 financial results and hosted the Q1 2024 Earnings Call.

225.    Following the corrective statements made during the Q1 2024 Earnings Call, discussed above and incorporated by reference herein, Fastly's stock price fell $4.14 per share, or 32.02%, to close at $8.79 per share on May 2, 2024.

226.    The full truth emerged on August 7, 2024, when Fastly issued a press release announcing the Company's Q2 2024 results and hosted the Q2 2024 Earnings Call.

227.    Following the corrective statements made during the Q2 2024 Earnings Call, discussed above and incorporated by reference herein, Fastly's stock price fell $0.98 per share, or 14.33%, to close at $5.86 per share on August 8, 2024.

## NO SAFE HARBOR

228.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged misstatements pled in this Complaint. The statements alleged to be false and/or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Fastly who knew that the statement was false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

229.    At all relevant times, the market for Fastly's securities was open, well-developed, and efficient for the following reasons:

(a)     Fastly's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

(b)     As a regulated issuer, Fastly filed periodic public reports with the SEC;

(c)     Fastly regularly communicated with the public using established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, publication on its website, and through other wide-ranging public disclosures, such as conference calls, communications with the financial press, and other similar reporting services; and

(d)     Fastly was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of those reports was publicly available and entered the public marketplace.

230.    As a result of the foregoing, the market for Fastly securities reasonably and promptly digested current information regarding Fastly from all publicly available sources and reflected such information in the price of Fastly securities. All purchasers and acquirers of Fastly securities during the Class Period suffered similar injury through their purchases and acquisitions of Fastly securities at artificially inflated prices and a presumption of reliance applies.

231.    During the Class Period, the artificial inflation of Fastly's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made, a series of materially false and/or misleading statements about, *inter alia*, macro effects on the Company's business, the Company's existing customers expanding their use of Fastly's services, and the Company's continued emphasis on driving revenue growth through its existing customers. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business,

operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

232.    The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's securities and purchase the Company's securities at artificially inflated prices.

233.    Plaintiffs and other Class members relied on Defendants to timely disclose material information as required by law, and would not have purchased or otherwise acquired Fastly securities at artificially inflated prices if Defendants had timely disclosed all material information as required by law.

234.    To the extent Defendants concealed or improperly failed to disclose material facts concerning Fastly and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

235.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Fastly securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

236.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fastly securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Fastly or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

237.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

238.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

239.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Fastly;

- whether the Individual Defendants caused Fastly to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Fastly securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

240.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

241.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

242.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

243.    During the Class Period, Defendants made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. This was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fastly securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Fastly securities and options at artificially inflated prices. In furtherance of this unlawful conduct, Defendants took the actions set forth herein.

244.    Each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Fastly securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Fastly's finances and business prospects.

245.    By virtue of their positions at Fastly, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants

were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

246.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Fastly, the Individual Defendants had knowledge of the details of Fastly's internal affairs.

247.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Fastly. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Fastly's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Fastly securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Fastly's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Fastly securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

248.    During the Class Period, Fastly securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Fastly securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class,

the true value of Fastly securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Fastly securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

249.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

250.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misstatements and omissions to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

251.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

252.    During the Class Period, the Individual Defendants participated in the operation and management of Fastly, and conducted and participated, directly and indirectly, in the conduct of Fastly's business affairs. Because of their senior positions, they knew the adverse non-public information about Fastly's false statements.

253.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fastly, and to correct promptly any public statements issued by Fastly which had become materially false or misleading.

254.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public statements, and public filings which Fastly disseminated in the marketplace during the Class Period concerning Fastly. Throughout the Class Period, the Individual Defendants exercised their

power and authority to cause Fastly to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Fastly within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Fastly securities.

255.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fastly.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: November 1, 2024

Respectfully submitted,

POMERANTZ LLP

*/s/ Murielle J. Steven Walsh*
Murielle J. Steven Walsh (*pro hac vice*)
Emily C. Finestone (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
mjsteven@pomlaw.com
efinestone@pomlaw.com

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

THE SCHALL FIRM
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
brian@schallfirm.com

*Co-Lead Counsel for Plaintiffs*

53
AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS