**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE FASTLY, INC. SECURITIES LITIGATION | Case No. 4:24-cv-03170-JST<br><br>CLASS ACTION |
| THIS DOCUMENT RELATES TO:<br>All Actions | SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

NATURE OF THE ACTION ... 1
JURISDICTION AND VENUE ... 11
PARTIES ... 11
FORMER EMPLOYEES WHO SUBSTANTIATE THE ALLEGATIONS ... 13
SUBSTANTIVE ALLEGATIONS ... 15
Background ... 15
Fastly Experiences Significant Customer Pullback Beginning in 2023 and Throughout 2024 ... 18
The Company Struggles to Acquire New Customers ... 24
DEFENDANTS MAKE FALSE AND MISLEADING STATEMENTS BUT THE DOWNPLAYED RISKS MATERIALIZE AND THE TRUTH TRICKLES OUT ... 26
Defendants Mislead Investors During Q4 2023 About Macroeconomic Impacts on the Company's Business ... 26
The Previously Downplayed Risks Begin to Materialize but Defendants Continue to Mislead Investors ... 27
Defendants Fail to Disclose Information Required to be Disclosed Under Regulation S-K ... 34
The Previously Downplayed Risks Continue to Materialize and The Truth About Macro Impacts on the Company's Business During Q4 2023 is Revealed ... 35
Defendants Continue to Mislead Investors About Existing Customers' Growth ... 39
The Previously Downplayed Risks Continue to Materialize and The Truth About the Stagnation in Growth During Q1 2024 Emerges ... 43
SCIENTER ALLEGATIONS ... 46
LOSS CAUSATION ... 52
NO SAFE HARBOR ... 55

APPLICABILITY OF PRESUMPTION OF RELIANCE ........ 56
(FRAUD-ON-THE-MARKET DOCTRINE) ........ 56
PLAINTIFFS' CLASS ACTION ALLEGATIONS ........ 57
COUNT I ........ 59
COUNT II ........ 61
PRAYER FOR RELIEF ........ 62
DEMAND FOR TRIAL BY JURY ........ 62

Lead Plaintiff Olger Guri ("Lead Plaintiff") and named plaintiffs Ken Kula, Ericka Billington, and Bhadresh Shah (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by Plaintiffs' attorneys, which included, among other things, a review of Fastly, Inc.'s ("Fastly" or the "Company") public documents, conference calls, statements, and announcements made by Fastly, Fastly's Chief Executive Officer, Todd Nightingale, and Fastly's Chief Financial Officer, Ronald Kisling (collectively, "Defendants"); United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Fastly; analyst reports and advisories about the Company; interviews with former employees; and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Fastly securities between November 15, 2023 and August 7, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its executives.

2. Fastly operates an edge cloud platform for processing, serving, and securing customer's applications. The edge cloud is a category of Infrastructure-as-a-Service ("IaaS") that enables developers to build, secure, and deliver digital experiences. Fastly's platform includes a Content Delivery Network ("CDN"), or a geographically distributed network of proxy servers and their data centers. Content owners, such as media companies and e-commerce vendors, pay CDN operators to deliver their content to their end users. In other words, Fastly's customers are delivering web experiences, whether in the form of applications, websites, or streaming services. Certain companies have adopted a "Multi-CDN" framework which combines multiple CDNs from various providers into one large global network.

3. The bulk of the Company's revenue is derived from its existing customers' use of Fastly's platform, although the Company generates some revenue from additional products and other services, such as account management and customer support.

4. Fastly charges customers based on their use of the Company's platform and typically enters into contracts that include a monthly minimum billing commitment in exchange for more favorable pricing terms.

5. For the fiscal years ended December 31, 2023 and December 31, 2024, roughly 95% of the Company's revenue was derived from customers' use of its platform and new customers contributed less than 10% of that revenue.

6. The majority of the Company's revenue is generated by its enterprise customers, which, as explained more fully below, were previously defined as those customers with revenue in excess of $100,000 over the trailing 12-month period, but are currently defined as those customers with annualized current quarter revenue in excess of $100,000, which is calculated by taking the revenue recognized in the current quarter and multiplying it by four.

7. The Company's ten largest customers, which one confidential witness referred to as "big whales," include large streaming accounts and other accounts in the media space such as, among others, TikTok, Amazon Video, Apple, Twitter (X), Netflix, Paramount, and Disney. These large streaming or media customers, referred to herein as the Company's "Key Customers," account for a significant portion of the Company's revenue, generating 37% of the Company's revenue in FY 2023 and 33% in FY 2024.

8. Thus, a decline in revenue from the Company's existing enterprise customers, especially its Key Customers, or a decline in retention of such customers, could create volatility in the Company's revenue and materially impact Fastly's business. Indeed, Nightingale admitted the "outsized impact" that the Company's "top-10, 15 largest accounts" can have on the Company's financial performance during the Company's Q1 2024 earnings call on May 1, 2024.

9. Against this backdrop, beginning in November 2023 and continuing into 2024, Defendants misled investors about how macroeconomic trends and uncertainties (*i.e.*, the impact

of rising interest rates, banking instability, and recession fears) were affecting the Company's business in late 2023 and continuing into 2024.

10. During a November 15, 2023 conference, in response to a question about whether "macro trends" were getting better, Nightingale replied: "[T]he macro trends that seemed to hinder some of our competitors, we were largely resilient to. . . . The biggest pressure that people saw in this area was like in small to medium SMB customers, maybe some of the mid market. We don't have a lot of exposure there. . . . [s]o I didn't see too many headwinds. The only thing we saw was a little bit of elongated deal flow." When pressed about budget tightening, Nightingale responded, "***My competitors are seeing these effects, some slowing in growth, and [] we're not seeing that***" (emphasis added).

11. However, according to one confidential witness, these statements were "BS," and Nightingale was "probably just trying to keep the share price afloat." That same confidential witness explained that an estimated 30 to 40% of the Company's sales team was dedicated to the small and medium-sized business ("SMB") segment of the market. Another confidential witness, who worked with mid market enterprise customers, described how beginning in March and April of 2023, customers began requesting more aggressive discounts, and there was a direct correlation between when customers began asking for these discounts and when interest rates began rising significantly.

12. In addition, one confidential witness explained that, contrary to Nightingale's November 2023 public statements, macro forces, such as rising interest rates, were "definitely in the business cycle" and in fact, negatively affecting the Company's revenues overall throughout 2023, including revenues from Fastly's largest customers, who were increasingly more price-conscious.

13. Adding to the pressures on Fastly was the fact that Fastly's competitors (*i.e.*, Cloudflare, Akamai, and Imperva) in the CDN market had caught up to the Company in technological prowess. Thus, Fastly had far less leverage in negotiating prices with its customers.

14. The risks of macro effects on the Company's business, which Nightingale downplayed in November 2023, began to materialize when the Company announced its Q4 and FY 2023 financial results on February 14, 2024. The Company reported revenues of $506 million for FY 2023 and $137.8 million for Q4 2023. The reported Q4 2023 revenue was on the lower side of their previous guidance and, according to Zacks Investment Research, missed analysts' consensus estimates by 1.1%. In response to this news, Fastly's stock price fell significantly, from a closing price of $23.54 per share on February 14, 2024 to a closing price of $16.34 per share on February 15, 2024, a decline of 30.59 %.

15. However, during the Q4 2023 earnings call with investors and analysts on February 14, 2024, Defendants continued to downplay the potential macro effects on the Company's business going forward, with Nightingale assuring investors: "We established our annual guidance of 16% growth to incorporate macro uncertainties." When pressed by analysts on whether there were fundamental changes to the business in light of macroeconomic trends and uncertainties affecting the Company, Nightingale stated unequivocally in the conference call, "No, I think it was pretty much as we saw last quarter. A handful of deals may be taking a little longer than we thought, a little bit of deals elongation."

16. On the same call, Defendants also misled investors about the Company's customer retention rates and its existing customers' continued expansion of their use of Fastly's services, with Nightingale stating that the Company's "customer retention efforts were stable in the fourth quarter."

17. However, according to various confidential witnesses, beginning in 2023 and continuing into 2024, the appetite for Fastly's services was declining. These confidential witnesses describe how numerous enterprise customers were canceling their contracts in 2023 and it was very difficult to land new clients. For example, Indeed and USAA did not renew their contracts with Fastly in 2023. In or around March and April of 2023, some enterprise customers began requesting steeper discounts when negotiating contract renewals with Fastly. The revenue decline became apparent to one confidential witness in November 2023, when they began to struggle to

meet sales quotas. By the end of 2023, only 30 percent of salespeople met their revenue targets. This stagnation in customer growth continued in 2024.

18. Both the macro impacts on the Company's business and the declining appetite for Fastly's services was well known throughout the Company and the Company's C-Suite because the Company regularly held quarterly "all hands" meetings at the Company's San Francisco office, which discussed the overall state of the business, including, but not limited to, the effect of macro forces on the Company's business in 2023 (*i.e.*, declining revenue from the Company's Key Customers) and the continuing decline in traffic and revenue from the Company's Key Customers in 2024. All hands meetings typically were held a week after the Company's earnings calls and would provide a recap of what was discussed during the earnings call. They would include slide deck presentations and were attended by the Company's C-Suite and all employees, who either attended in-person or could tune into the meetings live via Vimeo. Recordings of the meetings were distributed to all employees by email after the meeting.

19. By November 2023, during these all hands meetings, Nightingale was discussing how the Company's Key Customers were not bringing in as much traffic to Fastly. Specifically, during the November 2023 all hands meeting, which occurred shortly after Fastly's November 1, 2023 Q3 2023 earnings call, Nightingale spoke about "decreasing revenue from [the Company's] big customers" and discussed how Fastly's large media accounts (*i.e.*, the Company's Key Customers) had "throttled down" their usage, warning that a specific streaming company was "***throttling things back, which is why revenue is down***" (emphasis added). One confidential witness corroborated seeing this trend with their customers, stating that "[n]ew business really started falling off a cliff in Q4 [2023]." According to another confidential witness, Defendants continued to discuss the declining traffic and revenue from the Company's Key Customers during all hands meetings in 2024.

20. The decline in traffic was also known by Defendants because the Company's top executives – including, occasionally, Nightingale – attended weekly meetings throughout the relevant period, during which the Company's customers were rated based on how much traffic

they were transmitting through Fastly's platform. If a major enterprise customer continued to be rated poorly, a "tiger team" was assembled to focus on improving that customer's performance.

21. Notwithstanding the discussion behind the scenes about the Company's Key Customers "throttling things back" in November 2023, during the February 14, 2024 earnings call, Nightingale also misleadingly attributed the Company coming in at the lower end of its guidance range to "weaker than anticipated international traffic, offset by seasonally strong live streaming and gaming activity" while omitting the critical information that a substantial contributor to the revenue decline was several of the Company's Key Customers simultaneously experiencing a decline in traffic.

22. Defendants continued to make similarly misleading statements in the Company's annual report filed on February 22, 2024, touting that the Company's existing enterprise customers were increasing their spend on Fastly's platform and continuing to drive the Company's revenue growth. Further, Defendants claimed that any chance of its existing customers decreasing their use of Fastly's platform was a ***hypothetical risk***, despite the fact that the risk had already materialized.

23. However, the downplayed risks of macro effects on the Company's business – *i.e.*, a decline in usage and revenues from Fastly's Key Customers – continued to materialize on May 1, 2024 when the Company released its Q1 2024 financial results, announcing that it was reducing its full year 2024 revenue projection from the $580-$590 million projection announced when the Company released its Q4 2023 financial results on February 14, 2024 to $555-$565 million. During an earnings call held on the same day, Kisling attributed the decreased revenue projections to "a challenging environment of revenue declines in [the Company's] largest customers" (*i.e.*, its Key Customers) towards the end of Q1 2024. However, Key Customer pullback had begun far earlier than Q1 2024, as Defendants well knew, and the reduced revenue was a materialization of this previously concealed risk.

