**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Co-Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| IN RE FASTLY, INC. SECURITIES LITIGATION | Case No. 4:24-cv-03170-JST |
| | <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO:<br>All Actions | PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT |

## TABLE OF CONTENTS

I.    STATEMENT OF FACTS ............................................................................................... 1

II.   LEGAL STANDARD.................................................................................................... 4

III.  ARGUMENT ................................................................................................................. 4

   A.   The Court Should Disregard Defendants' Previously Rejected Arguments and
        Any That They Could Have but Did Not Raise in Their Prior Motion. ................. 4

   B.   The SAC Alleges Actionable Misstatements............................................................ 6

        1.   The CW Allegations Are Credible and Sufficiently Particularized............ 6

        2.   The SAC Adequately Alleges Falsity. ......................................................... 7

             a.   Statements the Court Already Concluded Were Misleading .......... 7

                  i.    Statement 2.......................................................................... 7

                  ii.   Statement 5........................................................................ 10

                  iii.  Statement 6........................................................................ 10

                  iv.   Statement 7 & 8 ................................................................ 11

             b.   Other Statements the SAC Supports Were Misleading ................ 12

                  i.    Statement 1........................................................................ 12

                  ii.   Statement 3........................................................................ 13

                  iii.  Statement 9........................................................................ 14

                  iv.   Statements 13 and 14 ........................................................ 14

        3.   The PSLRA Safe Harbor Does Not Shield Defendants from Liability for
             Statements 8, 9, 13, and 14. ..................................................................... 15

   C.   The SAC Adequately Alleges a Strong Inference of Scienter.............................. 17

        1.   The SAC Sufficiently Alleges That Defendants Knew Their Statements
             Were False And Misleading To Investors. ............................................... 18

        2.   Nightingale's Plausible Motive to Defraud Supports His Scienter. ......... 21

   D.   The SAC Adequately Alleges Loss Causation. ..................................................... 22

   E.   The SAC Adequately Alleges Control Person Claims. ......................................... 25

IV.   CONCLUSION............................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017) ...............................................................................15

*Askins v. U.S. Dep't of Homeland Sec.*,
899 F.3d 1035 (9th Cir. 2018) ........................................................................................5, 6

*Burgoon v. Narconon of N. Cal.*,
125 F. Supp. 3d 974 (N.D. Cal. 2015) .................................................................................25

*Cheever v. Huawei Device USA, Inc.*,
2019 WL 8883942 (N.D. Cal. Dec. 4, 2019) (Tigar, J.) .........................................................16

*City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*,
2024 WL 235183 (N.D. Cal. Jan. 22, 2024) .........................................................................17

*Doe v. Fitzgerald*,
2022 WL 2784805 (C.D. Cal. May 13, 2022) ........................................................................6

*Dolly v. Gitlab Inc.*,
2025 WL 2372965 (N.D. Cal. Aug. 14, 2025) ......................................................................22

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023), *cert. dismissed as improvidently granted*, 604
U.S. 20 (2024) ................................................................................................................17

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ..............................................................................................4

*Hemmer Grp. v. SW. Water Co.*,
527 F. App'x 623 (9th Cir. 2013) .......................................................................................25

*Hernandez v. City of San Jose*,
241 F. Supp. 3d 959 (N.D. Cal. 2017), *aff'd in part & appeal dismissed in
part*, 897 F.3d 1125 (9th Cir. 2018) ....................................................................................5

*Hoang v. ContextLogic, Inc.*,
2023 WL 6536162 (N.D. Cal. Mar. 10, 2023) ......................................................................10

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................................................17, 24

*In re Apple iPhone Antitrust Litig.*,
    846 F.3d 313 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 587 U.S.
    273 (2019) ..................................................................................................................5

*In re Cloudera, Inc., Sec. Litig.*,
    121 F.4th 1180 (9th Cir. 2024) ...............................................................................14

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ...........................................................................14, 16

*In re eHealth Inc. Sec. Litig.*,
    2021 WL 5855864 (N.D. Cal. Aug. 12, 2021) ........................................................10

*In re Eventbrite, Inc. Sec. Litig.*,
    2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ........................................................12

*In re Fusion-io, Inc. Sec. Litig.*,
    2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ...........................................................11

*In re Overstock Sec. Litig.*,
    2020 WL 5775845 (D. Utah Sep. 28, 2020) ............................................................9

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .................................................................................16

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F. 3d 869 (9th Cir. 2012) ..................................................................................22

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...................................................................21

*In re Smith & Wesson Holding Corp. Sec. Litig.*,
    836 F. Supp. 2d 1 (D. Mass. 2011) ...........................................................................9

*In re Splunk Inc. Sec. Litig.*,
    592 F. Supp. 3d 919 (N.D. Cal. 2022) (Tigar, J.) ..............................................15, 19

*In re UiPath, Inc. Sec. Litig.*,
    2025 WL 2065093 (S.D.N.Y. July 23, 2025) ..........................................................22

*In re Unity Software Inc. Sec. Litig.*,
    2025 WL 1387952 (N.D. Cal. Mar. 12, 2025).............................................................9

*Jaszcyszyn v. Sunpower Corp.*,
    2024 WL 3463348 (N.D. Cal. July 17, 2024)............................................................16

*Kampe v. Volta Inc.*,
    2024 WL 308262 (N.D. Cal. Jan. 26, 2024) ..............................................................7

*Kampe v. Volta, Inc.*,
  2024 WL 4534732 (N.D. Cal. Oct. 21, 2024)...............................................................................9

*Lamartina v. VMware, Inc.*,
  2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)..............................................................................16

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ....................................................................................................16

*Loffman v. Cal. Dep't of Ed.*,
  119 F.4th 1147 (9th Cir. 2024) ......................................................................................................4

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ...............................................................................................13, 22

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) .......................................................................................................22

*Minor v. Baker Mills, Inc.*,
  2021 WL 4522290 (N.D. Cal. May 20, 2021) .............................................................................5, 7

*Northstar Fin. Advisors, Inc. v. Schwab Invs.*,
  135 F. Supp. 3d 1059 (N.D. Cal. 2015), *aff'd in part & rev'd in part on other
  grounds*, 904 F.3d 821 (9th Cir. 2018) .........................................................................................5

*Omnicare. Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).....................................................................................................................17

*Pampena v. Musk*,
  705 F. Supp. 3d 1018 (N.D. Cal. 2023) .......................................................................................14

*Peters v. Twist Bioscience Corp.*,
  2025 WL 2532671 (N.D. Cal. Sep. 3, 2025) ...............................................................................25

*Pirani v. Netflix, Inc.*,
  710 F. Supp. 3d 756 (N.D. Cal. 2024) ...........................................................................................9

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .......................................................................................................8

*Reckstin Fam. Tr. v. C3.ai, Inc.*,
  718 F. Supp. 3d 949 (N.D. Cal. 2024) ...................................................................................22, 24

*Ret. Tr. v. RH, Inc.*,
  302 F. Supp. 3d 1028 (N.D. Cal. 2018) .......................................................................................13

*Sanders v. Polaris Indus., Inc.*,
  2022 WL 16713089 (D. Colo. Nov. 4, 2022) ................................................................................7

OPPOSITION TO MOTION TO DISMISS

*Schueneman v. Arena Pharms., Inc.*,
     840 F.3d 698 (9th Cir. 2016) ...............................................................................................20

*Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*,
     2022 WL 20286688 (N.D. Cal. Feb. 24, 2022) .......................................................................6

*SEB Inv. Mgmt. AB v. Wells Fargo & Co.*,
     742 F. Supp. 3d 1003 (N.D. Cal. 2024) ................................................................................25

*Sivakova v. Am. Honda Motor Co.*,
     2025 WL 2324632 (C.D. Cal. July 17, 2025) ..........................................................................5

*Sneed v Talphera, Inc.*,
     147 F.4th 1123 (9th Cir. 2025) .................................................................................8, 17, 20

*Special Situations Fund III QP, L.P. v. Brar*,
     2015 WL 1393539 (N.D. Cal. Mar. 26, 2015) .......................................................................22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
     551 U.S. 308 (2007) ..........................................................................................................17, 21

*Veal v. LendingClub Corp.*,
     423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................................................17

*Yockey v. Salesforce, Inc.*,
     745 F. Supp. 3d 945 (N.D. Cal. 2024) (Tigar, J.) ...................................................................6

*Zucco Partners, LLC v. Digimarc Corp.*,
     552 F.3d 981 (9th Cir. 2009) ..............................................................................4, 17, 20, 25

**Statutes**

Private Securities Litigation Reform Act of 1995 ...............................................................15, 16

Securities Exchange Act of 1934 ...........................................................................................4, 6, 25

**Rules**

17 C.F.R. § 240.10b-5............................................................................................................21

Fed. R. Civ. P. 12....................................................................................................................4, 5, 6

Local Rule 7-9.........................................................................................................................6

Plaintiffs[1] submit this opposition to Defendants' motion to dismiss the SAC. Defendants devote the bulk of their motion to improperly asking the Court to relitigate issues decided in the first motion to dismiss that are not tied to any amendments, including by offering new arguments that they could have raised in the first motion. This Court previously found, and the SAC similarly supports, that Plaintiffs adequately allege falsity and scienter with respect to Statements 2, 5, 6, 7, and 8, and adequately allege loss causation with respect to Statement 2.