24. The truth about macro impacts on the Company's business (*i.e.*, slowing growth and pricing pressure from the Company's customers, especially its Key Customers) during Q4 2023 also emerged on May 1, 2024 when Nightingale revealed during the May 1, 2024 earnings

call the pricing pressure that the Company faced during the prior quarter (Q4 2023) and indicated that it had continued into Q1 2024. Specifically, Rishi Jaluria, an analyst from RBC Capital Markets, LLC, asked Nightingale (emphasis added):

> **Last quarter [(Q4 2023)], after the kind of first guide down, you talked about the pricing environment being relatively in line with how it's been historically.** It sounds now like there's maybe a little bit more intensifying pricing pressure in spite of the fact that there is consolidation going on, as you pointed out, and vendors in this space. Can you speak to what has maybe changed in the past 90 days in terms of that? And what tools do you have in your arsenal to maybe start to counteract those headwinds?

25. Nightingale responded: "I think in the general market, **I would say that the pricing trend *that we have been seeing* sort of continues**" (emphasis added).

26. Defendants also disclosed during the May 1, 2024 earnings call that the "biggest factor" contributing to a revenue decline in Q1 2024 was "a reduction of revenue from a small number of [the Company's] largest customers" (*i.e.*, the Company's Key Customers), explaining that there was "a slight uptick from the typical level of rerates with [the Company's] largest customers," which was not accompanied by "the commensurate traffic expansion usually associated with this motion."

27. However, according to various CWs, the traffic and revenue decline from these Key Customers began long before Defendants belatedly admitted their impact on the Company's financials during Q1 2024, *i.e.*, as early as November 2023.

28. Nevertheless, when pressed for further detail on the timing of that pricing pressure from some of the Company's Key Customers, Kisling clarified: "[A] lot of that arose really at the end of March and in early April" with "negotiations result[ing] in bigger discounts than we thought that did not come with the typical increase in traffic that we've seen historically."

29. Analysts reacted negatively to the volatility with some of the Company's Key Customers. For example, on May 2, 2024, BofA downgraded Fastly stock from "Buy" to "Underperform," citing the "[d]ecelerating growth in Fastly's largest customers" (*i.e.*, its Key

Customers) as a basis to question "a rebound in 2024." Similarly, D.A. Davidson downgraded Fastly's stock from "Buy" to "NEUTRAL," expressing concern about the Company's apparent expectation to "recover[] traffic with large customers," and stating "[w]e cannot get comfortable with that premise given what's transpired over the last two quarters."

30. Following these developments, Fastly's stock price fell $4.14 per share, or 32.02%, from a closing price of $12.93 per share on May 1, 2024 to a closing price of $8.79 per share on May 2, 2024.

31. Nevertheless, Defendants continued to downplay the risk of macro impacts on the Company's business. During the May 1, 2024 earnings call, Madeline Brooks, an analyst from BOFA Securities, Inc. asked: "[I]n those 15 large customer accounts, do you see those accounts stabilizing after the second quarter or do you think we should expect and model declines in that cohort through the end of the year, just given the trends that you're seeing in the market now?" Nightingale responded (emphasis added):

> **I think our projection is relatively conservative**. I believe we're going to see traffic levels come up and we're going to find some success in recovering revenue in those large accounts. We're signaling the guide here because obviously there's a new projection and we want to reflect that. But look, I believe there's an opportunity for us to beat that projection, and reverse, not just stop the decline, but really reverse the trend in the second half.

32. Defendants also continued to mislead investors about the Company's revenue prospects from its existing enterprise customers, including its Key Customers.

33. For example, during the May 1, 2024 earnings call, Nightingale portrayed the revenue decline from the Company's Key Customers as stabilizing, stating: "Right now, we have already launched a new engagement model. We're driving a far higher touch across all those major accounts. We've been running it for a couple of weeks now, and we're – I'm pretty happy with the progress so far."

34. In reality, Defendants had not made any progress with its Key Customers. To the contrary, according to one confidential witness who was tasked with developing a product for two

of the Company's Key Customers, Apple and Amazon, Apple and Amazon had been requesting the product since 2023 and the Company promised to deliver it by the end of 2023, but the Company had not even begun working on it until May 2024. Nightingale told that confidential witness to do whatever was needed to get the project done.

35. Defendants also continued to mislead investors about the Company continuing to drive growth through existing customers. In the Company's Q1 2024 Quarterly Report filed on Form 10-Q on May 1, 2024, Defendants repeated that the Company is "focused on . . . expanding [its] relationship with existing customers" and "emphasize[s] retaining [its] customers and expanding their usage of [Fastly's] platform and adoption of [the Company's] other products."

36. However, by that time, Defendants had shifted the Company's focus away from driving revenue growth through existing customers, implementing a new sales strategy using a new compensation model in 2024 that prioritized revenue generated from new customer acquisitions over existing customers, thereby incentivizing the sales team to focus their efforts on new customer growth. Historically, new customers only accounted for less than 10% of the Company's revenue derived from the use of its platform.

37. The Company's Q1 2024 Quarterly Report also discussed the risk of existing customers, especially the Company's Key Customers, decreasing their use of the Company's platform as hypothetical risks when, in reality, the risk had already materialized, as existing customers' use of Fastly's platform had been stagnating for at least a quarter.

38. The risk of macro effects on the Company's business, again, materialized on August 7, 2024, when the Company released its Q2 2024 financial results, announcing that it was reducing its full year 2024 revenue projections even further, from $555-$565 million to $530-$540 million. During the earnings call held on the same day, Nightingale acknowledged that the reduction was "materially below our budgeted plans" and blamed sequential declines in revenue from Key Customers that partially offset growth in revenue from other areas, as well as their expectation of continued declines. Nightingale explained that the revenue decline was due to pricing pressure from the Company's Key Customers, which "are deeply focused on profitability."

39. The truth about the pricing pressure and revenue decline during the prior quarter (Q1 2024), which continued into Q2 2024, also emerged when Kisling disclosed during the August 7, 2024 earnings call: "In the second quarter, we **continued to see sequential declines** in revenue from" the Company's Key Customers, which was "driven by **further impacts** from the reversal in the consolidation of network services vendors last year **[2023] that we discussed in Q1 [2024]** and also **a continuation** of lower follow-on traffic than we have historically seen following typical customer rerate" (emphasis added). Defendants also disclosed that the Company had shifted its focus towards new customer acquisitions in order to diversify and mitigate the Company's dependence on its Key Customers, and that Fastly's top 10 customers' revenue share had fallen from 40% to 34% in two quarters.

40. Analysts reacted negatively. For instance, on August 7, 2024, Piper Sandler noted there was now "likely ***lack of management credibility*** for at least the next few quarters" (emphasis added). In an August 8, 2024 report, Craig-Hallum Capital noted that "[t]he team did make it clear that the decline was not in the whole top 10, but a 'small handful' of the top 10 in the media vertical [(*i.e.*, the Company's Key Customers)]. This would seem to imply declines of major magnitude at those customers, something on the order of ***halving*** revenue at those three or four customers." (emphasis added). It added, "***[t]here will be questions around management's visibility after this surprise***" and "FSLY is ***bleeding badly when it comes to large customers and is providing very little visibility***. . . . ***[I[nvestors are going to need more information***" (emphasis added).

41. Following these developments, Fastly's stock price fell $0.98 per share, or 14.33%, from a closing price of $6.84 per share on August 7, 2024 to a closing price of $5.86 per share on August 8, 2024.

42. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the previously downplayed risks materialized and/or upon the revelation of the alleged corrective disclosures, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

43. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

44. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

45. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Fastly is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

46. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

47. Lead Plaintiff, as set forth in the Certification previously submitted to the Court (ECF No. 25-5), acquired Fastly securities at artificially inflated prices during the Class Period and was damaged when the previously downplayed risks materialized and/or upon the revelation of the alleged corrective disclosures.

48. Named Plaintiff Ken Kula, as set forth in the Certification previously submitted to the Court (ECF Nos. 1-1 & 1-2), acquired Fastly securities at artificially inflated prices during the Class Period and was damaged when the previously downplayed risks materialized and/or upon the revelation of the alleged corrective disclosures.

49. Named Plaintiff Ericka Billington, as set forth in the Certification attached hereto as Exhibit A, acquired Fastly securities at artificially inflated prices during the Class Period and was damaged when the previously downplayed risks materialized and/or upon the revelation of the alleged corrective disclosures.

50. Named Plaintiff Bhadresh Shah, as set forth in the Certification attached hereto as Exhibit B, acquired Fastly securities at artificially inflated prices during the Class Period and was damaged when the previously downplayed risks materialized and/or upon the revelation of the alleged corrective disclosures.

51. Defendant Fastly is a Delaware corporation with principal executive offices located at 475 Brannan Street, Suite 300, San Francisco, California 94107. The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "FSLY."

52. Defendant Nightingale served as Fastly's Chief Executive Officer during the Class Period.

53. Defendant Kisling served as Fastly's Chief Financial Officer during the Class Period.

54. Defendants Nightingale and Kisling are collectively referred to herein as the "Individual Defendants."

55. The Individual Defendants possessed the power and authority to control the contents of Fastly's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Fastly's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Fastly, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

56. Fastly and the Individual Defendants are collectively referred to herein as "Defendants."

**FORMER EMPLOYEES WHO SUBSTANTIATE THE ALLEGATIONS**

57. CW1 worked for Fastly remotely out of Dallas as an Enterprise Sales Director from December 2021 through September 2024. CW1 reported to a Director of Sales, who reported to a Senior Vice President of Sales, who reported to the Chief Revenue Officer. CW1 worked with both new and existing customers and had a portfolio of about twenty companies, which included several Fortune 500 companies. CW1 was responsible for selling Fastly's security services and managing existing customers. By the end of CW1's employment at Fastly, CW1's job was heavily focused on acquiring new customers.

58. CW2 worked for Fastly both remotely and out of the Culver City office as a Senior Account Executive for the West Coast from September 2022 until August 2024. CW2 reported to Robbie Leukam, a Senior Sales Leader for the West Coast, who reported to TJ Michie, a Senior Vice President of Sales. CW2 managed around fifty mid-market enterprise customers and was involved in contract renewals, as well as "cross-selling," *i.e.*, working with existing customers to see if they could benefit from additional services offered by Fastly. CW2 worked with both new and existing mid-market enterprise customers.

59. CW3 worked for Fastly remotely from New Hampshire as an Enterprise Account Manager from September 2021 until April 2024 and reported to the Director of Account Management. CW3 was part of the Northeast enterprise account team, which focused on managing clients that brought in more than $100 million/year in revenue. These clients included some of the biggest clients at Fastly. CW3's job responsibilities included engaging in contract negotiations with customers and trying to upsell those customers by getting them to agree to use more of Fastly' services. CW3 was given quotas to meet on a "half-year" basis.

60. CW4 worked remotely for Fastly as a Senior Enterprise Account Executive for the West Coast sales team from July 2023 through April 2024 and reported to the West Coast Enterprise Sales Director. CW4 focused on customer growth and acquisition and managed a portfolio of about ten enterprise customers. CW4's duties included reaching out to potential new business, going to sales events, and meeting with current customers looking for expansion

opportunities. CW4 was tasked with attempting to bring on about one hundred and fifty businesses as customers during CW4's tenure at the Company.

61. CW5 worked for Fastly as a Technical Program Manager from March 2021 until August 2024, and reported to the VP of Product Operations, Chris Domergue, who reported to the Chief Product Officer. CW5 worked remotely but went into the San Francisco office about once a month. CW5 formed teams to develop new products at Fastly and CW5's responsibilities included assigning engineers to new roles, maintaining deadlines, and overseeing progress. CW5 interacted with many different departments, including the engineering, marketing, and sales teams. Following the release of the Q1 2024 results in May 2024, CW5 was tasked with developing a product for two of Fastly's biggest accounts, Apple and Amazon. The product consisted of a "staging environment" that would allow those companies to test out new web features before they go live on their platforms and functions much like a dress rehearsal where web engineers can evaluate how well a new product or tool works on their website before it is implemented.

62. CW6 worked for Fastly remotely out of California as a Website Producer from January 2021 through August 2024 and reported to a Web Production Manager, Chris LeCompte, who is no longer employed by Fastly. CW6's job responsibilities included managing Fastly's marketing website, overseeing content updates, and making the website more accessible for the public. CW6 was in charge of search engine optimization to improve page rankings and resolving any bugs on the website's backend.