Defendants also improperly rely on extraneous materials to offer their own counter-narrative of the facts. Even if the Court were permitted to consider these materials, they do not support Defendants' arguments. None of their arguments in support of dismissal pass muster. The SAC cures the defects that the Court identified in the first motion with respect to the falsity of Statements 1, 3, 9, 13 and 14, and the theory of loss causation based on the May 1, 2024 and August 7, 2024 materializations of the risk and corrective disclosures. The SAC also adequately alleges why the Court's rulings on scienter should apply to Statements 1, 3, 9, 13, and 14, and why its finding that the February 14, 2024 revenue announcement was a materialization of the risk likewise applies to Statement 1. Accordingly, Defendants' motion should be denied in its entirety.

## I.    STATEMENT OF FACTS

This is a securities fraud class action on behalf of shareholders who purchased or acquired Fastly securities between November 15, 2023 and August 7, 2024 (the "Class Period"). ¶1. Fastly operates an edge cloud platform for processing and delivering digital products. ¶2. Nearly all its revenue comes from charging customers for their usage of, or traffic driven to, Fastly's platform. ¶66. Fastly's customers enter into annual contracts, which are non-cancelable over the term and include monthly minimum billing commitments in exchange for more favorable pricing. ¶67. Over 90% of Fastly's revenue in 2023 was derived from its enterprise customers. ¶¶73-75. Fastly's Key Customers (its ten largest customers, which include large streaming or media accounts), generated 37% of 2023 revenue. ¶76. Thus, they have an "outsized impact" on its financial performance. ¶8.

---

[1] Unless otherwise indicated, capitalized terms have the same meaning as in the Second Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 72) (the "SAC") (cited as "¶_"), emphasis is added, and internal quotation marks and citations are omitted. Defendants' brief (ECF No. 75) is cited to herein as "Br."

1                    OPPOSITION TO MOTION TO DISMISS

In November 2023, Defendants began to mislead investors by claiming they were not seeing the same slowing growth or macroeconomic pressures as Fastly's competitors. ¶¶131-34. Nightingale claimed Fastly was "largely resilient" to macro trends that "hinder[ed] some of [its] competitors," was not experiencing macro impacts because it did not have exposure in the SMB or mid-market, and that while its competitors were seeing macro effects and "slowing in growth," Fastly was not. ¶10. However, his non-public statements told a different story. At an all-hands meeting (quarterly meetings attended by all employees) held that *same month*, *before* Nightingale made those misstatements, he told employees that Fastly's Key Customers had decreased their usage simultaneously, causing revenue declines, and he expressed concern about Fastly's revenue model relying on a handful of these big streaming accounts (*i.e.*, Key Customers). ¶¶99-102.

Various CWs corroborate that macroeconomic forces, such as rising interest rates, were "definitely in the business cycle" and negatively affecting Fastly's revenues throughout 2023 and into 2024, including revenues from Fastly's increasingly more price conscious Key Customers. ¶¶87, 89-90, 98, 114. This trend had been ongoing since as early as March or April 2023, with customers requesting more discounts, threatening to terminate services, decreasing their usage of Fastly's platform, and some cancelling their contracts. *See, e.g.*, ¶¶11-13, 17-20, 34, 87-101, 112-18, 124-27. Fastly also struggled to acquire new business, and new business "dried up" and started "falling off a cliff" during Q4 2023. ¶124. One CW, who ranked second across the entire enterprise team, was only able to bring on two new customers for all of 2023. ¶125. Even worse, Fastly's competitors had improved their services and were at least on par with Fastly, reducing its leverage in customer negotiations. ¶91.

Defendants were aware of these issues. Nightingale publicly admitted "I'm always tracking top 10, top 20 deals for any given quarter," and thus was aware of Key Customers' demands for more favorable pricing. ¶222. This was also regularly discussed during all-hands meetings throughout 2023 and 2024 (¶¶90, 100, 116-17), and weekly meetings attended by senior management and occasionally Nightingale, where Fastly's top customers were graded based on their usage. ¶¶103-05, 107, 110. Defendants also had access to Fastly's data tracking customers' usage and traffic flow. ¶¶103-05, 107, 110. Only 30% of Fastly's salespeople met their revenue

targets in 2023. ¶126. One CW described being about 40% short by the end of 2023. ¶98. Thus, contrary to Nightingale's public denial of slowing growth in November 2023, Defendants were aware it was well underway.

This concealed macro risk (*i.e.*, a decline in usage and revenue from Key Customers) began to materialize on February 14, 2024, when Fastly reported Q4 2023 revenue below analysts' consensus estimates and on the low end of its previous guidance (¶¶136), and Fastly's stock price declined roughly 30% (¶137). During an earnings call that day, Defendants still downplayed the macro effects on Fastly's business and denied seeing any macro impacts beyond "a little bit of deal elongation." ¶¶138, 148-49. Defendants also falsely claimed that "customer retention efforts were stable" and the cause of the revenue decline was "weaker than anticipated international traffic." ¶¶139-40, 146. These statements omitted the critical information about the customer pullback causing decreased revenue from Fastly's Key Customers. ¶¶21, 93, 147.

Fastly's annual report filed on February 22, 2024 also made misleading statements about their customers, stating "[o]ur enterprise customers *continue to leverage our platform*, increasing their spend on our platform and driving our revenue growth year over year." ¶154. It also described the risk of existing customers, including Key Customers, decreasing their usage as a mere hypothetical, when, as discussed above, Fastly had been experiencing a troubling trend of customer pullback for some time. ¶¶156, 158. To further conceal this trend, Defendants eliminated two key metrics historically reported: Dollar-Based Net Expansion Rate ("DBNER") and Net Retention Rate ("NRR"), which tracked revenue growth and existing customer retention. ¶¶78-79, 81-82, 84.

Meanwhile, the customer pullback, including among Key Customers, continued into Q1 2024. On May 1, 2024, however, the downplayed risks of macro effects on Fastly's business again materialized, with the release of Fastly's Q1 2024 financial results and lowered FY 2024 revenue guidance. ¶¶168-69. During an earnings call that day, Defendants blamed the reduced revenue guidance on decreased traffic and revenue from the Company's Key Customers. ¶¶170-77, 179-81. Defendants also revealed the truth about the macroeconomic effects on Fastly's business during Q4 2023, admitting the pricing pressure that Fastly had faced during Q4 2023. ¶¶170-71. The following day, Fastly's stock dropped roughly 32%. ¶185. Analysts downgraded Fastly's

3                           OPPOSITION TO MOTION TO DISMISS

stock, citing the "[d]ecelerating growth in Fastly's largest customers." ¶¶182-84.

Even at this point, Defendants continued to downplay the macro effects on Fastly's business, describing the revised revenue guidance as "relatively conservative," and discussing "beat[ing] that projection" and "revers[ing] the trend" of declining traffic and revenue from the Company's Key Customers. ¶186. Defendants also continued to mislead investors about hypothetical risks of existing enterprise customers, including Key Customers, decreasing their usage of Fastly's services when those risks had already materialized. ¶¶196, 198.

The final shoe dropped on August 7, 2024, when Fastly released its Q2 2024 financial results and reduced its revenue guidance again, a further materialization of the risk. ¶¶200-01. Defendants also revealed the pricing pressure that had occurred during Q1 2024, and that it had continued into Q2 2024, contrary to Defendants' statements about reversing course with the customer pullback. ¶¶186, 202-03. In response, Fastly's stock fell roughly 14%. ¶211.