63. CW7 worked for Fastly, both remotely and based out of Fastly's headquarters in San Francisco, as a Senior Program Manager from February 2016 through September 2023. CW7's immediate boss was a Senior Manager, Jordana Pilmanis, who is no longer employed by Fastly. CW7 was part of the Client Services team, also known as the Customer Ops team, and CW7's daily responsibilities included setting up meetings for new customers switching over to Fastly's CDN. CW7 worked with large enterprise clients to ensure everything ran smoothly as they integrated Fastly's services to their operations and stepped in to resolve any issues the enterprise customer had. CW7 also sent executive management weekly, and sometimes daily, end-of-day

reports to an email address for the C-Suite. During CW7's final year with Fastly, CW7 managed large live events for streaming companies, which included high-traffic events like the premiere of a hit TV show or popular live sports broadcasts. For example, CW7 oversaw Fastly's contract with CBS for hosting the Super Bowl, ensuring the CDN could handle the massive influx of viewers for such a major event.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

64. Fastly operates an edge cloud platform for processing, serving, and securing its customer's applications in the U.S., the Asia Pacific, Europe, and other international locations. The edge cloud is a category of IaaS that enables developers to build, secure, and deliver digital experiences. Organizations seeking to improve their user experience (*i.e.*, by faster loading websites) can benefit from processing at the edge.

65. Fastly's customers include organizations across many different industries. The Company's Key Customers are its top ten largest customers, who account for a significant portion of Fastly's revenue. According to CW1, the majority of the Company's top ten customers, or Key Customers, are in the media space (*i.e.*, TikTok, Apple, Twitter (X), Paramount, and Amazon Video), known at Fastly as the "media accounts." Nightingale likewise described during the Company's Q2 2024 earnings call on August 7, 2024 the Company's dependence on these Key Customers "in the media vertical" (referring to them as "the largest delivery customers" and stating the Company's "top 10 customers [are] a fair proxy for [them]").

66. The Company generates substantially all of its revenue from charging customers based on their usage of Fastly's platform, measured in gigabytes.

67. Typically, the Company enters into one-year contracts with customers, which include a minimum monthly billing commitment in exchange for more favorable pricing terms, although terms may vary by contract. Most of the Company's contracts are non-cancelable over the contractual term.

68. However, the Company also generates some revenue from additional products and professional and other services, such as implementation, account management, and customer support. The Company charges a flat one-time fee or recurring monthly fee for the additional products and services.

69. According to CW2, negotiations for existing customer contracts typically begin three months before the contract is set to expire, particularly with larger enterprise customers.

70. The bulk of the Company's revenue is derived from existing customers' usage of Fastly's platform.

71. For the years ended December 31, 2023 and 2022, approximately 95% and 94% of the Company's revenue, respectively, was driven by usage of its platform. New customers contributed less than 10% of that revenue.

72. Historically, the Company's revenue has been driven primarily by its enterprise customers who leverage the platform substantially from a usage standpoint.

73. The Company previously defined enterprise customers as those customers with revenue in excess of $100,000 over the trailing 12-month period. However, in 2023, the Company updated its methodology and redefined enterprise customers as those customers with annualized current quarter revenue in excess of $100,000, which is calculated by taking the revenue recognized in the current quarter and multiplying it by four.

74. Under the prior methodology, the comparative revenue generated from enterprise customers versus non-enterprise customers for FY 2021, 2022, and 2023 was as follows:

| | **2023** | **2022** | **2021** |
|---|---|---|---|
| Enterprise customers | $458,472,000 | $386,853,000 | $313,360,000 |
| Non-enterprise customers | $47,516,000 | $45,872,000 | $40,970,000 |
| Total Revenue | $505,988,000 | $432,725,000 | $354,330,000 |

75. Under the new methodology, the comparative revenue generated from enterprise customers versus non-enterprise customers for FY 2021, 2022, and 2023 was as follows:

| | **2023** | **2022** | **2021** |
|---|---|---|---|
| Enterprise customers | $464,452,000 | $393,152,000 | $315,918,000 |

| | | | |
|---|---|---|---|
| Non-enterprise customers | $41,536,000 | $39,573,000 | $38,412,000 |
| Total Revenue | $505,988,000 | $432,725,000 | $354,330,000 |

76. The Company's Key Customers account for a significant portion of its revenue. In FY 2022, the Key Customers generated an aggregate of 35% of the Company's revenue and in FY 2023, they generated an aggregate of 37% of the Company's revenue.

77. Thus, changes in usage by these customers can create volatility in the Company's revenue as they have an "outsized impact," in Nightingale's words, on the Company.

78. The Company measures revenue growth from existing customers – either through increased usage of Fastly's platform or purchase of additional products or services – using three key metrics: Dollar-Based Net Expansion Rate ("DBNER"), Net Retention Rate ("NRR") and Last-Twelve Months Net Retention Rate ("LTM NRR").

79. DBNER measures the Company's expansion of business with existing customers and provides insight into how effectively the Company is retaining and expanding its customer base over a specific period. DBNER increases when customers increase their usage of Fastly's platform or purchase additional products. It declines when customers reduce their usage of Fastly's platform, obtain lower pricing on their existing usage, or curtail their purchases of additional products. DBNER measures expansion only among continuing customers and does not indicate any decrease in revenue attributable to former customers.

80. DBNER is calculated by dividing revenue for a given period from customers who remained customers as of the last day of the given period (the current period) by revenue from the same customers for the same period measured one year prior (the base period). The revenue included in the current period excludes customers that churned (*i.e.*, terminated services) after the end of the base period and new customers that entered into customer agreements after the end of the base period.

81. NRR captures the ability of the Company to retain revenue from existing customers over a specific period by measuring the change in revenue generated by existing customers from one period to another. Fastly calculates NRR by dividing revenue derived from existing customers

in the last month of the period by revenue from those same customers during the last month of the same period one year prior.

82. NRR is a metric that tracks growth from existing customers without factoring in new customer acquisition. A low NRR could indicate customer churn or dissatisfaction. A NRR greater than 100% is a growth indicator.

83. LTM NRR measures revenue growth over a twelve-month period and is calculated by dividing the total customer revenue for the prior twelve-month period ("prior 12-month period") ending at the beginning of the last twelve-month period ("LTM period") minus revenue contraction due to billing decreases or customer churn, plus revenue expansion due to billing increases during the LTM period from the same customers by the total prior 12-month period revenue.

84. Beginning in Q1 2024, the Company discontinued disclosing quarterly NRR and DBNER. The Company had reported DBNER as a key metric since its first quarterly report, its Q2 2019 quarterly report filed with the SEC on Form 10-Q on August 9, 2019. The Company had reported quarterly NRR as a key metric since its Q2 2020 quarterly report filed with the SEC on Form 10-Q on August 7, 2020. The Company still discloses LTM NRR, which it described as "intended to be supplemental to our NRR" when it first began disclosing LTM NRR in the Company's Q3 2020 Quarterly Report filed on November 6, 2020.

**Fastly Experiences Significant Customer Pullback Beginning in 2023 and Throughout 2024**

85. During the Class Period, Nightingale denied that macro forces were having an impact on the Company's business or causing slowing growth and claimed that factors that had negatively impacted its competitors did not apply to Fastly, including because Fastly was not exposed to the type of customer where the market weakness was being felt (the SMB customer market). Similarly, the Company referred to the loss of, or reduction in usage by, Key Customers as merely a hypothetical risk, when that risk had already transpired.

86. However, in reality, the Company did face exposure from SMB customers because, according to CW1, an estimated 30 to 40% of the Company's sales team was dedicated to the SMB segment. CW1, who was an Enterprise Sales Director, estimated that 30 to 40% of the Company's

sales team was dedicated to the SMB segment based on Nightingale's communications during all hands meetings about wanting to expand the SMB segment.

87. Further, macro forces were impacting the Company's business in 2023. Starting in March and April 2023, CW2's mid-market enterprise customers began requesting more aggressive discounts when renewing their contracts with Fastly and threatened to terminate services with Fastly. According to CW2, customers were requesting these deals and specifically citing economic concerns. There was a direct correlation between when customers began asking for discounts and when interest rates began significantly rising. On average, customers were asking for a ten percent cut to their rates. Rather than agreeing to a discounted rate, Fastly often compromised by not increasing rates in the renewal contracts for these usage-based customers.

88. According to CW2, when considering whether to agree to discounted rates, a major component Fastly considers is how much traffic the customer is driving towards Fastly. CW2 had to get approval from a VP of Sales for discounts that went past a certain threshold. The Company had a system in place that once a contract would go above a certain percentage of a discount, it required executive approval.

89. According to CW2, general stagnation in customer growth continued into 2024 and through the end of CW2's tenure at the Company (*i.e.*, August 2024).

90. CW1 similarly described how macro forces, such as rising interest rates, were "definitely in the business cycle" and in fact, negatively affecting the Company's revenues overall throughout 2023, including revenues from Fastly's Key Customers, who were increasingly more price-conscious and demanding better pricing. CW1 referred to Nightingale's macro statements as "BS," and stated Nightingale was "probably just trying to keep the share price afloat." CW1 confirmed that these macro concerns were discussed at the Company's all hands meetings throughout 2023.

91. Adding to the pressures on Fastly was the fact that Fastly's competitors (*i.e.*, Cloudflare, Akamai, and Imperva) in the CDN market had caught up to the Company in technological prowess. Thus, Fastly had far less leverage in negotiating prices with its customers.

92. Defendants also touted that the Company's revenue growth was being driven by existing enterprise customers even as Defendants knew that revenue from existing enterprise customers, including the Company's Key Customers, was on the decline.

93. Beginning in 2023 and throughout 2024, existing enterprise customers were losing their appetite for Fastly's services.

94. During 2023, several of CW1's enterprise customers cancelled their contracts. For example, Indeed cancelled its $500,000/year security contract with Fastly in April 2023 because Fastly did not have the capability to fulfill their requirements for a bot solution. USAA's two-year $400,000 deal ended in November 2023 because the Company never implemented Fastly's software and CW1 could not convince the Company to deploy it.

95. In both instances, CW1 knew more than six months before the contracts were set to renew that it would be difficult to keep those customers.

96. CW1 also shared concerns about losing the $500,000/year contract if Fastly could not meet the customer's requirements all the way up to the founder of the Company, Artur Bergman.

97. CW4 worked on contract renewals for roughly ten existing customers between July 2023 through April 2024, and during that time period, only two of those customers were expanding their business with Fastly, while the majority of CW4's customers were stagnant in how they used Fastly year over year.

98. CW3, whose team handled clients responsible for at least $100 million of revenues, began to notice that revenues were declining for CW3's largest customers in November 2023 because CW3 began struggling to meet the quotas that the Company set for CW3. By the end of 2023, CW3 was about 40% short of meeting the quota set for CW3. CW3's colleagues were facing similar struggles with both large and small accounts. CW3 explained customers were no longer expanding their contracts with Fastly due to "tightening budgets" on their end, a general downturn in the tech sector as a whole, and sometimes being offered a better deal from competitors.

99. According to CW1, the Company's C-Suite "absolutely" knew by November 2023 that revenue for its larger customers was expected to decline because this issue was specifically discussed in all hands meetings held during Q4 2023. Specifically, Nightingale discussed how these large accounts were not bringing in as much traffic to Fastly, and the revenue derived from the large accounts was decreasing. He explained measures the Company was taking to address the decrease in traffic, such as assigning more "customer success" employees to the big accounts and using analytics to identify which accounts were slowing down the most.

100. CW6 corroborated CW1's account, describing that during all hands meetings during the last two quarters of 2023, including the November 2023 all hands meeting that occurred shortly after Fastly's November 1, 2023 Q3 2023 earnings call, Nightingale discussed how several of the Company's large media accounts (*i.e.*, its Key Customers) were not bringing in as much traffic to Fastly. During that all hands meeting, Nightingale spoke about "decreasing revenue from [the Company's] big customers" and how Fastly's large media accounts had had "throttled down" their usage simultaneously, resulting in a decrease in revenue. Nightingale warned that a specific streaming company was "***throttling things back, which is why revenue is down***" (emphasis added).

101. CW6 explained, during all hands meetings, Nightingale also discussed how the Company was trying to lessen its reliance on these Key Customers by acquiring several other large enterprise accounts because he was concerned about Fastly's revenue model relying on just a handful of big streaming accounts (*i.e.*, Netflix and Disney), which CW6 described as "big whales" and which were known to fluctuate in how much they used Fastly's services.

102. According to CW6, the Company's C-Suite and all employees attended the all hands meetings either in-person in the San Francisco office or remotely via Vimeo. The meetings included slide deck presentations and recordings of the meetings were distributed to all employees by email. The meetings were held regularly every quarter and typically occurred a week after the Company's earnings call. The meetings would include slide deck presentations and there would be a recap of what was discussed during the earnings call.