## II.   LEGAL STANDARD

The Court must "accept as true all well-pleaded factual allegations, and construe all factual inferences in the light most favorable to the plaintiff." *Loffman v. Cal. Dep't of Ed.*, 119 F.4th 1147, 1158 (9th Cir. 2024). To state a Section 10(b) claim, the SAC must allege "(1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 535 (9th Cir. 2024). To state a Section 20 claim, the SAC must allege "a primary violation of section 10(b)" and that "the defendant exercised actual power or control over the primary violator." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

## III.   ARGUMENT

### A.   The Court Should Disregard Defendants' Previously Rejected Arguments and Any That They Could Have but Did Not Raise in Their Prior Motion.

"Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). "[T]hese rules prohibit a

defendant from bringing a motion to dismiss raising defenses that could have been, but were not, asserted in a prior motion to dismiss." *Minor v. Baker Mills, Inc.*, 2021 WL 4522290, at *1 (N.D. Cal. May 20, 2021). *See also Hernandez v. City of San Jose*, 241 F. Supp. 3d 959, 985 (N.D. Cal. 2017) ("[A] number of cases make clear that a defendant must specifically address a defense in order to maintain the right to raise that defense in a later motion to dismiss.") (collecting cases), *aff'd in part & appeal dismissed in part*, 897 F.3d 1125 (9th Cir. 2018); *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 135 F. Supp. 3d 1059, 1069-70 (N.D. Cal. 2015) ("Defendants are foreclosed from" asserting "a defense that was available but omitted from an earlier" motion to dismiss pursuant to Rule 12(g)(2) and Rule 12(h)(2)), *aff'd in part & rev'd in part on other grounds*, 904 F.3d 821 (9th Cir. 2018). "To construe Rule 12(g)(2)" as permitting a subsequent motion to "advance[] completely different grounds for the argument that the complaint fails to state a claim," which are "not tied to any of the matter added by the amendments [to the complaint], and could have been asserted against the original complaint" would "make [Rule 12(g)(2)] *virtually meaningless*." *Minor*, 2021 WL 4522290, at *1. While "[s]ome courts have" still considered the merits "for the sake of judicial efficiency," *Id.* at *2, the Ninth Circuit has recognized that it may be error to do so, *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 315, 319 (9th Cir. 2017) (the district court "may have erred," pursuant to Rule 12(g)(2), by considering a subsequent motion to dismiss on the merits, but taking a "forgiving" approach as a "reviewing court" and concluding any such error "was harmless"), *aff'd sub nom. Apple Inc. v. Pepper*, 587 U.S. 273 (2019).

Defendants' authority (Br. at 5) does not support otherwise. In *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042-43 (9th Cir. 2018), the Court did not consider Fed. R. Civ. P. 12(g)(2), but rather, the "law of the case" doctrine, which "generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Askins*, 899 F.3d at 1042-43. The Ninth Circuit recognized that "[w]hen the defendant files a motion to dismiss the amended complaint, it may urge the district court to determine that the plaintiff's amended complaint *did not cure the deficiencies of the initial complaint*." *Id.* at 1043. Further, in *Sivakova v. Am. Honda Motor Co.*, 2025 WL 2324632, at *3-4 (C.D. Cal. July 17, 2025), the Court found *Askins* "irreconcilably different" from the situation at

hand—asserting new arguments that could have been raised in a prior motion to dismiss but were not—and interpreting *Askins* "too broadly would be in conflict with Rule 12(g)(2) or render the local rules throughout this Circuit regarding motions for reconsideration superfluous."[2]

Further, it would frustrate judicial economy to permit a subsequent motion to dismiss to relitigate the Court's prior rulings based on the same arguments, facts, and case law. Indeed, after rejecting the argument that a subsequent motion to dismiss was a "*de facto* motion for reconsideration" because the amended complaint "assert[ed] no new causes of action," this Court noted that even though an amended complaint supersedes the prior one, its ruling nonetheless "should not be construed as license simply to reassert arguments the Court previously rejected, *unless the arguing party has new, controlling authority decided after the Court's initial order*." *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 950, 951 n.3 (N.D. Cal. 2024) (Tigar, J.). That is consistent with Local Rule 7-9, which proscribes a party seeking reconsideration from simply repeating its prior arguments, "*subject to appropriate sanctions.*"

Here, the Court already determined that: (a) Plaintiffs adequately alleged the falsity of Statements 2, 5, 6, 7, and 8; (b) Statement 8 was not an inactionable forward-looking statement; (c) the CW allegations were reliable and sufficiently detailed; (d) Plaintiffs adequately alleged scienter with respect to Statements 2, 5, 6, 7, and 8; (e) loss causation was adequately alleged with respect to Statement 2; and (f) Plaintiffs adequately alleged a control person claim under Section 20(a). ECF No. 67 ("Order") at 14, 16, 20-21, 24, 28, 38, 42-43. Nevertheless, Defendants again challenge these issues, which are not tied to amendments to the SAC, improperly repeating some of their same failed arguments and advancing new arguments that they could have but failed to raise when they first moved to dismiss. The Court should disregard and reject their arguments.

**B.      The SAC Alleges Actionable Misstatements.**

**1.      The CW Allegations Are Credible and Sufficiently Particularized.**

Defendants again argue that the Court should disregard the CW allegations (Br. at 6-7), an

---

[2] Defendants' cases are distinguishable. *See Scilex Pharms. Inc. v. Sanofi-Aventis U.S. LLC*, 2022 WL 20286688, at *2 (N.D. Cal. Feb. 24, 2022) (relying on *Askins* for the law of the case doctrine, *not Fed. R. Civ P. 12(g)(2)*, precluding "re-litigation of matters considered and ruled upon by the Court in its prior order"); *Doe v. Fitzgerald*, 2022 WL 2784805, at *4 (C.D. Cal. May 13, 2022) (considering if *additional* allegations in amended complaint cured deficiencies of prior version).

argument the Court already rejected. *See* Order at 14, 38 (finding Plaintiffs adequately alleged CW1, CW6, and CW3's "personal knowledge of the events they report" and that "the alleged reports of all-hands meetings attributed to CW1 and CW6 that this order relies upon are sufficiently reliable and detailed"). The Court should disregard Defendants' attempt to relitigate these issues. *Supra* §III.A. Regardless, the only new case they cite, *Kampe v. Volta Inc.*, 2024 WL 308262, at *33 (N.D. Cal. Jan. 26, 2024), is distinguishable because, unlike here, the plaintiffs in *Kampe* did not support the basis for the CWs' personal knowledge. Further, while Defendants incorrectly contend the CW allegations do not support the declining usage and revenues from Top-10 customers (Br at 6-7), the CWs corroborate that Nightingale addressed Fastly's largest customers' (*i.e.*, Key Customers) declining usage during all-hands meetings. ¶¶99-102. The Court already credited the reliability of those allegations. Order at 38 ("[T]he alleged reports of all-hands meetings attributed to CW1 and CW6 that this order relies upon are sufficiently reliable and detailed.").

**2.      The SAC Adequately Alleges Falsity.**

**a.      Statements the Court Already Concluded Were Misleading**

The Court found falsity adequately alleged with respect to Statements 2, 5, 6, 7, and 8, and the Court should reject Defendants' efforts to relitigate these issues. Order at 16, 20-21, 24, 26. While the SAC provides additional context for Statements 2 and 6 and clarifies that "largest customers" are the same as Key Customers (*Compare* ECF No. 53 ¶¶119, 131-33, 138, 140, *with* SAC ¶¶133, 147-50, 155, 157), none of those minor changes warrant revisiting the Court's findings. *See Minor*, 2021 WL 4522290, at *1 (distinguishing between "minor corrections or additions" and "amendments"); *See also Sanders v. Polaris Indus., Inc.*, 2022 WL 16713089, at *4 (D. Colo. Nov. 4, 2022) (Defendants failed to "meaningfully explain how these amendments [were] so material so as to revive their right to challenge the sufficiency of Plaintiffs' allegations"). Regardless, as detailed below, none of Defendants' arguments have merit.