103. In addition, the Company also regularly tracked its customers' usage of Fastly's platform and their traffic flow.

104. According to CW1, employees at Fastly can track customer traffic through an internal tool known as the "Fastly App" and anyone managing those accounts would be able to see traffic flow. The app is mostly used by the customer success and engineering teams to analyze performance.

105. CW7 explained the Company also held weekly Customer Ops meetings, since at least as far back as 2022, to address customer issues and track bandwidth usage (*i.e.*, how much traffic was being transmitted through Fastly's platform) brought in by top clients, which took place every Thursday, typically at either 10 or 11 a.m. PT.

106. These meetings were attended by around fifty to seventy-five people via Zoom and were recorded and uploaded to the Company's intranet for individuals unable to attend the meeting live.

107. These meetings were cross-functional and included Account Managers, Technical Account Managers, Engineers, Customer Operations, and Sales team members. During the meetings, account managers would present the amount of bandwidth (also referred to as the "throughput") that each customer was using and Fastly used a red/yellow/green system to indicate how much bandwidth its top customers were using, with red representing a customer who was not using as much bandwidth as expected or desired.

108. A slide deck, compiled by Fastly's Vice President of Customer Support, Kami Richey, was always used at the meetings, showing each client's name and their color status. Every week, the Vice President of Customer Support gathered throughput data from the Account Managers, who monitored those numbers daily, and put that information in the slide deck.

109. During the meetings, Account Managers or Technical Account Managers typically provided the overview, with Account Managers talking about their top customers. If a major customer had opened a support ticket, that would also be a key topic of discussion and an engineering employee would provide a summary of the issue and the steps being taken to resolve

it. A support person also would present on the top support tickets and big customer tickets. The meetings would also include discussion about any type of security incident that would affect everyone.

110. Fastly's Chief Customer Officer, Kim Ogletree, and the Vice President of Global Customer Success, Windy Mesquita, regularly attended these meetings. Nightingale would also occasionally join the meetings.

111. If a major enterprise customer remained in "red" status week after week, the Chief Customer Officer, Vice President of Global Customer Success, and Vice President of Customer Support would assemble a "tiger team" to focus on improving the customer's performance.

112. CW7 recalled that by March 2023, Ticketmaster was one larger enterprise customer that consistently had issues with Fastly's services, was labeled "red" status in terms of throughput usage, and frequently threatened to cancel its contract with Fastly. These issues dated as far back as November 2022, with CW7 describing an incident involving Taylor Swift "Eras Tour" tickets, and Ticketmaster's system crashing due to several backend technical failures. CW7 explained Ticketmaster blamed Fastly for the issue.

113. In addition, according to CW1, it was well known throughout the Company, beginning in some point during 2023, that the Company was at high risk of eventually losing TikTok as a customer because TikTok had begun "building out their own network," which would result in TikTok transitioning off of Fastly at some point.

114. According to CW2, the stagnation in customer growth continued in 2024. CW2 explained customers did not have the appetite for more of Fastly's software.

115. According to CW 1, after the Q1 2024 results were released, the Company's leaders set up a "war room" and "tiger team," headed by the Chief Customer Officer, Kim Ogletree, to address the substantial drop in traffic from the Company's Key Customers. The tiger team was made up of employees involved with "customer success." CW1 learned about the tiger team because Nightingale announced it during an all hands meeting.

116. Also during the all hands meeting that occurred after the Q1 2024 financial results were released, according to CW6, Nightingale and Kisling discussed the declining revenue from the Company's Key Customers during Q1 2024 and how they did not expect multiple Key Customers to simultaneously throttle back their usage.

117. In subsequent all hands meetings, CW6 recalled Nightingale discussing how several of the Company's Key Customers were simultaneously reducing usage.

118. By the end of FY 2024, the Company's revenue derived from Key Customers had declined from 37% (for FY 2023) to 33%.

**The Company Struggles to Acquire New Customers**

119. As revenue from existing customers, including the Company's Key Customers, declined, the Company shifted its sales teams' focus towards acquiring new business, despite the fact that the vast majority of the Company's revenue was historically derived from existing customers and Defendants continued to publicly emphasize that the Company was driving revenue growth from existing customers.

120. Behind the scenes, according to CW6, Nightingale and the new Chief Revenue Officer put together teams to try to obtain business from several bigger companies in 2024.

121. Further, according to CW1, CW2, CW3, and CW4, Fastly reconfigured its sales compensation plan in 2024 in a manner that prioritized revenue secured from new accounts (also referred to as new "logos") over revenue generated from existing customers, thereby discouraging sales team members from continuing to attempt to drive growth from existing clients.

122. According to CW4, prior to 2024, the sales compensation model weighed all additional revenue a sales employee secured equally, regardless of whether it was generated from a new or existing customer. Under the new model implemented in 2024, sales employees received fifty percent more pay on revenue acquired from new customers, while the pay-out for revenue gained from cross-sells, upsells, and renewals was substantially lowered. CW2 explained revenue secured from renewals, cross-sells, and upsells was no longer a significant factor because the Company was only counting new logos. CW1 corroborated that "the entire focus of the

organization shifted to new business" and "[i]t was almost punitive to continue to work with your existing clients."

123. CW4's boss explained to CW4 and CW4's colleagues that the basis for the new compensation plan was that Fastly needed to acquire new customers in order to succeed.

124. However, according to CW1, new business "dried up" and started "falling off a cliff" during Q4 2023 and did not recover in 2024. No new contracts were being signed. CW1 explained potential customers were not interested in CW1's proposals because Fastly was offering only a slightly better deal than their current provider, but it would require a lot of resources and energy to implement Fastly's software.

125. CW1 stated that the Company fell far short of the unrealistic sales goals it had set for new customer acquisitions for 2023. The Company's 2023 target was set at around a lofty one hundred and seventy new logos. However, CW1 only managed to bring on two new enterprise customers throughout all of 2023 and CW1 ranked as number two across the entire enterprise team. The number one person on the enterprise team was only able to bring on three new customers. Several colleagues were unable to bring on even one new customer that year.

126. In 2023, only 30% of the Company's salespeople were able to meet their targets, a fact that was conveyed to CW1 and others by TJ Michie, the Senior VP of Sales for Fastly.

127. CW4 and the entire West Coast sales team, which was made up of six other sales executives and account managers, were unable to acquire any new business during CW4's tenure with the Company (July 2023-April 2024). Each week CW4 and CW4's boss had one-on-one meetings, and the West Coast sales team had weekly meetings during which the primary topic discussed was the lack of new customers that the team was bringing in. While CW4's boss was concerned about the lack of new business in the latter half of 2023, that concern escalated during 2024. Acquiring new customers was the main topic of conversation starting in 2024 until CW4 left Fastly in April 2024.

128. CW3 stated the Company began setting unrealistic quotas for the enterprise account managers in the first two months of 2024 and the new sales compensation plan made it even more challenging to meet the targets set by the Company.

129. According to CW2, sales teams struggled to meet the 2024 quota numbers and Fastly starting using performance improvement plans around April 2024. After CW3 left Fastly in April 2024, CW3 similarly heard that Fastly had begun instituting performance improvement plans in an effort to boost revenues and "increase quota attainment" and if employees failed to show signs of improvement, they were "on the chopping block."

130. Notwithstanding the lack of monetary incentive to drive revenue through existing customers, CW2 continued to have renewal meetings with existing customers in 2024, describing it as follows: "we want[ed] to do the right thing and take care of them, but would not get compensated for it." However, CW2's customers did not have the appetite for more of Fastly's software and experienced a stagnation in growth that continued until CW2 left Fastly in August 2024.

## DEFENDANTS MAKE FALSE AND MISLEADING STATEMENTS BUT THE DOWNPLAYED RISKS MATERIALIZE AND THE TRUTH TRICKLES OUT

### Defendants Mislead Investors During Q4 2023 About Macroeconomic Impacts on the Company's Business

131. During a November 15, 2023 conference call involving Nightingale, Kisling, and Rishi Jaluria from RBC Capital Markets, Defendants made misleading statements regarding macro impacts on the Company's business.

132. Specifically, when asked whether macro trends were getting better, Nightingale replied:

> [T]he macro trends that seemed to hinder some of our competitors, we were largely resilient to. Our customers are using our technology because it's the highest performance piece, it's not a nice to have for them. They weren't – if they wanted to reduce costs in their infrastructure, we couldn't be a target for them. So that was a pretty big piece of it. The biggest pressure that people saw in this area was like in small to medium SMB customers, maybe some of the mid market. We don't have a lot of exposure there. I wish [we] did have more exposure, and I am working to

> make our products simpler so we can. But I didn't have a lot of exposure. Financial services customers and telco customers, again, if I would had more exposure there, I probably would have seen more.

133. In a follow-up question, Jaluria referenced how "on the last earnings call, you did talk about some budget tightening that you had started to see," and asked "What's changed that you're seeing that now and you weren't seeing it a couple quarters ago?"

134. Nightingale responded that "for the last three or four quarters, I've gotten this question in each earnings call about what are we seeing from the macro. ***My competitors are seeing these effects, some slowing in growth, and [] we're not seeing that***" (emphasis added).

135. These statements were materially false or misleading because (i) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts; (ii) according to CW1 and CW2, customers were requesting more aggressive discounts in March and April 2023 due to economic concerns (*i.e.*, rising interest rates); (iii) the negative effect of macro forces such as rising interest rates had been generally discussed among Company executives at all hands meetings throughout 2023; (iv) Fastly was exposed to these macro pressures because Fastly's competitors in the CDN market had improved their services such that they were at least on par with Fastly, if not superior, and, as a result, Fastly had far less leverage in negotiating prices with its customers and was experiencing increased pricing pressure; and (v) the Company did have exposure in the SMB market because according to CW1, an estimated 30 to 40% of the Company's sales team was dedicated to the SMB segment. Thus, contrary to Nightingale's statements, macro forces were, in fact, negatively affecting the Company and slowing its growth.

**The Previously Downplayed Risks Begin to Materialize but Defendants Continue to Mislead Investors**

136. The previously downplayed risks of macro effects on the Company's business – *i.e.*, a decline in usage and revenues from Fastly's Key Customers – began to materialize when Fastly released its Q4 2023 financial results showing that it came in at the lower end of its revenue guidance and missed analysts' consensus revenue estimate.

137. During after-market hours on February 14, 2024, the Company issued a press release announcing the Company's Q4 and FY 2023 financial results and an investor supplement discussing the Company's Q4 and FY 2023 financial results. The Company reported revenues of $506 million for FY 2023 and $137.8 million for Q4 2024. The reported Q4 2023 revenue was on the lower side of their previous guidance and, according to Zacks Investment Research, missed analysts' consensus estimates by 1.1%. In response to this news, the Company's stock price fell from a closing price of $23.54 per share on February 14, 2024 to a closing price of $16.34 per share on February 15, 2024, a decline of 30.59 %.

138. Defendants, however, continued to downplay the potential macro effects on the Company's business going forward. Specifically, on February 14, 2024, the Company provided FY 2024 guidance in a range of $580 million to $590 million, and during an earnings call held on the same day to discuss the Company's Q4 and FY 2023 financial results, Nightingale told investors "[w]e established our annual guidance of 16% growth to incorporate macro uncertainties."

139. Defendants also continued to mislead investors about continuing to drive growth through existing customers.

140. During the February 14, 2024 earnings call, Nightingale stated that the Company's "customer retention efforts were stable in the fourth quarter." Notably, Nightingale described "customer retention" in a broader sense than simply maintaining existing customers rather than losing customers, *i.e.*, in terms of revenue growth and customer counts. Specifically, Nightingale defined it in terms of LTM NRR, a metric that measures customer growth by comparing total customer revenue over a twelve-month period, as well as total customer counts, a metric that could be net positive even if customers were terminating services provided that new customers offset the number of customers who terminated services: "**Our customer retention efforts were stable in the fourth quarter** with our LTM NRR at 113%, down slightly from Q3's 114%. Our total customer count in the fourth quarter was 3,243, which increased by 141 customers compared to Q3 and increased by 181 customers year over year" (emphasis added).