**i.      Statement 2**

First, Defendants argue Statement 2 conflicts with their transcript of the November 15, 2023 call, an argument they could have made in the first motion when they submitted the exact

same call transcript. *Compare* ECF No. 75-8, *with* ECF No. 55-7. Critically, the Court already signaled that such an argument would fail. *See* Order at 6 (stating it would *not* take judicial notice of the transcript "for the purpose of resolving factual disputes"). Nonetheless, Defendants ask the Court to resolve this factual dispute in their favor and conclude that their grammatically illogical version of Nightingale's statement ("competitors are seeing [macro] effects, ***and slowing your growth***, and we're not seeing that") is accurate, rather than Plaintiffs' memorialization of the audio file. Br. at 8; ECF No. 75-8 at 7. However, as detailed in the accompanying opposition to the request for judicial notice ("RJN Opp.") at 4-6, the Court cannot take judicial notice of the transcript to dispute the SAC's allegations, but even if it did, Defendants' transcript does not undercut falsity because Nightingale still falsely denied that Fastly was seeing macro effects on its business. ECF No. 75-8 at 7.

Second, Defendants assert Statement 2 must be analyzed in the context of Nightingale's statements during the November 1, 2023 earnings call (ECF No. 75-7), and that somehow undercuts falsity. Br. at 8. Again, the Court is not permitted to consider the November 1, 2023 transcript to resolve factual disputes or contradict allegations in the SAC. RJN Opp. at 2-4.[3] Regardless, the question Nightingale responded to referenced statements he made during the last earnings call about "budget tightening" that he "had started to see." ¶133. Statement 2 then clearly denied that Fastly was feeling macro impacts, as this Court previously found. ¶134. Regardless, the November 1 transcript does not even undercut falsity because when asked to clarify the budget tightening, Nightingale spun it positively: "That tends to be good news for us" because it results in consolidation where Fastly would gain business. ECF 75-7 at 9.

Third, Defendants claim Statement 2 is a "cherry-picked excerpt." Br. at 9. They then offer their own cherry-picked excerpt of the surrounding statement, omitting the critical portion in bold: "Maybe we are seeing a little, **and we're just beating it with better execution, but I'm not**

---

[3] Defendants' cases are factually distinguishable. In *Sneed v Talphera, Inc.*, 147 F.4th 1123, 1132 (9th Cir. 2025), the Court concluded a slogan would not mislead a reasonable investor because she "would not blindly accept [it] by itself when she has access to other contextual information," including "ample disclosures and caveats." In *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014), the Court considered what the market already knew and the context in which "general statements of optimism" (not factual statements like here) were made to determine if a reasonable investor would understand them as "mere corporate optimism."

OPPOSITION TO MOTION TO DISMISS

**seeing it. I haven't been seeing it this past quarter**." ECF No. 75-8 at 7. The full statement, not just Defendants' cherry-picked version, does not even undercut the falsity of Statement 2 because Nightingale, again, denied that the Company was experiencing macro impacts.

Fourth, Defendants are incorrect that Nightingale's non-public statements were consistent with his public ones, and that the SAC fails to allege when these declines occurred, what customers were impacted, how the declines impacted revenues,[4] and impacts from macroeconomic forces that contradict Statement 2. Br. at 9. As this Court recognized:

> Nightingale touted that Fastly was not seeing *any* "slowing in growth" like its competitors were seeing at the time that Statement 2 was made . . . . [and] he was aware that Fastly was seeing "some slowing in growth" at the time he made Statement 2 due to declining usage and revenue from the Company's large customers that were associated with macroeconomic effects.

Order at 12; *See also* ¶¶ 87, 90-96, 98-101, 135 (describing macro impacts the Company was experiencing, contrary to Statement 2, which Nightingale discussed internally).

Moreover, the Court has already rejected Defendants' attempt to undercut the CW allegations and Defendants fail to provide a basis for departing from that sound reasoning. *Supra* §III.B.1. Defendants' cases (Br. at 9-10) are distinguishable. *See In re Unity Software Inc. Sec. Litig.*, 2025 WL 1387952, at *7 (N.D. Cal. Mar. 12, 2025) (vague and generalized CW allegations that did not "specifically identify technical problems and customer complaints . . . that would render Unity's statements false"); *Kampe v. Volta, Inc.*, 2024 WL 4534732, at *9 (N.D. Cal. Oct. 21, 2024) (CW from a single region, who the Court could not infer "was in a position to have reliable information about Volta's accounting practices," did not support that alleged revenue recognition violations were widespread and thus material); *Pirani v. Netflix, Inc.*, 710 F. Supp. 3d 756, 769-70 (N.D. Cal. 2024) (complaint failed to allege when former employees or anyone at the Company discussed the issue, as well as what was specifically discussed); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 836 F. Supp. 2d 1, 10 (D. Mass. 2011) ("cherry pick[ed]" negative feedback was not evidence of declining demand that contradicted public statements touting

---

[4] Defendants' contention that the SAC fails to allege material declines in revenue because revenue from Top 10 Customers increased in Q4 2023 (Br. at 9) is belied by their own exhibit. *See* ECF No. 75-9 at 7 ("Our top 10 customers comprise 40% of our total revenue in the fourth quarter of 2023, *flat with their contribution in Q3* . . . ."). Thus, *In re Overstock Sec. Litig.*, 2020 WL 5775845, at *7 (D. Utah Sep. 28, 2020) (data undercut the CW allegations), is inapposite.

increasing demand). In sum, none of Defendants' arguments have merit.

### ii.    Statement 5

Defendants ask the Court to revisit its ruling that Statement 5 was false or misleading because the SAC clarifies that the "largest customers" whose traffic were declining, which rendered Statement 5 misleading, were Fastly's Key Customers (*Compare* ECF No. 53 ¶130, *with* SAC ¶147). Br. at 12. However, this change is inconsequential because Fastly's "largest customers" and "Key Customers" are *the same*. The Court already found the allegations sufficient, and the SAC still adequately supports them. ¶¶6-8, 99-102. Defendants' argument that the SAC fails to allege particularized facts "contradicting Fastly's explanation" or supporting that "revenues were actually driven by" its Key Customers (Br. at 12) misses the mark because, as this Court previously recognized, Plaintiffs adequately allege this statement was misleading for omitting another cause of the revenue declines known to Defendants (declining usage from Key Customers). Order at 19.

In addition, while Defendants challenge the falsity of Statement 5 because the explanation that lower revenue was driven by weaker than anticipated international traffic did not foreclose other causes (Br. at 12), their authority, *In re eHealth Inc. Sec. Litig.*, is unpersuasive because the plaintiff argued the challenged statement was "impermissibly incomplete" and the Court recognized that "allegations that the challenged statement is incomplete are insufficient, *without more.*" 2021 WL 5855864, at *4 (N.D. Cal. Aug. 12, 2021). In contrast, here, the Court found that Defendants were required to disclose the other undisclosed cause of the lower revenue because it was "material" and "a reasonable investor would have acted differently if [it] had been disclosed." Order at 19 (citing *Hoang v. ContextLogic, Inc.*, 2023 WL 6536162, at *18 (N.D. Cal. Mar. 10, 2023) (misleading to attribute decline in users to "de-emphasized advertising and customer acquisition," and not disclose another alleged cause)).

### iii.    Statement 6

Defendants' arguments urging the Court to revisit its ruling that Statement 6 was false or misleading all fall flat. Br. at 10-11. First, they, again, attempt to undercut the CW allegations by relying on the same authority that the Court already implicitly found unpersuasive when it credited

the CW allegations as supportive of falsity. *Compare* Br. at 11, *with* ECF No. 55 at 7-8.

Second, Defendants suggest that the SAC must allege macroeconomic impacts worsened between Q3 2023 and Q4 2023 for Statement 6 to be false. Br. at 11. Not so. Nightingale was asked whether "something [had] materially changed" in terms of macro, and he responded by misrepresenting that it had not, other than "a little bit of deal elongation." ¶¶148-49. The Court correctly concluded that was misleading because Fastly was experiencing macroeconomic impacts beyond deal elongation in Q4 2023, including declining revenue caused by the Company's large customers decreasing their usage. Order at 20. *See also* ¶¶90-91, 98-101 (describing declining revenue from Key Customers throughout Q4 2023). Defendants' authority, *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015), is distinguishable because the plaintiffs relied on subsequent facts, rather than contemporaneous facts like here, to support falsity.

Third, Defendants now ask the Court to extend its reasoning for rejecting Statement 9 on falsity grounds to Statement 6. Br. at 11. As the Court clearly understood, that reasoning has no application to Statement 6. Statement 9 specifically warned of the risk of reduced revenue from "key customers" or "major customers." ¶158. Thus, unlike Statement 6, for Statement 9 to be false, the complaint must identify who the "key customers" and "major customers" are and support that they had, in fact, reduced their usage when Statement 9 was made. Order at 27.