141. Nightingale's statement about stable customer retention efforts during Q4 2023 was materially false or misleading because: (i) his statement was based on metrics that do not accurately support that customer retention was stable during Q4 2023 because LTM NRR measures total customer revenue growth over a 12-month period that includes but is not limited to Q4 2023 and therefore does not specifically indicate what was happening in Q4 2023 and total customer counts does not indicate how many customers terminated services in Q4 2023; (ii) the Company's revenue from its Key Customers had been declining during Q4 2023 because they were not bringing in as much traffic to Fastly, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; and (iii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts.

142. Kisling also indicated during the February 14, 2024 earnings call that the projected revenue range of $580 to $590 million was based on, *inter alia*, the Company's "expectation for . . . revenue growth through the year driven by . . . continued expansion of existing customers."

143. This statement was materially false or misleading because Kisling suggested that the Company's revenue from existing customers would likely grow in 2024, despite the fact that (i) the Company's revenue from its Key Customers had been steadily declining because they were not bringing in as much traffic to Fastly, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline, (ii) the Company's revenue from some of its Key Customers was likely going to continue to decline because some of their contracts were up for renewal and by that time, those customers were already demanding more favorable pricing; (iii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts; and (iv) the Company had shifted its sales strategy using a new compensation plan, beginning in 2024, which prioritized new customer

acquisitions over generating revenue from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

144. The fact that the Company's existing customers were decreasing their use of Fastly's platform was material because the Company derived the vast majority of its revenue from such customers. For example, in FY 2023, 95% of the Company's revenue was derived from the usage of its platform and new customers only contributed less than 10% of that revenue.

145. Further, the fact that the Company's Key Customers, in particular, were decreasing their use of Fastly's platform also was material because they accounted for a substantial portion of the Company's revenue. In FY 2023, the Company's Key Customers generated an aggregate of 37% of the Company's revenue.

146. During the February 14, 2024 earnings call, Nightingale also attributed the Company's revenue coming in at the lower end of the Q4 2023 guidance range to "weaker than anticipated international traffic, offset by seasonally strong live streaming and gaming activity."

147. This statement was materially false or misleading insofar as it omitted the critical information that the decline in traffic involved several of the Company's Key Customers, which accounted for a significant portion of the Company's revenue, and Defendants knew about the traffic decline by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline.

148. In addition, during the February 14, 2024 earnings call, Nightingale was asked:

> Did anything get worse in the last quarter versus 3Q? I mean 3Q is really the first quarter we heard from you guys, macro, a lot of your competitors and the rest of software started talking about macro much earlier. So just wondering if we should view this as hitting Fastly a little bit behind the ball compared to the industry, or if something has materially changed from your perspective?

149. Nightingale responded: "No. I think it was pretty much as we saw last quarter. A handful of deals may be taking a little longer than we thought, a little bit of deal elongation."

150. This statement was materially false or misleading because (i) the Company's revenue from its Key Customers had been declining because they were not bringing in as much

traffic to Fastly, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; (ii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts; (iii) according to CW1 and CW2, customers were requesting more aggressive discounts in March and April 2023 due to economic concerns (*i.e.*, rising interest rates); (iv) the negative effect of macro forces such as rising interest rates had been generally discussed among Company executives at all hands meetings throughout 2023; and (v) Fastly was exposed to these macro pressures because Fastly's competitors in the CDN market had improved their services such that they were at least on par with Fastly, if not superior, and, as a result, Fastly had far less leverage in negotiating prices with its customers and was experiencing increased pricing pressure.

151. In a February 15, 2024 report titled "Mixed Quarter And Outlook Driven By International Weakness. Lowering to HOLD," Jeff Van Rhee of Craig-Hallum Capital Group LLC noted the Company's lack of transparency: "Explanations on the call around the weak Q4 and weak Q1 revenue guide were particularly vague, other than generally calling out international" and "we are unclear on the drivers of Q4 and Q1 weakness."

152. Shortly thereafter, Defendants made several similar misleading statements and risk disclosures about the growth of the Company's existing customers in the Company's annual report reporting the Company's financial and operating results for the quarter and year ended December 31, 2023, which the Company filed with the SEC on Form 10-K on February 22, 2024 (the "2023 10-K").

153. Nightingale and Kisling signed the 2023 10-K and it included as exhibits signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Nightingale and Kisling certified that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report,

fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

154. First, the 2023 10-K stated: "Our enterprise customers continue to leverage our platform, increasing their spend on our platform and driving our revenue growth year over year."

155. This statement was materially false or misleading because (i) the Company's revenue from its Key Customers had been declining because they were not bringing in as much traffic to Fastly, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; (ii) the Company's revenue from its some of its Key Customers was likely going to continue to decline because some of their contracts were up for renewal and by that time, those customers were already demanding more favorable pricing terms; (iii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts; and (iv) the Company had shifted its sales strategy using a new compensation plan, beginning in 2024, to prioritize new customer acquisitions over generating revenue from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

156. Second, under the heading, "If we are unable . . . to have existing enterprise customers continue and increase their use of our platform, our business will likely be harmed," the 2023 10-K warned investors, in relevant part (emphasis added):

> [O]ur ability to grow and generate incremental revenue depends on our ability to maintain and grow our relationships with our existing enterprise customers so that they continue and increase their usage of our platform. If these customers do not maintain and increase their usage of our platform, our revenue may decline and our results of operations will likely be harmed.
>
> For some of our products, we charge our customers based on the usage of our platform. Most of our customers, including some of our largest enterprise customers, do not have long-term contractual financial commitments to us. In addition, most of our current customer contracts are only one year in duration and these customers may not use our platform in a subsequent year. In order for us to maintain or improve our results of operations, it is important that our customers, in particular, our enterprise customers, use our platform in excess of their commitment levels, if any, and continue to use our platform on the same or more favorable terms.

…

> **Our future success also depends in part on our ability to expand our existing customer relationships, in particular, with enterprise customers, by increasing their usage of our platform, selling them additional products and upgrading their existing products. . . . If our efforts to increase usage of our platform by, or sell new and additional products to, our enterprise customers are not successful, our business would be harmed.** In addition, even if our largest customers increase their usage of our platform, we cannot guarantee that they will maintain those usage levels for any meaningful period of time.

157. This statement was materially false or misleading because the Company's Key Customers' use of Fastly's platform had been declining since 2023, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline. Defendants' disclosures were, therefore, inadequate.

158. Third, under the heading, "We receive a substantial portion of our revenues from a limited number of customers …, and the loss of, or a significant reduction in usage by, one or more of our major customers [(the Company's Key Customers)] would result in lower revenues and could harm our business," the 2023 10-K also warned investors, in relevant part:

> It is likely that we will continue to be dependent upon a limited number of customers for a significant portion of our revenues for the foreseeable future. . . . The loss of one or more key customers or a reduction in usage by any major customers would reduce our revenues. If we fail to maintain existing customers . . , our business would be harmed.

159. This statement was materially false or misleading because Defendants described the risk of loss of its Key Customers, or a reduction in their usage of Fastly's platform, in hypothetical terms when that risk had already materialized, as (i) the Company's revenue from its Key Customers had already been declining since 2023, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; and (ii) the Company's revenue from some of its Key Customers was likely going to continue to decline because some of their contracts were up for renewal and by that time, those customers were already demanding more favorable pricing terms.

160. Fourth, under the Management's Discussion and Analysis of Financial Condition and Results of Operations Section of the 2023 10-K, it states: "[w]e emphasize retaining our customers and expanding their usage of our platform and adoption of our other products."

161. This statement was materially false or misleading because, the Company had shifted its sales strategy using a new compensation plan, beginning in 2024, to prioritize new customer acquisitions over generating revenue from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

162. Fifth, under the Management's Discussion and Analysis of Financial Condition and Results of Operations Section of the 2023 10-K, it states: "[o]ur enterprise customers continue to leverage our platform, increasing their spend on our platform and driving our revenue growth year over year."

163. This statement was materially false and misleading because (i) the Company's revenue from its Key Customers had been declining since 2023, which Defendants knew by, at latest, November 2023 given that the Company was hosting all hands meetings by that time during which Nightingale discussed the decline; (ii) the Company's revenue from some of its Key Customers was likely going to continue to decline because some of their contracts were up for renewal and by that time, those customers were already demanding more favorable pricing terms; and (iii) numerous existing enterprise customers were cancelling their contracts with the Company in 2023 or requesting more aggressive discounts when renewing their contracts.

**Defendants Fail to Disclose Information Required to be Disclosed Under Regulation S-K**

164. Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), requires Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

165. Under the Management's Discussion and Analysis of Financial Condition and Results of Operations Section of the 2023 10-K, Defendants stated: "[o]ur enterprise customers

continue to leverage our platform, increasing their spend on our platform and driving our revenue growth year over year."

166. As set forth above, this statement was materially false or misleading and, in violation of Item 303, Defendants failed to accurately describe the trends or uncertainties related to the Company's revenue derived from existing customers.

167. Whereas Defendants claimed that the Company's existing enterprise customers were continuing to increase their usage of Fastly's platform and drive revenue growth, in reality, as described above, there was a trending material decline in such customers' use of Fastly's platform and the Company's revenue derived from them.

**The Previously Downplayed Risks Continue to Materialize and The Truth About Macro Impacts on the Company's Business During Q4 2023 is Revealed**

168. On May 1, 2024, the Company released its Q1 2024 financial results and announced that it was reducing its FY 2024 revenue projection from $580-$590 million to $555-$565 million.

169. Fastly's downward revenue guidance was a further materialization of the previously downplayed risks of macro effects on the Company's business – *i.e.*, decline in usage and revenues from Fastly's Key Customers. Contrary to Defendants' prior public statements in November 2023 and on February 14, 2024, which misled investors about the continuing macro impacts on the Company in the form of slowing customer growth, and Defendants' February 22, 2024 risk disclosures that described the risk of customer pullback in hypothetical terms when the risk had already come to fruition, Fastly was in fact experiencing significant customer pullback in 2023 and 2024, including traffic and revenue declines from the Company's Key Customers. As a result of this customer pullback, which Defendants concealed and downplayed, the Company was, again, forced to reduce its guidance. Accordingly, the reduced revenue guidance was a foreseeable consequence of the earlier concealed facts regarding the customer pullback, including Fastly's Key Customers.

170. In addition, during the Q1 2024 earnings call held on May 1, 2024, Nightingale also revealed the truth about macroeconomic effects on the Company's business during Q4 2023 when

he admitted the pricing pressure that the Company faced during the prior quarter (Q4 2023) and indicated that it had continued into Q1 2024. Specifically, Rishi Jaluria, an analyst from RBC Capital Markets, LLC, asked Nightingale:

> **Last quarter [(Q4 2023)], after the kind of first guide down, you talked about the pricing environment being relatively in line with how it's been historically.** It sounds now like there's maybe a little bit more intensifying pricing pressure in spite of the fact that there is consolidation going on, as you pointed out, and vendors in this space. **Can you speak to what has maybe changed in the past 90 days in terms of that?** And what tools do you have in your arsenal to maybe start to counteract those headwinds?

(Emphasis added).

171. Nightingale responded: "I think in the general market, **I would say that the pricing trend *that we have been seeing* sort of continues**" (emphasis added). Thus, Nightingale conceded that nothing had changed between Q4 2023 and Q1 2024, and the negative trend of increased pricing pressure and decreased revenue from the Company's Key Customers had continued through the quarters.

172. On that same call, Defendants also expanded on the impact that pricing pressure from the Company's Key Customers had during Q1 2024. For example, Nightingale stated, in relevant part:

> There are a few factors that contributed to a challenging short-term environment. **The biggest factor is a reduction of revenue from a small number of our largest customers [(*i.e.*, the Company's Key Customers)]. The first-quarter revenue from our top 10 customers dropped from 40% to 38%.**
>
> Many of the top 10 accounts run a multi-vendor strategy. And we did see significant volatility here. And there are a few reasons for that. Firstly, historically, Fastly has gradually won greater traffic share in our largest accounts. But with the timing of rate and volume changes, we saw increased volatility this quarter. To be clear, we have not been removed from any of our largest customers and we remain in a strong strategic position, each of them long term.
>
> Secondly, in some accounts, we did see an addition of CDN vendors or reversal of the vendor consolidation we saw last year. And thirdly, **we are seeing a slight uptick from the typical level of rerates with our largest customers, but we have not yet seen the commensurate traffic expansion usually associated with this motion.**

173. Kisling likewise attributed the decreased revenue projections to "a challenging environment of revenue declines in [the Company's] largest customers" (*i.e.*, the Company's Key Customers).