### iv.     Statement 7 & 8

The SAC's minor clarification of Fastly's "largest customers" as Key Customers does not warrant revisiting Defendants' arguments that: (1) the SAC is insufficiently detailed to support falsity, and (2) the SAC fails to allege an Item 303 violation because it fails to allege that customers materially reduced their use of Fastly's services in Q4 2023 and that it was known at the time of Statement 7. Br. at 12-13. *See supra* §III.B.2. Regardless, the same reasoning applies for rejecting those arguments. *See* Order at 25 ("[t]he Court disagrees" that "Plaintiffs' allegations are insufficiently detailed to raise the inference that Fastly's enterprise customers decreased their usage of Fastly's platform during Q4 2023") & 22 (complaint adequately alleged "Fastly's large (or enterprise customers) were reducing their usage of Fastly's platform and that this was causing Fastly's revenue from those customers to decline at least during Q4 2023," management knew,

11            OPPOSITION TO MOTION TO DISMISS

and "the declines were reasonably likely to have a material unfavorable impact on [] Fastly's revenues"). Defendants' new authority, which was available to Defendants when they first moved to dismiss, is distinguishable. *See In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *15 (N.D. Cal. Apr. 28, 2020) ("exact risks" allegedly not disclosed were disclosed).

Further, Defendants' improper new argument that the SAC fails to allege "a decline by Top-10 Customers had occurred as of February 2024 in substance or quantity that differed from what Fastly disclosed starting on November 1, 2023" (Br. at 12-13) falls flat for two reasons. First, the SAC need only allege that enterprise customers were decreasing their usage of Fastly's platform in Q4 2023 to satisfy falsity, which it does. ¶¶155, 157, 165. Second, even if the Court were permitted to rely on the extraneous November 1, 2023 call transcript for Defendants' counter-narrative of the facts (Br. at 3, 13), which it is not (*see* RJN Opp. at 2-4), it does not even support that the decline in usage and revenue from the Company's Top-10 customers had already been disclosed when these statements were made in February 2024.[5] ¶¶155, 157, 167, 169, 172-81.

### b.    Other Statements the SAC Supports Were Misleading

#### i.    Statement 1

The SAC expands Statement 1 with the following:

> [T]he macro trends that seemed to hinder some of our competitors, we were largely resilient to. Our customers are using our technology because it's the highest performance piece, it's not a nice to have for them. They weren't – if they wanted to reduce costs in their infrastructure, we couldn't be a target for them. So that was a pretty big piece of it.

¶132. This statement that Fastly was "resilient to" macro trends was false or misleading because of the customer pullback described above, which was caused by economic concerns. ¶135.

Defendants argue that the SAC fails to adequately allege falsity because it does not allege "what time period Nightingale was referring to, what the 'macro trends' were, or that Fastly had experienced the same impact from SMB 'macro trends' as competitors." Br. at 8. However, Nightingale was asked "whether macro trends were getting better," a question that addressed their *current* impact. ¶132. Further, the SAC identifies examples of macro trends (*i.e.*, "the impact of

---

[5] This argument directly contradicts their incorrect contention that Top-10 Customer reported revenue *increased* from Q3 2023 to Q4 2024. Br. at 9. Defendants cannot have it both ways.

rising interest rates, banking instability, and recession fears") and explains this statement was false because Fastly was experiencing the negative effect of macro forces, such as rising interest rates. ¶¶9, 135. In addition, while Defendants attempt to conflate this broader statement with the narrower statement that followed about SMB customers, Nightingale responded to a broad question about macro trends with a broad false or misleading answer that Fastly was "largely resilient to" the macro trends hindering competitors. Thus, the SAC adequately alleges falsity.[6]

### ii.    Statement 3

In evaluating the falsity of Statement 3, the Court assumed that "customer retention" referred to "maintaining existing customers (as opposed to losing existing customers)." Order at 17 n.6. The SAC clarifies that Nightingale discussed "customer retention" in terms of revenue growth (*i.e.*, LTM NRR, a metric that measures customer growth by comparing total customer revenue over a twelve-month period and therefore does indicate revenue performance for a specific quarter) and customer counts (a metric that could be net positive even if customers were terminating services provided that new customers offset the number of customers who terminated services). ¶140. Statement 3 was false because, not only could those metrics not support that "customer retention" (*i.e.*, customer revenue growth and customer counts) was stable during Q4 2023,[7] but also, revenue during *that quarter* was declining as Key Customers brought in less traffic and numerous existing enterprise customers cancelled their contracts or requested discounts. ¶141.

Defendants appear to challenge this statement on materiality grounds. Br. at 15. "[D]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact . . . ." *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1039 (N.D. Cal. 2018). Here, the SAC alleges that Nightingale misled investors because there was declining revenue from the Company's Key Customers, and the decline would be material to a reasonable investor, given that Key Customers contributed to a substantial portion of

---

[6] Defendants' authority (Br. at 8) is distinguishable. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("vague" and "conclusory allegations" that statements about company's financial health or performance created "false impression that defendants ran their business with proper financial reporting compliance" and were "*per se* false").

[7] Accordingly, contrary to Defendants' suggestion (Br. at 15), whether the reported LTM NRR and customer counts were accurate is inconsequential.

13                    OPPOSITION TO MOTION TO DISMISS

the Company's revenue—37% in FY 2023 and 33% in FY 2024—and had an "outsized impact" on the Company's financial performance. ¶¶7-8. This satisfies materiality. *See Pampena v. Musk*, 705 F. Supp. 3d 1018, 1040 (N.D. Cal. 2023) (statement is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available").

### iii.    Statement 9

The Court found falsity inadequately alleged for Statement 9 because Plaintiffs had failed to define "key customers" and "major" customers and support that such customers "had reduced their usage of Fastly's services." Order at 27. The SAC cures this by defining who the "major" or "key customers" (*i.e.*, Key Customers) are and supporting that by the time Statement 9 was made in February 2024, the risk of lost revenue from these customers had already materialized because Key Customers had been decreasing their usage of Fastly's platform and were bringing in less revenue to Fastly by Q4 2023. ¶¶6-8, 90-91, 99-101, 158-59. Thus, Defendants' reliance on *In re Cloudera, Inc., Sec. Litig.*, 121 F.4th 1180, 1189 (9th Cir. 2024), in which the falsity allegations were "unsupported by details," is unavailing. Defendants' conclusory argument that these allegations are deficient also falls flat insofar as it relies on their argument that the CW allegations are unreliable (Br. at 13 (citing Br. §IV.A.1)), which this Court has already rejected. *Supra* §III.B.1.

### iv.    Statements 13 and 14

The SAC addresses the Court's concerns about supporting that Key Customers' declining usage continued into Q1 2024 (Order at 32-33), by clarifying that Statement 13 was misleading insofar as existing customers' growth had been stagnating for at least a quarter, Defendants made contemporaneous admissions that the declining usage and revenue from Key Customers had continued into Q1 2024, and, according to CW6, in the all-hands meeting that followed these statements,[8] Defendants likewise admitted that multiple Key Customers' usage was declining during Q1 2024. ¶¶197, 199. The SAC also cures the deficiency the Court identified with respect

---

[8] Thus, unlike in Defendants' authority, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1110 n.4 (9th Cir. 2010), where the CW's allegation was *consistent* with the defendants' public statement, CW6's allegation supports the contention that Statements 13 and 14 were false or misleading.

to Statement 14 (Order at 33) by defining who the "major customers" are: Key Customers. ¶¶6-8, 90-91, 99-101, 198-99. Thus, the SAC adequately alleges the falsity of Statements 13 and 14.

While Defendants cast aspersions on the credibility of CW6's allegations (Br. at 14), supplementing a CW's allegations is not suspicious, especially where, like here, they are consistent. The prior complaint alleged that, according to CW6, in "subsequent all hands meetings" (after the Q1 2024 results were released), Nightingale discussed "how several of the Company's top ten accounts were simultaneously reducing usage." ECF No. 53 ¶¶103-04. The SAC clarifies that those "subsequent all hands meetings" *included* the all-hands meeting following the release of the Q1 2024 financial results. ¶¶116-17. Defendants' argument that CW6's allegations are insufficiently detailed also falls flat. *See supra* §III.B.1.