174. During the Q&A portion of the call, Nightingale told investors:

> [W]hat we saw in our top-10, 15 largest accounts, we saw some or slightly more kind of pricing pressure than we're used to. And that's got an outsized impact for us, and we are trying to make sure that we're doing the right adjustments to our projection based on that.
>
> Usually, with these kinds of pricing changes, we see a commensurate volume increase as well, and we still hope to see that, especially in some of these key accounts.

175. Kisling added, "we saw more modest rerates historically. I think that continues across kind of the broad market, but we have seen a change in the largest accounts" (*i.e.*, the Company's Key Customers).

176. Nightingale also stated: "The weakness and the shift in the projection from last quarter [to] this quarter is really in those large accounts," and "we see a little more pricing pressure up there[] [a]nd that has – for the large accounts for us and have a large impact."

177. In addition, Nightingale stated: "I think it's fair to say that we've seen some more rerates in our largest 10 or 15 accounts in this past quarter."

178. Rudy Kessinger, an analyst from D.A. Davidson, pushed for further detail, asking:

> When exactly in the quarter did these customers start repricing contracts and adding other CDNs and moving share, et cetera? And with these repricings, I guess, you guys just have no control over it whatsoever. And they just asked for repricing, you guys do it within a couple of days. I mean, I just don't understand how, you know, three months ago, you told us you didn't have any barge repricing expected. And now it turns out you did within a six-week time frame.

179. Kisling responded (emphasis added):

> **[A] lot of that arose really at the end of March and in early April**, when we saw, one, the motion of some of our customers, kind of reversing their trend to consolidating on CDNs, which affected our traffic projections for the year. **And then as we engage in some of the rerates that we knew were coming, those negotiations resulted in bigger discounts than we thought that did not come with the typical increase in traffic that we've seen historically. And so those were the big drivers. I would say timeframe really was late March, early April, when we saw these different dynamics.**

180. Kessinger then asked, "so is it larger-than-expected pricing pressure?" Nightingale responded:

> [A] small number of accounts where we had – where our projection, our revenue projection has pulled back. And those are large accounts that have very significant swing and they need to be handled and managed and optimized very specifically. It's why we're changing our motion there and look I believe we have an opportunity to move back to growth in those accounts. But our projection reflects where we currently are.

181. In response to a question about the volatility with some of the Company's larger customers, Nightingale stated:

> [W]e had a couple of accounts in that very large set that negotiated rerates in the past quarter. Usually, a rerate like that would come up – would come with like a commensurate volume increase. And we tried to model that very carefully. But our projections there was a little bit aggressive, I believe.

182. Analysts reacted negatively. On May 2, 2024, during pre-market hours, BofA downgraded Fastly stock from a "Buy" rating to an "Underperform" rating and cut its price target on the stock from $18 per share to a mere $8 per share, noting that "[d]ecelerating growth in Fastly's largest customers, share loss in delivery, and limited visibility in 2H cause us to question a rebound in 2024," and that "[w]hile we continue to like Fastly's positioning in the edge compute market, we see it as a 2025 opportunity instead of a near-term growth driver."

183. Other analysts followed suit. On May 2, 2024, in a report titled "Expectations Were Low But Wow; D/G to NEUTRAL - $8.50 PT," Rudy Kessinger, CFA, of D.A. Davidson, downgraded Fastly's stock from "Buy" to "NEUTRAL," stating:

> The revised guide implies acceleration . . . seemingly expected to come from recovering traffic with large customers. We cannot get comfortable with that premise given what's transpired over the last two quarters. We are thus stepping to the sidelines until we can get more comfort around the concentration risk and see more durable growth from non-top 10 customers.

184. On that same day, in a report titled "Fastly Earnings: Atrocious Outlook on Weakness with Major Customers Creates Grave Concerns," Matthew Dolgin, of Morningstar, announced that Morningstar was cutting its fair value estimate in half, from $20 to $10. Discussing the drop in revenue guidance, Dolgin stated:

> More troublesome is that this drop does not seem to be due to short-term vacillations. Management advised that the change in its outlook was due to a decline in revenue from Fastly's biggest customers. Fastly's top 10 customers make up nearly 40% of revenue, and more than 90% comes from enterprise customers spending more than $25,000 quarterly. Major enterprises use multiple providers for their content delivery network needs. The biggest enterprises are now paying Fastly lower prices without giving Fastly more traffic, and it appears the reduced traffic is not the result of less demand but rather a shift to other providers.

185. Following these developments, Fastly's stock price fell $4.14 per share, or 32.02%, from a closing price of $12.93 per share on May 1, 2024 to a closing price of $8.79 per share on May 2, 2024.

**<u>Defendants Continue to Mislead Investors About Existing Customers' Growth</u>**

186. Even while Defendants pulled back the Company's FY 2024 revenue projections for being "a little bit aggressive," Defendants continued to misrepresent and downplay the risks of macro impacts on the Company's business going forward, with Nightingale assuring investors during the May 1, 2024 earnings call about the Company's prospects for meeting the reduced 2024 projections:

> I think our projection is relatively conservative. I believe we're going to see traffic levels come up and we're going to find some success in recovering revenue in those large accounts. We're signaling the guide here because obviously there's a new projection and we want to reflect that. But look, I believe there's an opportunity for us to beat that projection, and reverse, not just stop the decline, but really reverse the trend in the second half.

187. Defendants also continued to mislead investors about the Company's revenue prospects from its existing enterprise customers, including its Key Customers.

188. During the Q1 2024 Earnings Call, Nightingale stated (emphasis added):

> The top 15 or 20 accounts at Fastly, they carry a lot of our revenue and the way that we engage with them, the way that we drive platforms like product line penetration, the way we drive price control and discount control, the way that we optimize their performance and driving more significant and complete technology solution, I believe we have an opportunity in all of those categories to improve the way that we engage and dedicate more resources and more focus to it. And that's exactly what we're doing.
>
> **Right now, we have already launched a new engagement model. We're driving a far higher touch across all those major accounts. We've been running it for**

> **a couple of weeks now, and we're – I'm pretty happy with the progress so far.** But just looking at the – where our projection is for those accounts and how much it's changed in just one quarter, like you said, some plus February, I think decisive change in our engagement model was warranted. And that's exactly the transition that we're undergoing right now.

189. This statement was materially false or misleading because it suggested that the Company had begun making progress with driving additional revenue from these Key Customers when no such progress had been made. Fastly's customers were bringing their business to competitors, reversing the consolidation trend (*i.e.*, working with more vendors).

190. Further, according to CW5, two of Fastly's largest accounts, Apple and Amazon, had been requesting a "staging environment" to test out new web features before they go live on their platforms since 2023, and while Fastly originally told these customers it would have the product completed by the end of 2023, Fastly did not begin working on it until May 2024. According to CW5, two other program managers had previously tried to get the staging environment launched in 2023 but were unable to secure the necessary resources to do so. However, when CW5 was tasked with this project following the release of the Company's Q1 2024 results, it was backed by the Chief Product Officer and Nightingale. CW5 was instructed to have the product ready by the end of June 2024, and Nightingale told CW5 to do whatever was needed to get it done. CW5 was under the impression that Apple and Amazon would leave Fastly if Fastly was unable to deliver this feature, but described the June 2024 deadline as unrealistic and was ultimately unable to meet it.

191. Defendants also made materially false or misleading statements in the Company's Q1 2024 Quarterly Report on Form 10-Q, filed with the SEC on May 1, 2024 (the "Q1 2024 10-Q").

192. Nightingale and Kisling signed the Q1 2024 10-Q and it included as exhibits signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein the Individual Defendants certified that the Q1 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this

report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report."

193. Under the Management's Discussion and Analysis of Financial Condition and Results of Operations section, the Company stated "[w]e focus our direct selling efforts on expanding our customer's use of our platform," "[w]e are focused on . . . expanding our relationship with existing customers," "[w]e emphasize retaining our customers and expanding their usage of our platform and adoption of our other products," and "[u]tilizing our direct sales force, we have multiple selling points within organizations to . . . increase usage from our existing customers."

194. These statements were materially false and misleading because they suggested the Company was focused on driving revenue from existing customers when at that time, the Company had already shifted its sales strategy using a new sales compensation plan that prioritized new customer acquisitions over generating revenue from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

195. The Q1 2024 10-Q also contained the same misleading risk disclosures as the 2023 10-K.

196. Under the heading, "If we are unable . . . to have existing enterprise customers continue and increase their use of our platform, our business will likely be harmed," the Q1 2024 10-Q warned investors, in relevant part (emphasis added):

> [O]ur ability to grow and generate incremental revenue depends on our ability to maintain and grow our relationships with our existing enterprise customers so that they continue and increase their usage of our platform. If these customers do not maintain and increase their usage of our platform, our revenue may decline and our results of operations will likely be harmed.
>
> For some of our products, we charge our customers based on the usage of our platform. Most of our customers, including some of our largest enterprise customers, do not have long-term contractual financial commitments to us. In addition, most of our current customer contracts are only one year in duration and these customers may not use our platform in a subsequent year. In order for us to

> maintain or improve our results of operations, it is important that our customers, in particular, our enterprise customers, use our platform in excess of their commitment levels, if any, and continue to use our platform on the same or more favorable terms.
>
> …
>
> **Our future success also depends in part on our ability to expand our existing customer relationships, in particular, with enterprise customers, by increasing their usage of our platform, selling them additional products and upgrading their existing products. . . . If our efforts to increase usage of our platform by, or sell new and additional products to, our enterprise customers are not successful, our business would be harmed.** In addition, even if our largest customers increase their usage of our platform, we cannot guarantee that they will maintain those usage levels for any meaningful period of time.

197. This statement was materially false or misleading because Defendants described the risk of existing customer growth stagnating or declining due to decreased usage as hypothetical or possible when the risk had already materialized, as (i) existing customers' growth had already been stagnating for at least a quarter; (ii) during the Q1 2024 earnings call on May 1, 2024, Defendants admitted the Company's revenue from its Key Customers was continuing to decline during Q1 2024, informing investors that the Company had faced pricing pressure from its Key Customers during Q1 2024, which created "a challenging environment of revenue declines in [its] largest customers" (*i.e.*, its Key Customers), and that was the "biggest factor" contributing to the "challenging short-term environment;" (iii) according to CW6, Defendants admitted during the all hands meeting that followed the release of the Q1 2024 financial results that multiple Key Customers simultaneously throttled back their usage during Q1 2024; and (iv) the Company had already shifted its sales strategy using a new sales compensation model in 2024 that deterred the sales team from focusing on driving existing customer growth, given that their compensation plan weighed revenue from new customer acquisition more heavily than revenue from existing customers.

198. Under the heading, disclosure "We receive a substantial portion of our revenues from a limited number of customers …, and the loss of, or a significant reduction in usage by, one or more of our major customers [(the Company's Key Customers)] would result in lower revenues and could harm our business," the Q1 2024 10-Q also warned investors, in relevant part:

> It is likely that we will continue to be dependent upon a limited number of customers for a significant portion of our revenues for the foreseeable future. . . . The loss of one or more key customers or a reduction in usage by any major customers would reduce our revenues. If we fail to maintain existing customers . . . , our business would be harmed.

199. This statement was materially false or misleading because Defendants described the risk of loss of its Key Customers, or a reduction in their usage of Fastly's platform, in hypothetical terms when that risk had already materialized, as (i) during the Q1 2024 earnings call on May 1, 2024, Defendants admitted that the Company's revenue from its Key Customers was continuing to decline during Q1 2024, informing investors that the Company had faced pricing pressure from its Key Customers during Q1 2024, which created "a challenging environment of revenue declines in [its] largest customers" (*i.e.*, its Key Customers), and that was the "biggest factor" contributing to the "challenging short-term environment;" (ii) according to CW6, Defendants admitted during the all hands meeting that followed the release of the Q1 2024 financial results that multiple Key Customers simultaneously throttled back their usage during Q1 2024; (iii) the Company's new engagement model for driving growth among these Key Customers was not making progress in driving growth; and (iv) at least some of the Company's Key Customers were not likely to contribute to any revenue growth because the Company failed to deliver products to them within the time period requested and the Company had only just begun working on the product in May 2024, despite telling the customers that the product would be ready by the end of 2023.