Defendants also argue Statements 13 and 14 are not false or misleading because Defendants claim the Q1 2024 earnings call disclosed the information purportedly concealed: that Key Customers' declining usage was impacting revenue. Br. at 14. The Court should disregard this argument because Defendants failed to raise it on the first motion to dismiss (ECF No. 55 at 14-15, 17-18), although the factual basis for this argument was available to them. *Supra* §III.A. Regardless, where "reasonable minds could differ as to the adequacy of [the] disclosure . . . the question of whether that disclosure was adequate to render the challenged statements not misleading cannot be resolved as a matter of law." *In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 940 (N.D. Cal. 2022) (Tigar, J.). Here, reasonable minds could differ as to whether disclosing the concealed information in a *separate call* was adequate to render their statements in the Company's Q1 2024 quarterly report not misleading. *Cf. eHealth*, 2021 WL 5855864, at *8 (statements purportedly concealing information were not misleading where Defendants disclosed that information during *the same earnings call*). Defendants' out-of-circuit authority, *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 170, 179-80 (E.D.N.Y. 2017), is distinguishable because the information allegedly concealed was disclosed in the *same prospectus*.

### 3. The PSLRA Safe Harbor Does Not Shield Defendants from Liability for Statements 8, 9, 13, and 14.

The Court explicitly rejected that Statement 8 is shielded by the PSLRA safe harbor (Order

at 26) and should reject Defendants' attempt to reargue the same issue with authority available to it on the first motion to dismiss. While the Court did not expressly address whether the safe harbor applies to Statements 9, 13, and 14, Defendants made that argument in the first motion to dismiss. ECF No. 55 at 17-18. In any event, Defendants' arguments, again, lack merit. The PSLRA safe harbor provision "cannot protect cautionary statements made with superior knowledge that some of the potential perils identified have in fact been realized." *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *12 (N.D. Cal. Mar. 31, 2023). Here, the Court found the safe harbor did not apply to Statement 8 because it "[did] not disclose that Fastly had already experienced some of the risks and challenges that it warned about." Order at 26. The same reasoning applies with respect to Statements 9, 13, and 14. Statement 13 is identical to Statement 8 and likewise warned of challenges Fastly was already experiencing in Q1 2024, *i.e.*, a continued decline in usage and revenue from Fastly's Key Customers. ¶197. Statements 9 and 14 similarly warned about the hypothetical risk of declining usage and revenues from Key Customers, when those risks had already materialized in Q4 2023 and Q1 2024. ¶¶159, 199. Thus, the safe harbor does not apply.

Defendants' cases (Br. at 18) are distinguishable. *See Cutera*, 610 F.3d at 1111 (involving revenue projections, which are "by definition" forward-looking); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 n.18 (9th Cir. 2002) (court did not reach the issue of whether the safe harbor applied to statements about "seeing a continuing ramp up in sales" and "that the company [was] looking at strong sales growth" because the allegations failed to support scienter); *Jaszcyszyn v. Sunpower Corp.*, 2024 WL 3463348, at *11 (N.D. Cal. July 17, 2024) (risk warnings did not warn of "contingencies that Defendants knew had already come to fruition").[9]

In addition, the Court should disregard Defendants' perfunctory arguments raised in a footnote about Nightingale's statements in ¶186 (Br. at 18 n.2). *See Cheever v. Huawei Device USA, Inc.*, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019) (Tigar, J.) ("Arguments raised only in footnotes . . . are generally deemed waived and need not be considered."). Regardless, their conclusory argument fails to support application of the safe harbor. *See In re Quality Sys., Inc.*

---

[9] Defendants are wrong that Fastly had disclosed the declines (Br. at 18). *Supra* §III.B.2.a.iv & 2.b.iv.

OPPOSITION TO MOTION TO DISMISS

*Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017) (forward-looking statement only protected by the safe harbor where it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements" or "the plaintiff fails to prove [it] was made with actual knowledge" of falsity). Nor does it support that the statement is an inactionable opinion. *See Omnicare. Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 193 (2015) ("magic words," such as "[I] think," "can preface nearly any conclusion, and the resulting statements . . . remain perfectly capable of misleading investors").

### C.     The SAC Adequately Alleges a Strong Inference of Scienter.

To allege scienter "Plaintiffs must state with particularity facts giving rise to a strong inference that defendants acted with the requisite state of mind," "intent to deceive, manipulate, or defraud," or "deliberate recklessness." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023), *cert. dismissed as improvidently granted*, 604 U.S. 20 (2024). "The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007) (emphasis in original). The inference of scienter need not be the "most plausible of competing inferences." *Id.* at 324. A "tie" "goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014).[10]

Defendants rely on the same authority for the same failed arguments, which are untethered to any amendments in the SAC. For instance, Defendants again challenge the CW allegations on the grounds that they did not directly interact with Defendants (Br. at 20; ECF No. 55 at 20),[11] notwithstanding that the Court found the CWs' accounts of the all-hands meetings "sufficiently reliable and detailed." Order at 38. *See also* ¶¶99-102 (the CWs heard from Nightingale at the all-hands meetings). They also repeat the argument that the nonfraudulent inference—that Defendants were merely updating investors about what Fastly was seeing—is more compelling (Br. at 22),[12]

---

[10] *Sneed*, 147 F.4th at 1134, does not support Defendants' apparent suggestion that only "flagrant falsity" supports scienter, nor does it supplant *Tellabs*.

[11] Defendants rely on the same cases, *Zucco Partners* and *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785 (N.D. Cal. 2019). Br. at 20; ECF No. 55 at 20.

[12] Defendants also rely on the same authority, *City of Hollywood Firefighters Pension Fund v. Atlassian Corp.*, 2024 WL 235183 (N.D. Cal. Jan. 22, 2024). Br. at 22; ECF No. 55 at 24.

which the Court explicitly rejected, Order at 36-37 ("If the individual Defendants had been inclined to keep investors updated about business developments as they arose, then one would expect that they would have updated investors about the alleged Q4 2023 usage and revenue declines from large or enterprise customers at the time they made Statements 2, 5, 6, 7, and 8 given that [they] were allegedly aware of those matters at the time they made the statements in question."). Defendants offer no reason to rule otherwise here.

Defendants also improperly raise new arguments that are unrelated to any amendments and that they could have asserted in the first motion to dismiss. For example, they challenge scienter on the grounds that Fastly repeatedly warned investors of the risks at issue, an argument they previously made in another context. Br. at 19; ECF No. 55 at 3. Defendants also argue that the CW allegations track what was already publicly disclosed. Br. at 20. As discussed above, Defendants did not disclose the truth.[13] They also appear to claim, without citing any authority, that Fastly meeting its revenue guidance undercuts scienter. Br. at 22. However, the Court explicitly acknowledged that Fastly met its revenue guidance but still found coming in "*at the lower end of its revenue guidance for that quarter*," a materialization of the risk. Order at 40. Further, Fastly repeatedly had to revise its FY 2024 revenue guidance downward, which caused significant stock declines. ¶¶168, 200. The Court should disregard these improper arguments (*Supra* §III.A), none of which have merit. As discussed below, the SAC adequately alleges scienter.

**1.    The SAC Sufficiently Alleges That Defendants Knew Their Statements Were False And Misleading To Investors.**

The Court has already concluded that Defendants knew their Statements 2, 5, 6, 7, and 8 were false or misleading when made:

> Plaintiffs' allegations strongly indicate that the individual Defendants knew of the declines in usage and revenues from Fastly's large (or "enterprise") customers in Q4 2023 that were associated with macroeconomic conditions, as well as of the negative impact that those declines had on Fastly's revenue in Q4 2023, because those matters were discussed during all-hands meetings that were attended by all

---

[13] The Court implicitly rejected these arguments in the first motion to dismiss. It concluded that one such "warning" (Statement 8) was misleading. Order at 25. Further, while Defendants argue that the CW allegations aligned with their public disclosures, the Court found that their public disclosures "omit[ted] the usage and revenue declines and related macroeconomic effects at issue" described by the CWs. Order at 36. These arguments fail for the same reasons here.

> Fastly employees and the Company's C-Suite, which included the individual Defendants. The Q4 2023 declines in usage and revenues from Fastly's enterprise customers were allegedly discussed by Defendant Nightingale himself at an all-hands meeting that took place in early November 2023.