**<u>The Previously Downplayed Risks Continue to Materialize and The Truth About the Stagnation in Growth During Q1 2024 Emerges</u>**

200. On August 7, 2024, Fastly released its Q2 2024 financial results, announcing that it was again reducing its full year 2024 revenue guidance from $555-$565 million to $530-$540 million. During the Q2 2024 earnings call held on the same day, Nightingale acknowledged that the reduction in annual projected revenue growth was "materially below our budgeted plans," and blamed sequential declines in revenue from Key Customers that partially offset growth in revenue from other areas, as well as their expectation of continued declines. Nightingale explained that the

revenue decline was due to pricing pressure from the Company's Key Customers, which "are deeply focused on profitability."

201. The downward revenue guidance was a further materialization of the risks of macro effects on the Company's business, *i.e.*, a decline in usage and revenues from Fastly's Key Customers, which Defendants had downplayed and concealed in November 2023, February 2024, and May 2024. On May 1, 2024, Defendants again downplayed the continuing impacts of customer pullback and assured investors that the Company had taken a more conservative approach to its revenue projections that accounted for the revenue decline from Key Customers, but unbeknownst to investors, those Key Customers continued to bring in less traffic to Fastly. Thus, Defendants' May 1, 2024 risk disclosures that described the risk of customer pullback in hypothetical terms – when the risk had already come to fruition – were misleading. As a result of this customer pullback, which Defendants concealed and downplayed, the Company was, again, forced to reduce its guidance. Accordingly, the reduced revenue guidance was a foreseeable consequence of the concealed facts regarding continuing customer pullback, including Fastly's Key Customers.

202. In addition, during the August 7, 2024 earnings call, Defendants also revealed the truth about the pricing pressure and revenue declines from the Company's Key Customers during the prior quarter (Q1 2024), which continued into Q2 2024, and that, as a result, the Company was shifting its focus towards acquiring new business.

203. Specifically, during the scripted portion of the August 7, 2024 earnings call, Kisling informed investors (emphasis added):

> In the second quarter, we **continued to see sequential declines** in revenue from some of our largest customers [(*i.e.*, the Company's Key Customers)] that partially offset growth in revenue from other areas, particularly social media, development platforms and gaming. **The sequential declines in revenue from our largest customers were driven by further impacts** from the reversal in the consolidation of network services vendors last year [(2023)] **that we discussed in Q1 [2024]** and also **a continuation** of lower follow-on traffic than we have historically seen following typical customer rerate.
>
> As a result, network services revenue per gigabit declined more year-over-year than the historical trend line we typically experience. We anticipate this dynamic will continue throughout Q3 and then begin to moderate in the fourth quarter.

> Our Top 10 customers comprised 34% of our total revenues in the second quarter of 2024 compared to 38% in Q1 2024, reflecting the impact of the revenue declines from some of our largest customers. Also, no customer accounted for more than 10% of revenue in the second quarter.

204. Nightingale similarly discussed the Company's challenges "with a small set of [its] largest customers" (*i.e.*, its Key Customers) and how "projected growth in those accounts ha[d] declined.".

205. In response to a question about the declines from the Key Customers, Nightingale clarified:

> [T]here is definitely softness in the traffic of those large accounts, primarily media, large media accounts. And there's certainly a push to profitability from within those teams and we're seeing that and trying to react to their needs and their business priorities of those customers. We've really transformed our customer success motion for these large multi-vendor customers.
>
> We're focusing on delivering the kind of differentiation and the kind of service that they're looking for in a very bespoke way. So we have consumed obviously some headwinds here in terms of the revenue projection for the back half which you see in our outlook. But yes, we believe we've stabilized those accounts at this point.

206. However, Kisling discussed how the Company's "increased engagement model" with those accounts, which entailed "senior level engagement regularly with these customers," would provide "much better visibility into their own internal dynamics around their traffic expectations and traffic allocations," which would "translate[] into a much more reliable view of how their business will play out over the remainder of the year."

207. Nightingale also described the Company's shifting focus towards acquiring new business, stating "we haven't lost focus on driving customer acquisition and growth in the other 2/3 of our business to effectively outgrow this concentration risk over time" and "[t]he success in this transformation will continue to drive top line revenue growth and become the foundation of our business."

208. Nightingale stated that "[t]his is truly a moment of transition for Fastly," focused on "mitigat[ing] [the Company's] dependence on large multi-vendor customers," including by "expanding [the Company's] portfolio," in order to "drive more stability and higher growth for Fastly in the years to come."

209. Similarly, Kisling stated: "As we continue to transform our business towards a bifurcated customer strategy, we will continue to focus our customer acquisition strategy and direct more development and go-to-market investment towards the broader market opportunity outside our Top 10 customers."

210. Nightingale concluded by discussing the Company's "outlook" and "path forward," stating:

> The large customer headwinds we've seen have continued to impact our business . . . . [A]s I discussed previously, this is a moment of transition and we take this very seriously.
>
> We must continue to acquire new customers and grow accounts outside our large media cohort. This will diversify and strengthen our business and this is exactly the path that we're on.

211. Following these developments, Fastly's stock price fell $0.98 per share, or 14.33%, from a closing price of $6.84 per share on August 7, 2024 to a closing price of $5.86 per share on August 8, 2024.

212. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the previously downplayed risks materialized and/or upon the revelation of the alleged corrective disclosures, Plaintiffs and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

213. During the Class Period, Defendants emphasized the importance of the Company's existing enterprise customers, including its Key Customers, for driving the Company's revenue growth, even while Defendants knew or recklessly disregarded the fact that the revenue derived from such customers was on the decline and would likely continue to decline given that: (i) many enterprise customers were canceling contracts or demanding more favorable pricing, (ii) the Company's Key Customers were already decreasing their use of the platform in 2023 – a trend which continued into 2024 – and some of them were in the process of renegotiating their contracts by January 2024 at the latest and seeking more favorable terms, (iii) the Company was shifting its focus towards acquiring new business versus generating revenue from existing customers, and (iv)

the Company's new engagement model with its Key Customers was not driving progress as Defendants suggested.

214. Based on the information provided by CW1, CW2, CW3, and CW4, at best, customers were stagnant in their use of Fastly's platform by November 2023, whereas many other enterprise customers were canceling contracts and requesting more aggressive discounts during contract renewals, threatening to leave Fastly altogether. The customer pullback continued into 2024.

215. This trend pervaded Company sales teams across the country and was known by Defendants. CW1 described sharing concerns about a contract that was cancelled in April 2023 all the way up to the founder of the Company.

216. Further, the Company held all hands meetings attended by the Individual Defendants during 2023, during which, according to CW1 and CW6, Nightingale discussed how the Company's Key Customers had "throttled down" their usage and were not bringing in as much traffic, which resulted in a decrease in revenue from these customers. These all hands meetings also included discussion on the overall state of the Company's business, including, but not limited to, the effect of macro forces on the Company's business. Nightingale and Kisling likewise discussed the continuing decline in traffic and revenue from the Company's Key Customers during all hands meetings in 2024.

217. In addition, according to CW1, the Company regularly tracks its customers' traffic using the "Fastly App." Thus, at all relevant times, the Company had data demonstrating Key Customers' declining traffic beginning in 2023 and continuing through 2024.

218. According to CW7, the Company also held weekly Customer Ops meetings every Thursday during the relevant period to discuss any customer issues and their bandwidth usage (*i.e.*, how much traffic they were transmitting through Fastly's platform). Top Company executives, including the Chief Customer Officer, Vice President of Global Customer Success, and Vice President of Customer support regularly attended and participated in these meetings, and Nightingale occasionally attended as well. During the Customer Ops meetings, each customer was

rated using a red/yellow/green system to indicate how much the customer was using Fastly's platform, with red indicating a customer who was not using as much bandwidth as expected or desired. If a major enterprise customer continued to be rated "red," the Chief Customer Officer, Vice President of Global Customer Success, and Vice President of Customer Support would assemble a "tiger team" to focus on improving the customer's performance.

219. Defendants, thus, knew by, at latest, November 2023 (before Defendants' misleading statements on November 15, 2023 that the Company was not experiencing macro impacts in the form of slowing growth), that the Company's revenue from its Key Customers was declining.

220. Defendants also knew that these declines had continued into 2024 when they misled investors about stable customer retention rates and customer growth in February 2024.

221. Defendants knew that the traffic and revenue declines that started in late 2023 had continued into 2024 because some of the Company's Key Customers' contracts were up for renewal in March and April 2024 and they were putting increased pricing pressure on the Company. According to CW2, contract negotiations typically begin roughly three months before the contract is set to expire. Thus, these Key Customers were already negotiating their renewals and demanding more favorable pricing terms by early January 2024 at the latest (three months before early April 2024).

222. Nightingale admitted during a November 15, 2023 RBC Capital Markets 2023 Technology, Internet, Media and Telecommunications Conference, "I track – just to give you it a hundred percent verbatim, I'm always tracking top 10, top 20 deals for any given quarter." Thus, he was certainly tracking these Key Customer deals and aware of the bigger discounts that these Key Customers were demanding and offered. Defendants therefore knew, when they made their misleading statements on February 14, 2024, of the significant risk that the Company's revenue generated from these Key Customers, whose use of the platform Defendants knew was already declining, would continue to decline in 2024. It also defies logic that as they were negotiating these deals, Defendants were nevertheless completely unaware of how these Key Customers were using

Fastly's platform at the time (less). Thus, Defendants were aware, or should have been aware, that the traffic declines from the Company's Key Customers had continued into Q1 2024.

223. Nightingale and Kisling's admissions after the Q1 2024 financial results were released also support that when they misled investors on May 1, 2024 about the hypothetical risk of declining customer growth, including among the Company's Key Customers, they knew that the risk had already come to fruition. During the Q1 2024 earnings call on May 1, 2024, Nightingale and Kisling admitted that the Company had faced pricing pressure from its Key Customers during Q1 2024, which created "a challenging environment of revenue declines in [its] largest customers" (*i.e.*, its Key Customers) and that was the "biggest factor" contributing to the "challenging short-term environment."

224. According to CW6, Nightingale and Kisling also admitted during the all hands meeting that followed the release of the Q1 2024 financial results that multiple Key Customers had simultaneously throttled back their usage during Q1 2024.

225. The revenue decline from Key Customers was not something that happened overnight. Rather, it was the result of months of continued decreasing traffic throughout Q1 2024, notably after such customers had secured bigger discounts from the Company. Given the data that was available to Defendants, the internal meetings that took place discussing traffic trends, the recent negotiations of new deals for these Key Customers, Nightingale's admission that he tracked the top deals, and the outsized impact of these Key Customers on the Company's overall revenue, the revenue declines from Key Customers that the Company reported for Q1 2024 were no surprise to Defendants. Defendants knew, or should have known, that the Company's Key Customers had been using Fastly's platform less and less for months.

226. Further, following the release of the Company's Q1 2024 results, the Company also set up a "war room" and "tiger team" to address the substantial drop in traffic from the Company's Key Customers, demonstrating the severity of the issue.

227. Accordingly, by the time Defendants touted the Company's customer retention and continued revenue growth from its existing enterprise customers and described the risk of declining

usage from the Company's enterprise customers (especially its Key Customers) in hypothetical terms in February 2024 and May 2024, Defendants knew, or should have known, that the revenue from such customers was on the decline and the risk had already come to fruition.

228. Defendants also falsely or misleadingly implied that their new engagement model with the Company's Key Customers was making progress, when in reality, they knew that was not the case. Specifically, according to CW5, two of Fastly's largest accounts, Apple and Amazon, had been requesting a staging environment to test out new web features before they go live on their platforms since 2023, and while Fastly originally told these customers it would have the product ready by the end of 2023, no one at Fastly actually began working on it until May 2024. CW5 was instructed to have the product ready by the end of June 2024, but CW5 described that deadline as unrealistic and was unable to meet it.

229. Nightingale knew about the product that CW5 was tasked with developing because, according to CW5, the only reason CW5 managed to get traction on the project was because she had the backing of the Chief Product Officer and the CEO, Nightingale. Nightingale told CW5 to do whatever was needed to get it done.

230. In addition, Defendants knew, or should have known, that the revenue derived from its other existing enterprise customers would continue to decline because, despite touting its continued focus on expanding its existing customers' use, the Company began shifting its focus towards acquiring new business.