Order at 35. Defendants ask the Court to revisit this ruling because the SAC clarifies that the "larger customers," "large media accounts," and the "handful of big streaming accounts" that Fastly was heavily reliant on, which Nightingale discussed were decreasing their usage during the November 2023 all-hands meeting (ECF No. 53 ¶¶88-90), were the Company's "Key Customers" (¶¶99-101). Br. at 20. While that minor change does not support relitigating the issue (*Supra* §III.B.2), the same allegations support scienter here. Various CWs corroborate that at all-hands meetings in Q4 2023 attended by all employees and Defendants, Nightingale discussed how Fastly's Key Customers were simultaneously decreasing their usage, causing revenue declines. ¶¶99-102. *See also Splunk*, 592 F. Supp. 3d at 947 (scienter adequately alleged where, *inter alia*, defendants knew underlying issues because a defendant spoke about them at all-hands meetings).

Further, the Court has already concluded that "Defendants' omissions of the Q4 2023 usage and revenue declines . . . carried a significant danger of misleading investors that was so obvious that the individual Defendants must have been aware of it," and was "sufficient to raise a strong inference of scienter" for two reasons:

> First, Plaintiffs allege that Fastly's revenue model depended significantly on the usage and revenues from its enterprise customers, and [] a decline in revenue from those customers could create volatility in the Company's overall revenue and materially impact Fastly's business. *See* [ECF No. 53] ¶¶ 3, 6, 58, 62-64. The individual Defendants knew that Fastly's dependence on revenue from enterprise customers was known to investors . . . . Thus, a failure by the individual Defendants to disclose the declines in revenues at issue carried a significant and obvious risk of misleading investors into adopting a view of the Company's financial health that was more favorable than warranted given the volatility risks that such declines entailed. Second, Plaintiffs' allegations suggest that analysts and investors were very interested in learning about and understanding any revenue impacts associated with macroeconomic forces that Fastly's business may have been experiencing during the Class Period, as they asked pointed questions to solicit information about those issues during earnings calls. *See, e.g., id.*, ¶¶ 118, 120, 132. Thus, it is reasonable to infer that a failure to reveal the declines in usage and revenues from enterprise customers associated with macroeconomic effects in Q4 2023 carried a significant and obvious risk of leading investors to believe, incorrectly, that the Company was not experiencing any such macroeconomic impacts.

Order at 35-36. The same circumstances that the Court relied upon are repeated in the SAC. ¶¶3, 6, 66, 70-72, 132, 134, 148. Thus, there is no reason to depart from the Court's sound reasoning.

The Court should find scienter adequately alleged for Statements 1, 3, and 9, which were made at the same time as Statements 2, 5, 6-8 (November 2023 and February 2024) under the same logic.

The SAC also supports that Defendants knew the stagnation in growth that was occurring in Q4 2023 had continued into 2024, which rendered their May 1, 2024 statements about hypothetical risks of declining traffic and revenues from existing enterprise customers, including Key Customers (Statements 13 and 14), misleading. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016) (scienter adequately alleged where defendants had knowledge of adverse facts contradicting their public statements). While Defendants continued to describe the risks in hypothetical terms (¶¶196, 198), they admitted that some of the risks had already begun to materialize. Specifically, Nightingale discussed how Fastly's Key Customers had put more pricing pressure on Fastly without bringing in a commensurate traffic increase, which had an "outsized impact" on Fastly's revenue. ¶¶172, 174, 176, 180-81. Kisling also admitted that Defendants knew about the impacts as early as March 2024. ¶179.[14] Further, Nightingale admitted that he was always tracking the top deals of the quarter, which necessarily would include any contract negotiations involving Key Customers, and it defies logic that as he was tracking Key Customers' contract negotiations, he was unaware of how much traffic these customers were bringing into Fastly. ¶222. Nightingale also clearly spoke about revenues and usage from the top customers in the all-hands meeting (¶¶99-101), indicating he was aware of this issue and tracking it.

Defendants challenge this allegation as insufficiently particularized (Br. at 22), but the SAC quotes his exact statement, and identifies when he said it and in what context.[15] Defendants mistake this allegation as invoking a core operations theory (Br. at 22), but the SAC alleges Nightingale had scienter because he admittedly tracked top deals, which would have necessarily included Key Customers' deals (¶222), not that he must have known simply because of Key Customers' importance to Fastly's business. *See Sneed*, 147 F.4th at 1134 ("The core operations

---

[14] Thus, Defendants' suggestion that they only learned *after* Q1 2024 about these issues (Br. at 22) falls flat. This also undercuts their suggestion that Nightingale and Kisling "not expect[ing] multiple Key Customers to simultaneously throttle back their usage" (¶116) after the Q1 2024 financial results were released means they were not contemporaneously aware it was happening (Br. at 20).

[15] *Zucco Partners*, 552 F.3d at 1000-01 (9th Cir. 2009) (discussing "narrow exception" when falsity alone creates a strong inference of scienter) is distinguishable.

doctrine allows courts to infer that facts critical to a business' core operations or an important transaction are known to the company's key officers."). Regardless, the Court already concluded that the same omissions "carried a significant danger of misleading investors that was so obvious that the individual Defendants must have been aware of it." Order at 35.

Defendants also, again, attempt to undercut scienter by relying on isolated allegations related to Fastly's app tracking traffic, customer ops meetings, the typical timing of contract negotiations, and Fastly's elimination of DBNER and quarterly NRR. Br. at 21; ECF No. 55 at 21-23. The Court found scienter adequately alleged even without explicitly considering these allegations (Order at 34-38), and taken holistically, they contribute to a strong inference of scienter. *See* ¶¶214, 217-18, 233-39 (discussing Defendants' access to customer traffic data; weekly ops meetings with senior management, including Nightingale, about customer usage trends; CW allegations regarding stagnating growth in 2023 and 2024; and suspicious elimination of DBNER and quarterly NRR, metrics measuring revenue growth from existing customers).[16]

### 2. Nightingale's Plausible Motive to Defraud Supports His Scienter.

Motive is not required. *Tellabs*, 551 U.S. at 310. Further, the Court has already found a strong inference of fraudulent intent or deliberate recklessness. Order at 37.[17] Regardless, the SAC alleges Nightingale had a plausible motive based on his opportunity to receive significant performance-based restricted stock units ("PRSUs") if Fastly's share price hit certain targets. ¶241. On November 15, 2023, the same day Nightingale misled investors, he received 326,086 PRSUs, and the next day, he sold 233,270 shares (approximately 14% of his holdings) for roughly $3.79 million." *Id*. *See In re SeeBeyond Techs. Corp. Sec. Litig*., 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (selling 7.6% of holdings in "close proximity to false positive statements" supported

---

[16] Defendants also claim they disclosed in conference calls the relevant facts. Not so. They omitted material facts then provided misleading excuses instead of revealing the truth. *Supra* §II.A.2.

[17] Thus, Defendants' attempt to undercut scienter for lack of motive—repeating the arguments that the SAC does not support suspicious stock sales out of line with prior trading practices, the sales were nondiscretionary and made to cover taxes or pursuant to Rule 10b5-1 plan, and Defendants increased their holdings during the Class Period (Br. at 19; ECF No. 55 at 19-20)—falls flat. Their mischaracterization that Defendants disclosed on November 1, 2023 that Fastly was experiencing macroeconomic impacts, which relies on the same allegations in the prior complaint (*Compare* SAC ¶133, *with* ECF No. 53 ¶119) to argue their failure to capitalize on the alleged scheme undercuts scienter (Br. at 18-19), is improper (*supra* §III.A.) and unpersuasive for the same reason.

scienter, notwithstanding relatively small percentage of shares sold because proceeds were significant). Defendants' cases are distinguishable. *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F. 3d 869, 884 (9th Cir. 2012) (defendants motivated by the prospect of receiving "higher salaries, bonuses, and stock options" if the company performed well); *Metzler Inv. GMBH*, 540 F.3d at 1058, 1067 (evaluating whether stock sales, alone, were suspicious and supported scienter).

### D.    The SAC Adequately Alleges Loss Causation.

*First*, the Court previously held that Plaintiffs sufficiently alleged loss causation for Statement 2. Order at 40. The Court's holding that "the risks of the decline in usage and revenues from Fastly's large customers in Q4 2023," which Statement 2 concealed, materialized when "Fastly came in at the lower end of its revenue guidance for that quarter and missed analysts' consensus revenue estimates by 1.1%" (Order at 40) similarly applies to Statement 1, which concealed the same. *See also Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss.").