231. Unbeknownst to investors, Defendants reconfigured the sales strategy under a new sales compensation model in 2024 to prioritize revenue derived from new accounts over revenue derived from existing customers, thereby discouraging sales team members from continuing to dedicate resources towards driving revenue from existing customers.

232. As CW2 explained, sales team members lacked a financial incentive to continue to push for growth from existing customers, and only worked with them because "we want[ed] to do the right thing and take care of them."

233. Meanwhile, Defendants took steps to ensure that the declining revenue from its existing customers would remain undetected. Beginning in Q1, 2024, the Company discontinued disclosing metrics that measure revenue growth from existing customers, DBNER and quarterly NRR.

234. The Company had reported DBNER as a key metric since its first quarterly report, its Q2 2019 quarterly report. The Company had reported quarterly NRR as a key metric since its Q2 2020 quarterly report. The only remaining key metric which the Company discloses that measures growth from existing customers, LTM NRR, was "intended to be supplemental to [the Company's] NRR," according to the Company's Q3 2020 quarterly report, when the Company first reported LTM NRR.

235. Defendants claimed the Company ceased reporting these metrics because, according to the Company's Q1 2024 10-Q, they "were used infrequently by investors." However, both Defendants and analysts regularly discussed these metrics.

236. For example, during the August 12, 2019 KeyBanc Capital Markets Technology Leadership Forum, Adriel Lares, then-CFO of Fastly, discussed the growth of the Company's enterprise customers, stating:

> And the idea is, how much can we continue with them to grow, which is why we report the DBNER. The DBNER also takes into account any rerates they may negotiate on a yearly basis. So hopefully, it's a fairly truthful metric, because if there's a rerate and the DBNER is 132%, for example, that must mean their traffic to us is growing quite quickly.

237. During the Company's Q2 2021 Earnings Call, Rishi N. Jaluria of D.A. Davidson asked:

> If I look at NRR in the quarter itself, it's the first time I've ever seen this number drop below 100%. And that's kind of a little bit of a scary number to see. Can you maybe walk me through why was NRR so low this quarter, at 93%? What is that – when you have customers that are shrinking their footprint, is it bringing more to competitors? Is it bringing more in-house? Maybe walk us through that number and how we should be thinking about that metric going forward.

238. Further, the decision to discontinue reporting DBNER and quarterly NRR was suspiciously timed when those metrics would have revealed the trend that existing customer

growth was declining, in contradiction to Defendants' statements about existing customers continued to drive revenue growth.

239. While the Company's 2023 10-K, the Company's last disclosure of DBNER, showed a deceased in DBNER from 122.7% in FY 2022 to 119% in FY 2023 and showed a drop in NRR from 110.7% in FY 2022 to 110.1% in FY 2023, the quarterly data that the Company disclosed for 2022-2023 showed fluctuations in DBNER and NRR and did not yet reveal a trend.

240. With the market price of Fastly stock artificially inflated based on Defendants' false and misleading statements and omissions, Defendants Nightingale and Kisling sold a substantial amount of Fastly stock during the Class Period. Specifically, Defendant Nightingale sold 410,228 of his shares of Fastly stock for proceeds of roughly $5,968,797, while Defendant Kisling sold 149,568 of his shares of Fastly stock for proceeds of roughly $1,969,417.

241. Nightingale, specifically, had a strong personal incentive to maximize the share price so that he could achieve certain targets and personally profit from vested performance-based restricted stock units ("PRSUs"). According to his statement of changes in beneficial ownership filed with the SEC on Form 4 in November 2023, Nightingale had the opportunity to receive up to approximately 1.3 million PRSUs if the stock price achieved certain targets over a 60-day average. On November 15, 2023, *the same day* that Nightingale misled investors about Fastly's slowing growth, Nightingale received 326,086 PRSUs based on the share price hitting certain targets. The next day, Nightingale sold 233,270 shares (approximately 14% of his holdings) for roughly $3.79 million.

## LOSS CAUSATION

242. As a result of Defendants' materially false or misleading statements and omissions of material fact, Fastly securities traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Fastly securities and public information related to Fastly, Plaintiffs and other Class members purchased or otherwise acquired Fastly securities at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein.

243. Defendants' materially false and misleading statements and omissions of material fact had their intended effect, directly and proximately causing Fastly securities to trade at a price higher than it would have had the facts, risks, and conditions concealed by Defendants' fraud become known sooner than they did.

244. Absent Defendants' misrepresentations and omissions of material fact, Plaintiffs and other Class members would not have purchased or otherwise acquired their Fastly securities at the artificially inflated prices at which they traded.

245. Plaintiffs and other Class members were damaged when the previously downplayed risks of macro effects on the Company's business (*i.e.*, a decline in usage and revenues from Fastly's Key Customers) materialized on the dates listed below, and/or when the material facts and foreseeable risks mispresented or concealed by Defendants were revealed through the disclosure of new information concerning Fastly on the dates listed below, each of which directly and proximately caused declines in the price of Fastly securities by removing the artificial inflation in the price of Fastly's securities that resulted from Defendants' fraud.

246. The previously downplayed risks of macro effects on the Company's business (*i.e.*, the significant pullback by Fastly's Key Customers) began to materialize when the Company announced its Q4 and FY 2023 financial results on February 14, 2024, reporting revenues on the lower side of their previous guidance and that missed analysts' consensus estimates by 1.1%. In response to this news, Fastly's stock price fell significantly, from a closing price of $23.54 per share on February 14, 2024 to a closing price of $16.34 per share on February 15, 2024, a decline of 30.59 %.

247. Nevertheless, Defendants continued to downplay the potential macro effects on the Company's business going forward, with Nightingale assuring investors on February 14, 2024 that the Company's annual guidance "incorporate[d] macro uncertainties."

248. However, these risks continued to materialize on May 1, 2024, when the Company released its Q1 2024 financial results and announced that it was reducing its full year 2024 revenue projection from $580-$590 million to $555-$565 million. The reduction in revenue projections

was caused by the revenue declines from the Company's Key Customers, which was already ongoing when Nightingale misled investors in February 2024 by blaming "weaker than anticipated international traffic" rather than traffic declines from Key Customers for the Company coming in at the lower end of its Q4 2023 guidance, downplaying the risk of macro impacts on the Company's business, and describing the risk of customer pullback in hypothetical terms when the risk had already come to fruition.

249. In addition, the truth about macroeconomic impacts on the Company's business during Q4 2023 was revealed during the Q1 2024 earnings call on May 1, 2024, when Nightingale disclosed the pricing pressure that the Company faced during the prior quarter (Q4 2023) and indicated that it had continued into Q1 2024.

250. Following the materialization of the previously downplayed risks, and the revelation of corrective information during the May 1, 2024 earnings call, discussed above and incorporated by reference herein, Fastly's stock price fell $4.14 per share, or 32.02%, from a closing price of $12.93 per share on May 1, 2024 to a closing price of $8.79 per share on May 2, 2024.

251. Nevertheless, Defendants continued to downplay the risk of macro effects on the Company's business going forward, and Nightingale assured investors on May 1, 2024:

> I think our projection is relatively conservative. I believe we're going to see traffic levels come up and we're going to find some success in recovering revenue from those large accounts. We're signaling the guide here because obviously there's a new projection and we want to reflect that. I believe there's an opportunity for us to beat that projection, and reverse, not just stop the decline, but really reverse the trend in the second half.

252. The previously downplayed risks of macro effects on the Company's business (*i.e.*, the continued pullback by Fastly's Key Customers), again, materialized on August 7, 2024, when the Company released its Q2 2024 financial results and announced that it was, again, reducing its full year 2024 revenue projections from $555- $565 million to $530-$540 million due to sequential declines in revenue from the Company's Key Customers and the expectation of continued declines.

The newly revised guidance was caused by declines in revenue from the Company's Key Customers that had continued and was still occurring when Defendants made their false and misleading statements on May 1, 2024 discussing the risks related to customer retention and existing customer growth as hypothetical despite the fact that those risks had already come to fruition.

253. In addition, the truth about the pricing pressure and revenue declines from the Company's Key Customers during Q1 2024 emerged during the Q2 2024 earnings call on August 7, 2024 when Kisling discussed the *continued* sequential declines (a comparison of the declines in the present quarter to the one immediately preceding it, Q1 2024) in revenue from the Company's Key Customers due to a *continuation* of traffic declines that the Company experienced during Q1 2024.

254. Following the materialization of the previously downplayed risks and the revelation of the corrective information made during the Q2 2024 Earnings Call, discussed above and incorporated by reference herein, Fastly's stock price fell $0.98 per share, or 14.33%, from a closing price of $6.84 per share on August 7, 2024 to a closing price of $5.86 per share on August 8, 2024.

**NO SAFE HARBOR**

255. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the alleged misstatements pled in this Complaint. The statements alleged to be false and/or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker

had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Fastly who knew that the statement was false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

256. At all relevant times, the market for Fastly's securities was open, well-developed, and efficient for the following reasons:

(a) Fastly's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange (NYSE), a highly efficient and automated market;

(b) As a regulated issuer, Fastly filed periodic public reports with the SEC;

(c) Fastly regularly communicated with the public using established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, publication on its website, and through other wide-ranging public disclosures, such as conference calls, communications with the financial press, and other similar reporting services; and

(d) Fastly was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of those reports was publicly available and entered the public marketplace.

257. As a result of the foregoing, the market for Fastly securities reasonably and promptly digested current information regarding Fastly from all publicly available sources and reflected such information in the price of Fastly securities. All purchasers and acquirers of Fastly securities during the Class Period suffered similar injury through their purchases and acquisitions of Fastly securities at artificially inflated prices and a presumption of reliance applies.

258. During the Class Period, the artificial inflation of Fastly's securities was caused by the material misrepresentations and/or omissions particularized herein, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made, a series of materially false and/or misleading statements about, *inter alia*, macro effects on the Company's business, the Company's existing customers expanding their use of Fastly's services, and the Company's continued emphasis on driving revenue growth through its existing customers. These material misstatements and/or omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.

259. The material misrepresentations and omissions alleged herein would tend to induce, and did induce, reasonable investors to misjudge the value of the Company's securities and purchase the Company's securities at artificially inflated prices.

260. Plaintiffs and other Class members relied on Defendants to timely disclose material information as required by law, and would not have purchased or otherwise acquired Fastly securities at artificially inflated prices if Defendants had timely disclosed all material information as required by law.

261. To the extent Defendants concealed or improperly failed to disclose material facts concerning Fastly and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

262. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Fastly securities during the Class Period (the "Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

263. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fastly securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Fastly or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

264. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

265. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

266. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Fastly;
- whether the Individual Defendants caused Fastly to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Fastly securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

267. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

268. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

269. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

270. During the Class Period, Defendants made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. This was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fastly securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Fastly securities and options at artificially inflated prices. In furtherance of this unlawful conduct, Defendants took the actions set forth herein.

271. Each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Fastly securities. Such reports, filings, releases and

statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Fastly's finances and business prospects.

272. By virtue of their positions at Fastly, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

273. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Fastly, the Individual Defendants had knowledge of the details of Fastly's internal affairs.

274. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Fastly. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Fastly's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Fastly securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Fastly's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Fastly securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

275. During the Class Period, Fastly securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Fastly securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Fastly securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Fastly securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

276. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

277. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misstatements and omissions to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

278. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

279. During the Class Period, the Individual Defendants participated in the operation and management of Fastly, and conducted and participated, directly and indirectly, in the conduct of Fastly's business affairs. Because of their senior positions, they knew the adverse non-public information about Fastly's false statements.

280. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fastly, and to correct promptly any public statements issued by Fastly which had become materially false or misleading.

281. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public statements, and public filings which Fastly disseminated in the marketplace during the Class Period concerning Fastly. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Fastly to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Fastly within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Fastly securities.

282. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fastly.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 24, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Murielle J. Steven Walsh*
Murielle J. Steven Walsh (*pro hac vice*)
Emily C. Finestone (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
mjsteven@pomlaw.com
efinestone@pomlaw.com

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

THE SCHALL FIRM
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
brian@schallfirm.com

*Co-Lead Counsel for Plaintiffs*

THE ROSEN LAW FIRM, P.A.
Phillip Kim (*pro hac vice* forthcoming)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com

*Additional Counsel for Plaintiffs*