Defendants, nevertheless, ask the Court to reverse course (Br. at 23-24). However, none of their authority—which includes cases that were available to Defendants when they first moved to dismiss, cases the Court previously relied upon in *upholding this theory of loss causation*, and non-binding out-of-circuit authority—undercuts the Court's ruling. *See Dolly v. Gitlab Inc.*, 2025 WL 2372965, at *3, *15 (N.D. Cal. Aug. 14, 2025) (alleging announcement of lower than expected revenue growth was a corrective disclosure, not a materialization of the risk); *Reckstin Fam. Tr. v. C3.ai, Inc.*, 718 F. Supp. 3d 949, 962, 989-90 (N.D. Cal. 2024) (connection between company's disappointing salesforce performance and the allegedly concealed risk, which related specifically to the oil and gas segment, too attenuated because the disappointing performance was "not identified as flowing from the oil and gas segment specifically" and "analysts identified factors unrelated . . . in explaining" it); *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *9 (N.D. Cal. Mar. 26, 2015) (materialization of the risk adequately alleged); *In re UiPath, Inc. Sec. Litig.*, 2025 WL 2065093, at *17, *19-21 (S.D.N.Y. July 23, 2025) (Loss causation not

supported where broad statement that "investments . . . made to reaccelerate growth have fallen short of our expectations, and made us less agile in responding to customer needs" did not reveal "either explicitly or implicitly, and either considered alone or in conjunction with" disappointing financial results, the falsity of statements regarding investing in the sales team and customer success functions). Further, Defendants' apparent suggestion that Plaintiffs must allege an omission "was revealed on February 14, 2024" to support loss causation (Br. at 24) conflates this theory with the corrective disclosure theory and is belied by the Court's prior ruling.

*Second*, while the Court previously held that the complaint did not sufficiently plead loss causation with respect to Statements 5, 6, 7 and 8 because they related to the Company's performance in Q4 2023 and the alleged corrective disclosures on May 1, 2024 and August 7, 2024 related to the Company's performance in Q1 and Q2 2024 (Order at 42), the SAC cures that deficiency. The SAC includes additional corrective statements from May 1, 2024, which conceded that the pricing pressure trend that the Company experienced during Q1 2024 was a continuation of the pricing pressure that Company "[had] been seeing" *in Q4 2023*. ¶¶170-71.[18] Thus, it corrected Defendants' November and February misstatements *about Q4 2023* (Statements 1, 2, 3, 5, 6, 7, 8, and 9), which misleadingly denied that the Company was experiencing macro impacts on its business, stated customer retention was stable, blamed the revenue miss on weaker than anticipated international traffic, omitted that enterprise customers were decreasing traffic and revenue, and discussed as hypothetical risks of decreased traffic that had already materialized. ¶¶132, 134, 140, 146, 149, 154, 156, 158. Likewise, the SAC clarifies that the August 7, 2024 disclosure revealed the pricing pressure *during Q1 2024*, and corrected Defendants' May 1, 2024 misstatements (Statements 13 and 14) discussing as hypothetical risks of decreased traffic and revenue that had already materialized by then. ¶¶196, 198. The August 7, 2024 disclosure also revealed that the pricing pressure of Q1 2024 had continued into Q2 2024, contrary to Defendants' statements on May 1, 2024 about Fastly's likelihood of "beat[ing]" Fastly's "conservative" revenue projection and "revers[ing]" the declining revenue from Key Customers going forward.

---

[18] Thus, Defendants are wrong that the SAC does not identify what the "trend" was or when it started (Br. at 25). *See, e.g.*, ¶¶24, 28, 87, 90, 169-76 (discussing macro effects on Fastly's business in the form of pricing pressure and decreased usage and revenues).

¶¶186, 202-03. Thus, the SAC adequately alleges a corrective disclosure theory of loss causation.

Defendants argue these disclosures did not reveal anything new (Br. at 25), but they did not divulge the pricing pressure and Key Customers' declining traffic and revenues caused by macro forces until May 1, 2024. ¶170. The August 7, 2024 disclosure corrected Defendants' statements about reversing the declining traffic from Key Customers. ¶¶186, 200-03.

*Third,* the SAC also now alleges an alternative materialization of the risk theory for Statements 3, 5-9, and 13-14 based on the additional materializations of the previously undisclosed risk of declining customer usage, when the Company announced reduced revenue guidance on May 1, 2024 and August 7, 2024. *See Reckstin*, 718 F. Supp. 3d at 989 (permitting plaintiffs to "advance two theories of loss causation"); *Amgen*, 2014 WL 12585809, at *20 (rejecting plaintiff's corrective disclosure theory, but "this [did] not end the story" because a plaintiff "may also plead loss causation in other ways," and materialization of the risk was adequately pled).

Specifically, although the risks of the decline in usage and revenues from Fastly's Key Customers in Q4 2023 began to materialize with the February 2024 release of disappointing Q4 2023 financial results (Order at 40), Defendants continued to conceal and downplay the potential macro impacts on the Company's business. On February 14, 2024, Nightingale attributed the weaker than expected revenues in Q4 2023 to "weaker than anticipated international traffic" (Statement 5), omitting Key Customers' decreased usage and revenue, and misrepresented that macro impacts had not materially changed (Statement 6). ¶¶146, 148. On February 22, 2024, the Company's annual report also misleadingly described the risk of customer pullback in hypothetical terms (Statements 7-9) when the risk had already come to fruition at that time. ¶¶154-59. In addition, Defendants continued to downplay the potential macro impacts going forward, assuring investors that the Company's annual guidance "incorporate[d] macro uncertainties." ¶138.

However, the risks of macro impacts on Fastly's business (in the form of declining usage and revenue from Fastly's Key Customers) concealed by these positive statements continued to materialize on May 1, 2024, when Fastly was forced to reduce its revenue guidance. ¶169. Several analysts downgraded Fastly's stock based on the "[d]ecelerating growth in Fastly's largest customers." ¶¶182-84. Even then, Nightingale continued downplaying the macro risks, assuring

24                    OPPOSITION TO MOTION TO DISMISS

investors that the revised guidance was "relatively conservative." The Company's quarterly report filed on May 1, 2024 also misleadingly continued to describe the risk of customer pullback in hypothetical terms (Statements 13 and 14) when the risk had already come to fruition at that time. ¶¶196-99. These downplayed risks again materialized on August 7, 2024 when the Company released its disappointing Q2 2024 financial results and reduced the FY 2024 revenue guidance even further. ¶¶200-01. Thus, the SAC adequately alleges a materialization of the risk theory of loss causation. Because Defendants failed to challenge these additional materializations of the risk (Br. at 24-25), they waived the argument. *Burgoon v. Narconon of N. Cal.*, 125 F. Supp. 3d 974, 991 (N.D. Cal. 2015) ("waiv[ing]" argument they could have raised "in their opening brief but failed to do so").

### E.    The SAC Adequately Alleges Control Person Claims.

Defendants' sole challenge to control person liability on the first motion to dismiss was the failure to allege a primary 10(b) violation, which again falls flat. They now also improperly challenge the adequacy of the control person allegations. *Supra* §III.A. Regardless, "[t]his inquiry is normally an intensely factual question." *Zucco Partners*, 552 F.3d at 990; *See also Peters v. Twist Bioscience Corp.*, 2025 WL 2532671, at *19 (N.D. Cal. Sep. 3, 2025) ("Given the fact-intensive nature of the control person analysis . . . it would be premature for the Court to dismiss the Section 20(a) . . . claim[]."). Defendants' cherry-picking of one summary allegation (Br. at 25) ignores the host of other allegations supporting Nightingale's and Kisling's control person status. *E.g.*, ¶¶52-53, 55, 132, 142, 153, 192. *See also Hemmer Grp. v. SW. Water Co.*, 527 F. App'x 623, 627 (9th Cir. 2013) (control person status adequately alleged where defendants signed the registration statements in which false statements appeared); *SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 742 F. Supp. 3d 1003, 1018, 1024 (N.D. Cal. 2024) (control person status adequately alleged with role at the Company and involvement in the aspect of the business at issue).

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion in its entirety.

Dated: January 26, 2026                          Respectfully submitted,

POMERANTZ LLP

*/s/ Murielle J. Steven Walsh*
Murielle J. Steven Walsh (*pro hac vice*)
Emily C. Finestone (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
mjsteven@pomlaw.com
efinestone@pomlaw.com

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

THE SCHALL FIRM
Brian Schall
2049 Century Park East, Ste. 2460
Los Angeles, CA 90067
Telephone: 310-301-3335
brian@schallfirm.com

*Co-Lead Counsel for Plaintiffs*

OPPOSITION TO MOTION TO DISMISS